# EXHIBIT

## "A"

EXECUTION COPY

# AGREEMENT AND PLAN OF MERGER

among

LIVEPERSON, INC.,

SOHO ACQUISITION CORP.,

PROFICIENT SYSTEMS, INC.,

and

GREGG FREISHTAT, AS SHAREHOLDERS' REPRESENTATIVE

Dated as of June 22, 2006

TABLE OF CONTENTS

Page

I. DEFINITIONS ............................................................................................ 2
   SECTION 1.01. Certain Defined Terms ........................................... 2
   SECTION 1.02. Construction ............................................................. 11

II. THE MERGER; CONVERSION OF SECURITIES .............................. 12
   SECTION 2.01. The Merger; Effective Time of the Merger ........... 12
   SECTION 2.02. Closing .................................................................... 12
   SECTION 2.03. Effect of the Merger; Articles of Incorporation; Bylaws;
      Directors and Officers of Surviving Corporation ..................... 12
   SECTION 2.04. Merger Consideration; Conversion of Company Preferred Stock
      and Cancellation of Company Common Stock ........................ 13
   SECTION 2.05. Exchange Procedures ............................................ 18
   SECTION 2.06. Dissenters Rights ................................................... 19
   SECTION 2.07. Fractional Shares .................................................... 19
   SECTION 2.08. Lost, Stolen or Destroyed Certificates ................. 19
   SECTION 2.09. Withholding Rights .................................................. 20
   SECTION 2.10. Stock Transfer Books ............................................. 20
   SECTION 2.11. Certain Adjustments ............................................... 20
   SECTION 2.12. Indemnity Escrow Fund .......................................... 20
   SECTION 2.13. Balance Sheet Escrow Fund .................................. 21
   SECTION 2.14. Other Provisions Relating to Parent Common Stock . 23
   SECTION 2.15. Shareholders' Representative ................................ 23

III. REPRESENTATIONS AND WARRANTIES AS TO THE COMPANY .... 24
   SECTION 3.01. Organization and Qualification; Subsidiaries ........ 24
   SECTION 3.02. Articles of Incorporation and Bylaws .................... 25
   SECTION 3.03. Capitalization ........................................................... 25
   SECTION 3.04. Authority Relative to this Agreement ..................... 25
   SECTION 3.05. No Conflicts; Required Filings and Consents ........ 26
   SECTION 3.06. Permits; Compliance with Laws ............................. 27
   SECTION 3.07. Financial Statements .............................................. 27
   SECTION 3.08. Absence of Certain Changes or Events ............... 28
   SECTION 3.09. Employee Matters ................................................... 28
   SECTION 3.10. Contracts .................................................................. 33
   SECTION 3.11. Litigation .................................................................. 34
   SECTION 3.12. Environmental Matters ............................................ 34
   SECTION 3.13. Intellectual Property ................................................ 34
   SECTION 3.14. Taxes ....................................................................... 38
   SECTION 3.15. Insurance ................................................................. 39
   SECTION 3.16. Properties ................................................................ 40
   SECTION 3.17. Affiliates ................................................................... 40
   SECTION 3.18. Brokers ..................................................................... 41
   SECTION 3.19. Certain Business Practices ..................................... 41

SECTION 3.20. Accounts Receivable........................................................41
SECTION 3.21. Customers and Suppliers...................................................41
SECTION 3.22. Grants, Incentives and Subsidies.........................................41
SECTION 3.23. Bank Accounts...............................................................41
SECTION 3.24. Books and Records...........................................................41
SECTION 3.25. The Worker Adjustment and Retraining Act................................41
SECTION 3.26. Representations Complete....................................................42

IV. [INTENTIONALLY OMITTED]....................................................................42

V. REPRESENTATIONS AND WARRANTIES OF PARENT....................................42
SECTION 5.01. Organization and Qualification; Subsidiaries.............................42
SECTION 5.02. Capitalization.................................................................42
SECTION 5.03. Authority Relative to this Agreement......................................43
SECTION 5.04. No Conflict; Required Filings and Consents..............................43
SECTION 5.05. SEC Filings; Financial Statements.........................................43
SECTION 5.06. Absence of Certain Changes or Events....................................44
SECTION 5.07. Brokers.........................................................................44
SECTION 5.08. Certain Tax Representations and Warranties..............................44
SECTION 5.09. Representations Complete....................................................45

VI. COVENANTS...................................................................................45
SECTION 6.01. Conduct of Business by the Company Pending the Closing................45
SECTION 6.02. Notices of Certain Events...................................................47
SECTION 6.03. Access to Information; Confidentiality.....................................47
SECTION 6.04. No Solicitation of Transactions.............................................48
SECTION 6.05. Further Action; Consents; Filings..........................................48
SECTION 6.06. Certain Tax Matters..........................................................49
SECTION 6.07. Public Announcements........................................................51
SECTION 6.08. Trading Restriction Agreement Legend.....................................51
SECTION 6.09. Certain Covenants of Parent................................................51
SECTION 6.10. Certain Covenants of Company.............................................51

VII. STOCK MATTERS.............................................................................51
SECTION 7.01. Required Registration........................................................51
SECTION 7.02. Registration Procedures.....................................................52
SECTION 7.03. Transfer of Shares...........................................................55
SECTION 7.04. Restricted Securities; Stock Certificate Legend..........................56
SECTION 7.05. Reservation of Stock; Certain Adjustments...............................56
SECTION 7.06. No Shareholder Rights........................................................57
SECTION 7.07. Compliance with Law or Stock Exchange.................................57
SECTION 7.08. Limitation on Resale.........................................................57

VIII. CONDITIONS PRECEDENT....................................................................57
SECTION 8.01. Conditions Precedent to the Obligations of Each Party...................57
SECTION 8.02. Conditions Precedent to the Obligation of the Parent....................57

SECTION 8.03. Conditions Precedent to the Obligations of the Company and the
    Shareholders .................................................................... 60

IX. INDEMNIFICATION ................................................................ 60
    SECTION 9.01. Survival of Representations and Warranties ............... 60
    SECTION 9.02. Tax Indemnity ........................................... 61
    SECTION 9.03. General Indemnity ....................................... 61
    SECTION 9.04. Conditions of Indemnification ........................... 62
    SECTION 9.05. Threshold for Damages ................................... 63
    SECTION 9.06. Escrow Funds ............................................ 63
    SECTION 9.07. Escrow Period ........................................... 64
    SECTION 9.08. Claims upon Escrow ...................................... 64
    SECTION 9.09. Objections to Claims .................................... 64
    SECTION 9.10. Resolution of Conflicts; Arbitration ................... 64

X. TERMINATION AND ABANDONMENT ..................................... 65
    SECTION 10.01. Termination ............................................ 65
    SECTION 10.02. Procedure and Effect of Termination ................... 66

XI. MISCELLANEOUS .................................................................. 66
    SECTION 11.01. Expenses, Etc. ........................................ 66
    SECTION 11.02. Notices ............................................... 67
    SECTION 11.03. Waivers ............................................... 67
    SECTION 11.04. Amendments, Supplements, Etc. ........................ 68
    SECTION 11.05. Governing Law; Submission to Jurisdiction ............ 68
    SECTION 11.06. Waiver of Jury Trial .................................. 68
    SECTION 11.07. Headings; Interpretation .............................. 68
    SECTION 11.08. Counterparts .......................................... 69
    SECTION 11.09. Entire Agreement ...................................... 69
    SECTION 11.10. Binding Effect; Benefits .............................. 69
    SECTION 11.11. Assignability ......................................... 69
    SECTION 11.12. Severability .......................................... 69

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Escrow Agreement |
| Exhibit B | Form of Opinion of Counsel to the Company |
| Exhibit C | Form of Trading Restriction Agreement |
| Exhibit D | Form of UK Minority Shareholder Consent and Waiver |
| Exhibit E | Form of UK Exchange Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule I | List of Shareholders, Including Address and Number of Shares Owned |
| Schedule II | Contractual Severance Waiver Employees |
| Schedule III | Significant Shareholders |

## ANNEXES

| | |
|---|---|
| Annex I | Company Existing Customers |
| Annex II | Company Pipeline Customers |
| Annex III | Company Business Development Customers |

# AGREEMENT AND PLAN OF MERGER

**AGREEMENT AND PLAN OF MERGER**, dated as of June 22, 2006 (the "*Agreement*"), among LIVEPERSON, INC., a Delaware corporation ("*Parent*"); SOHO ACQUISITION CORP., a Georgia corporation and a wholly-owned subsidiary of Parent ("*Merger Sub*"); PROFICIENT SYSTEMS, INC., a Georgia corporation (the "*Company*"); and GREGG PREISHTAT (the "*Shareholders' Representative*") as agent and attorney-in-fact for each shareholder of the Company, a complete list of whom is listed in Schedule I hereto (individually, a "*Shareholder*" and collectively, the "*Shareholders*").

## RECITALS

**WHEREAS**, the boards of directors of each of Parent, the Company and Merger Sub believe it is advisable, fair to and in the best interests of their respective corporations and their stockholders that the Company and Merger Sub combine into a single corporation through the statutory merger of Merger Sub with and into the Company (the "*Merger*") and, in furtherance thereof, have approved the Merger, this Agreement and the transactions contemplated hereby and the board of directors of the Company has determined to recommend that its shareholders adopt this agreement;

**WHEREAS**, pursuant to the Merger, the Company Preferred Stock (as defined below) shall be converted into the right to receive cash and/or Parent Common Stock (as defined below) in the amounts, on the terms and subject to the conditions set forth herein;

**WHEREAS**, Parent, Merger Sub, the Company and the Shareholders' Representative desire to make certain representations and warranties and other agreements in connection with the Merger;

**WHEREAS**, as a condition and inducement to Parent and Merger Sub entering into this Agreement, each Contractual Severance Waiver Employee (as identified on Schedule II hereto), concurrently with the execution and delivery of this Agreement, shall sign an agreement, contingent upon the Closing, by which such employee agrees to unconditionally waive any rights to severance payments he or she may have pursuant to employment arrangements with the Company; and

**WHEREAS**, as a condition and inducement to Parent and Merger Sub entering into this Agreement, certain shareholders of the Company listed on Schedule III hereto (the "*Significant Shareholders*"), concurrently with the execution and delivery of this Agreement, are entering into trading restriction agreements in favor of Parent in the form of Exhibit C hereto (the "*Trading Restriction Agreement*"), dated as of the date of this Agreement;

**NOW, THEREFORE**, in consideration of the premises, covenants and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

# I.

# DEFINITIONS

SECTION 1.01.  *Certain Defined Terms*  Unless the context otherwise requires, the following terms, when used in this Agreement, shall have the respective meanings specified below (such meanings to be equally applicable to the singular and plural forms of the terms defined):

"*Accounting Referee*" has the meaning set forth in Section 2.04(b).

"*Accredited Holders*" means Shareholders who are Accredited Investors.

"*Accredited Investor*" has the meaning set forth in Rule 501(a) promulgated under the Securities Act.

"*Affiliate*" means, with respect to any Person, any other Person that controls, is controlled by or is under common control with the first Person.

"*Aggregate Merger Consideration*" has the meaning set forth in Section 2.04(a).

"*Agreement*" has the meaning set forth in the preamble hereto.

"*Assets*" means all the properties, assets and contract rights (including, without limitation, cash, cash equivalents, accounts receivable, inventory, equipment, office furniture and furnishings, trade names, trademarks and patents, contracts, agreements, licenses and real estate) of the Company, whether tangible or intangible, real, personal or mixed.

"*Balance Sheet Escrow Fund*" has the meaning set forth in Section 2.13.

"*Balance Sheet Certificate*" has the meaning set forth in Section 2.13(b).

"*Benefit Plan*" means any "employee benefit plan" as defined in ERISA Section 3(3), whether or not subject to ERISA, and any other employment, consulting, severance, change in control, salary continuation, bonus, incentive, savings, insurance, retention, retirement, deferred compensation, vacation, sick leave, sick pay, health, medical, vision, disability, life, welfare benefit, stock purchase, stock option, equity, fringe benefit or other compensatory plans, policies, agreements or arrangements (whether written or unwritten, insured or self-insured, or domestic or foreign) sponsored, maintained or contributed to by the Company or any Company Subsidiary on behalf of any employee, officer, director, shareholder or service provider of the Company or any Company Subsidiary (whether current, former or retired) or their beneficiaries or with respect to which the Company or any Company Subsidiary has or could reasonably be expected to have any obligation or liability.

"*Blocked Period*" has the meaning set forth in Section 7.02(c).

"*Business*" has the meaning set forth in Section 3.01(n).

"*Business Day*" means a day other than a Saturday, Sunday or other day on which banks located in New York, New York are authorized or required by law to close.

"*Cash and Cash Equivalents*" means the amount of cash and cash equivalents, as reported on the Company's financial statements.

"*Cash and Cash Equivalents Shortfall*" has the meaning set forth in Section 2.13(a).

"*Cash Equivalent Amount*" means the number of shares of Parent Common Stock that would have been received by such Shareholder, multiplied by the Closing Price.

"*Certificate of Merger*" has the meaning set forth in Section 2.01.

"*Certificates*" has the meaning set forth in Section 2.05.

"*Closing*" has the meaning set forth in Section 2.02.

"*Closing Date*" has the meaning set forth in Section 2.02.

"*Closing Price*" has the meaning set forth in Section 2.07.

"*Code*" means the United States Internal Revenue Code of 1986, as amended to the date of this Agreement.

"*Company*" has the meaning set forth in the preamble hereto.

"*Company Business Development Customers*" means those prospective customers of the Company listed on Annex III hereto, who enter into agreements with Parent by or through business development partners of the Company, if such customers become actual clients of Parent on or before January 1, 2007, provided, however, that companies that are, as of the date of this Agreement or as of the Closing Date, existing customers of Parent or pipeline customers of Parent shall not be included as Company Business Development Customers, and provided, further, that if the prospective customer of the Company enters into an agreement with Parent other than through the efforts of the business development partner, then such customer will not be deemed to be a Company Business Development Customer.

"*Company Common Stock*" has the meaning set forth in Section 3.03.

"*Company Disclosure Schedule*" means the disclosure schedule delivered by the Company to the Parent prior to the execution of this Agreement and forming a part hereof.

"*Company Existing Customers*" means those current customers of the Company listed on Annex I hereto, assuming that, in March 2007, such customers (i) have a contract with Parent, Company or any of their respective Affiliates, and such contract has, or had from inception, a term of one year or more, or (ii) have been a customer of Parent, the Company or any of their respective Affiliates for a period of at least one year prior to April 1, 2007, or (iii) were customers of the Company as of the Closing, but the contract was terminated by the

customer following such date due to a breach of their contract by Parent or Company following the Closing.

"*Company Financial Statements*" has the meaning set forth in Section 3.07(a).

"*Company Intellectual Property*" means all Intellectual Property owned by either the Company or the Company Subsidiary or used or held for use in connection with the Business.

"*Company Licensed Intellectual Property*" has the meaning set forth in Section 3.13(b).

"*Company Material Adverse Effect*" means any change in or effect on (i) the business of the Company that, individually or in the aggregate (taking into account all other such changes or effects), is, or is reasonably likely to be, materially adverse to the business, assets, liabilities, financial condition or results of operations of the Company, or (ii) the ability of the Company to perform its obligations under this Agreement and any other Transaction Document to which it is a party or to consummate the Merger or the other transactions contemplated by this Agreement or any other Transaction Document to which it is a party.

"*Company Options*" has the meaning set forth in Section 2.04(f).

"*Company Option Plans*" means the Proficient Systems, Inc. Stock Option Plan, the Proficient Systems, Inc. Management Stock Incentive Plan and the Proficient Systems, Inc. Nonemployee Director Stock Option Plan, each as in effect as of the date hereof.

"*Company Permits*" has the meaning set forth in Section 3.06.

"*Company Pipeline Customers*" means those prospective customers of the Company listed on Annex II hereto, if such customers become actual clients of Parent on or before January 1, 2007.

"*Company Preferred Stock*" has the meaning set forth in Section 3.03.

"*Company Software Programs*" has the meaning set forth in Section 3.13(g).

"*Company Subsidiary*" and "*Company Subsidiaries*" have the meaning set forth in Section 3.01(b).

"*Company Warrants*" has the meaning set forth in Section 2.04(g).

"*Company's Third Amended and Restated Articles of Incorporation*" means the articles of incorporation of the Company, as in effect at the time of the Closing.

"*Competing Transaction*" means any of the following involving the Company (other than the transactions contemplated by this Agreement):

(i)    any merger, consolidation, share exchange, business combination or other similar transaction;

(ii)    any sale, lease, exchange, mortgage, pledge, transfer or other disposition of 20% or more of the Assets of the Company and its Subsidiaries, taken as a whole, in a single transaction or series of transactions;

(iii)    any Person having acquired beneficial ownership or the right to acquire beneficial ownership of, or any "group" (as such term is defined under Section 13(d) of the Exchange Act) having been formed that beneficially owns or has the right to acquire beneficial ownership of, 20% or more of the outstanding voting securities of the Company; or

(iv)    any public announcement of a proposal, plan or intention to do any of the foregoing or any agreement to engage in any of the foregoing.

"*Confidentiality Agreement*" means the confidentiality agreement dated May 2, 2006 between the Parent and the Company.

"*Contracts*" means, with respect to any Person, all agreements, undertakings, contracts, obligations, arrangements, promises, understandings and commitments (whether written or oral and whether express or implied) to which such Person is a party.

"*Contractual Severance Waiver Employee*" means those employees of the Company listed on Schedule II hereto.

"*Damages*" has the meaning set forth in Section 9.03.

"*Defaulting Party*" has the meaning set forth in Section 10.01(b).

"*Dissenting Shares*" has the meaning set forth in Section 2.06.

"*$*" means United States Dollars.

"*Earn-Out Closing*" has the meaning set forth in Section 2.04(b).

"*Earn-Out Dispute Notice*" has the meaning set forth in Section 2.04(b).

"*Earn-Out Merger Consideration*" has the meaning set forth in Section 2.04(a).

"*Earn-Out Notice*" has the meaning set forth in Section 2.04(b).

"*Earn-Out Payment*" has the meaning set forth in Section 2.04(b).

"*Earn-Out Payment Date*" has the meaning set forth in Section 2.04(b).

"*Effective Time*" has the meaning set forth in Section 2.01.

"*Environmental Law*" means any Law and any enforceable judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to pollution or protection of the environment or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Material, as in effect as of the date hereof.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under or issued pursuant to any applicable Environmental Law.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" means JPMorgan Chase Bank, N.A.

"*Escrow Agreement*" means the Escrow Agreement in the form attached hereto as Exhibit A to be entered into as of the Closing among the Parent, the Shareholders and the Escrow Agent.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

"*Excluded License*" has the meaning set forth in Section 3.13(a).

"*Expenses*" means, with respect to any party hereto, all out-of-pocket expenses (including, without limitation, all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its Affiliates) incurred by such party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of its obligations pursuant to this Agreement and the consummation of the transactions contemplated by this Agreement, and all other matters related to the transactions contemplated hereby.

"*Foreign Benefit Plan*" has the meaning set forth in Section 3.09(s).

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect as of the date hereof, and as consistently applied by Parent or the Company, as appropriate in the circumstances.

"*GBCC*" has the meaning set forth in Section 2.01.

"*Governmental Entity*" means any United States Federal, state or local or any foreign governmental, regulatory or administrative authority, agency or commission or any court, tribunal or arbitral body.

"*Governmental Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity.

"*Grants*" has the meaning set forth in Section 3.22.

"*Hazardous Material*" means (i) any petroleum, petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials or polychlorinated biphenyls or (ii) any chemical, material or substance defined or regulated as toxic or hazardous or as a pollutant or contaminant or waste under any applicable Environmental Law.

"*Indemnity Escrow Fund*" has the meaning set forth in Section 2.12.

"*Indemnity Escrow Period*" has the meaning set forth in Section 9.07.

"*Initial Merger Consideration*" has the meaning set forth in Section 2.04(a).

"*Intellectual Property*" means any of the following, anywhere in the world: (a) trade secrets, inventions, know-how and processes, (b) patents (including all reissues, divisions, continuations and extensions thereof) and patent applications, utility models and design rights (c) trademarks, trademark registrations, trademark applications, service marks, service mark registrations and service mark applications, (d) copyright registrations and copyright applications, and (e) Internet domain names applications and reservations therefor, uniform resource locators and the corresponding Internet sites; (f) proprietary information not otherwise listed in (a) through (e) above, including, without limitation, moral and economic rights of authors and inventors (however denominated), confidential information, technical data, statistical models, customer lists, corporate and business names, trade names, trade dress, brand names, logos, know-how, show-how, formulae, methods (whether or not patentable), invention disclosures, designs, processes, procedures, technology, source codes, object codes, computer software programs, databases, data collections and other proprietary information or material of any type, and all derivatives, improvements and refinements thereof, howsoever recorded, or unrecorded; (g) any good will associated with any of the foregoing; (h) all copies and tangible embodiments thereof (in whatever form or medium), and registrations, applications and renewals for any of the foregoing assets listed above; and (i) all other tangible or intangible proprietary information or materials that are material to the Company's Business or are currently used in the Company's Business in any product, technology or process (1) currently being or formerly manufactured, published or marketed by the Company or (2) previously or currently under development for possible future manufacturing, publication, marketing or other use by the Company.

"*IRS*" means the United States Internal Revenue Service.

"*June 30, 2006 Balance Sheet*" has the meaning set forth in Section 2.13(b).

"*Knowledge*" and words of similar import mean, with respect to the Company, the actual knowledge, after due inquiry, of Gregg Freishtat, Neal McElwen, Stephen Hulford and Jackson Wilson, and, with respect to Parent, the actual knowledge, after due inquiry, of Robert LoCascio and Timothy Bixby.

"*Law*" means any Federal, state, foreign or local statute, law, ordinance, regulation, rule, code, order, judgment, decree, other requirement or rule of law of the United States or any other jurisdiction, and any other similar act or law.

"*Liability*" means any and all claims, debts, liabilities, obligations and commitments of whatever nature, whether asserted or reasonably expected to be asserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due, and whenever or however arising (including those arising out of any Contract or tort, whether based on negligence, strict liability or otherwise) regardless of whether the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"*License Agreement*" has the meaning set forth in Section 3.13(b).

"*Lien*" means any charge, claim, community property interest, condition, easement, covenant, contract, commitment, warrant, demand, encumbrance, equitable interest, lien, mortgage, option, purchase right, pledge, security interest, right of first refusal, or other rights of third parties or restriction of any kind, including without limitation any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"*Liquidation Preference*" means the amount that a holder of a share of capital stock of the Company would be entitled to receive upon liquidation, dissolution or winding up under Article IV, Section 2 of the Company's Third Amended and Restated Articles of Incorporation.

"*Material Contract*" and "*Material Contracts*" have the meaning set forth in Section 3.10.

"*Merger*" has the meaning set forth in Section 2.01.

"*Merger Sub*" has the meaning set forth in the preamble hereto.

"*Net Annualized Revenue*" shall equal 12 times the Normalized March 2007 Revenue.

"*Net Assets*" means total assets minus total liabilities, as calculated under GAAP and calculated in accordance with past practice.

"*Net Assets Shortfall*" has the meaning set forth in Section 2.13(a).

"*Non-Accredited Shareholders*" means those Shareholders that are not Accredited Holders.

"*Non-Accredited Shareholders' Consideration*" has the meaning set forth in Section 2.04(d).

"*Normalized March 2007 Revenue*" means Normalized Monthly Revenue for March 2007.

"*Normalized Monthly Revenue*" for any given month means (A) the monthly recurring revenue which Parent books as revenue in that month, according to GAAP, generated from Company Existing Customers, Company Business Development Customers and Company

Pipeline Customers (which explicitly excludes (X) any one-time or non-recurring revenues such as testing or training fees and (Y) any revenue booked by Parent from Company Existing Customers, Company Business Development Customers or Company Pipeline Customers that have indicated to Parent in writing that they intend to cancel their contract and (Z) any revenue recognized by Parent in connection with the provision of professional services (unless such professional services fees are ongoing rather than one-time in nature)), plus (B) one-half of the monthly recurring revenue which Parent books as revenue in that month, according to GAAP, generated by Company Business Development Customers or Company Pipeline Customers that are on a 90-day paid trial contract, plus (C) the monthly recurring revenue which Parent books as revenue in that month, according to GAAP, generated from the customer, if any, of Parent that is listed on Annex II next to the phrase "(the least of any of the four)" that generates the least amount of revenue for Parent in that month, plus (D) the most recent full month's revenue of any Company Existing Customer that terminated their contract following the Closing due to a material breach of their contract and where such contract termination was specifically due to such breach.

*"Officer's Certificate"* has the meaning set forth in Section 9.08.

*"Organizational Documents"* has the meaning set forth in Section 3.02.

*"Parent"* has the meaning set forth in the preamble hereto.

*"Parent Common Stock"* has the meaning set forth in Section 2.04(a).

*"Parent Indemnified Group"* has the meaning set forth in Section 9.02(a).

*"Parent Material Adverse Effect"* means any change in or effect on the business of the Parent that, individually or in the aggregate (taking into account all other such changes or effects), is, or is reasonably likely to be, materially adverse to (i) the business, assets, liabilities, financial condition or results of operations of the Parent, or (ii) the ability of the Parent to perform its obligations under this Agreement and any other Transaction Document to which it is a party or to consummate the Merger or the other transactions contemplated by this Agreement or any other Transaction Document to which it is a party.

*"Parent SEC Documents"* has the meaning set forth in Section 5.05(a).

*"Parent Subsidiaries"* has the meaning set forth in Section 5.01

*"Person"* means an individual, corporation, partnership, private company, limited partnership, limited liability company, limited liability partnership, syndicate, person (including, without limitation, a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association, entity or government or political subdivision, agency or instrumentality of a government.

*"Record Date"* has the meaning set forth in Section 2.10.

*"Representatives"* has the meaning set forth in Section 6.03.

*"Re-Sale Registration Statement"* has the meaning set forth in Section 7.01.

*"Review Period"* has the meaning set forth in Section 2.04(b).

*"Rule 144"* has the meaning set forth in Section 7.01.

*"Securities Act"* means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

*"SEC"* means the Securities and Exchange Commission.

*"Senior Secured Promissory Notes"* means the Company's Senior Secured Promissory Notes, dated December 30, 2005 and February 3, 2006, in the aggregate principal amount of $2,500,000.

*"Senior Secured Promissory Notes Repayment Amount"* means the number of shares of Parent Common Stock (valued at the Closing Price) equal to the aggregate principal and accrued interest (determined as of August 31, 2006) under the Company's Senior Secured Promissory Notes, in the aggregate principal amount of $2,500,000.

*"Senior Unsecured Promissory Notes"* means the Company's outstanding Senior Unsecured Promissory Notes, to be issued following the date of this Agreement and prior to the Closing Date, in an aggregate principal amount not to exceed $500,000.

*"Senior Unsecured Promissory Notes Repayment Amount"* means an amount not to exceed $600,000.

*"Shareholder"* and *"Shareholders"* have the meaning set forth in the preamble hereto.

*"Shareholders' Representative"* has the meaning set forth in the preamble hereto and in Section 2.15(a).

*"Shareholders' Representative Certificate"* has the meaning set forth in Section 2.05.

*"Shares"* has the meaning set forth in Section 7.01.

*"Significant Shareholders"* has the meaning set forth in the preamble hereto.

*"Subsidiary"* means, with respect to any Person, any corporation, private company, partnership, limited partnership, limited liability company, limited liability partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other subsidiary of such Person) owns, directly or indirectly, a majority of the stock or other equity interests.

*"Supporting Documentation"* has the meaning set forth in Section 2.04(b).

*"Surviving Corporation"* has the meaning set forth in Section 2.03.

*"Suspension Event"* has the meaning set forth in Section 7.02(d).

*"Tax"* or *"Taxes"* means (i) any and all taxes, fees, levies, duties, tariffs, imposts and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Entity or taxing authority, including, without limitation, taxes or other charges on or with respect to income, franchise, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value-added or gains taxes; license, registration and documentation fees; and customs duties, tariffs and similar charges; and any obligation to report or pay other unclaimed or abandoned funds or property; (ii) any liability for the payment of any amounts of the type described in (i) as a result of being a member of an affiliated, combined, consolidated or unitary group for any taxable period; and (iii) any liability for the payment of amounts of the type described in (i) or (ii) as a result of being a transferee of, or a successor in interest to, any Person or as a result of an express or implied obligation to indemnify any Person.

*"Tax Return"* means any return, statement or form (including, without limitation, any estimated tax reports or return, withholding tax reports or return and information report or return) required to be filed with respect to any Taxes.

*"Terminating Company Breach"* has the meaning set forth in Section 10.01(c).

*"Terminating Parent Breach"* has the meaning set forth in Section 10.01(d).

*"Threshold Amount"* has the meaning set forth in Section 9.05.

*"Trading Restriction Agreement"* has the meaning set forth in the preamble hereto.

*"Transaction Documents"* means, collectively, this Agreement, the Escrow Agreement, the Trading Restriction Agreements, the UK Minority Shareholder Consent and Waiver and the UK Exchange Agreement.

*"UK Minority Shareholders"* means Abraham Smith and Jack Blockley.

*"Underpayment Amount"* has the meaning set forth in Section 2.04(b).

SECTION 1.02. *Construction.* For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (a) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders; (b) references herein to "Articles," "Sections," "subsections" and other subdivisions, and to Exhibits, Schedules, Annexes and other attachments, without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of, and Exhibits, Schedules, Annexes and other attachments to, this Agreement; (c) a reference to a subsection or other subdivision without further reference to a Section is a reference to such subsection or subdivision as contained in the same Section in which the reference appears; (d) the words "herein", "hereof", "hereunder",

"hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (e) the words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation"; and (f) all accounting terms used and not defined herein have the respective meanings given to them under GAAP.

II.

THE MERGER; CONVERSION OF SECURITIES

SECTION 2.01.  *The Merger; Effective Time of the Merger.*  Subject to the provisions of this Agreement, Merger Sub will be merged with and into Company (the "*Merger*").  At the Closing (defined below), the Company and Merger Sub will cause a Certificate of Merger (the "*Certificate of Merger*") to be completed, executed, acknowledged and filed with the Secretary of State of the State of Georgia as provided in Section 14-2-1105(b) and Section 14-2-1105.1 of the Georgia Business Corporation Code, as amended (the "*GBCC*"). The Merger shall be effective at the time when the Certificate of Merger has been duly filed with the Secretary of State of the State of Georgia or such other time as shall be agreed upon by the parties hereto in writing and set forth in the Certificate of Merger in accordance with the GBCC (the "*Effective Time*").  Solely for purposes of clarification, Company and the Shareholders' Representative acknowledge and agree that Parent will have no obligation to make any payment pursuant to this Agreement until the Merger has been confirmed in writing by the Secretary of State of the State of Georgia.

SECTION 2.02.  *Closing.*  The closing of the Merger (the "*Closing*") shall take place as soon as practicable but no later than the third Business Day after satisfaction or waiver of the conditions set forth in Article VIII (the "*Closing Date*"), at the offices of Kilpatrick Stockton LLP, 100 Peachtree Street, NE, Atlanta, Georgia 30309, unless another date or place is agreed to in writing by the parties hereto.

SECTION 2.03.  *Effect of the Merger; Articles of Incorporation; Bylaws; Directors and Officers of Surviving Corporation.*  At the Effective Time, (i) the separate existence of Merger Sub shall cease and Merger Sub shall be merged with and into Company and Company shall continue as the surviving corporation and as a wholly owned subsidiary of Parent (subsequent to the Merger, Company is sometimes referred to herein as the "*Surviving Corporation*"), (ii) the Articles of Incorporation and the Bylaws of Merger Sub as in effect immediately prior to the Effective Time shall be the Articles of Incorporation and the Bylaws of the Surviving Corporation, until thereafter amended as provided by Law and such Articles of Incorporation or Bylaws; provided, however, that Article I of the Articles of Incorporation of the Surviving Corporation shall be amended to read as follows: "The name of the corporation is Proficient Systems, Inc. (the "Corporation")."; (iii) the directors and officers of Merger Sub immediately prior to the Effective Time shall be the directors and officers of the Surviving Corporation in each case until their respective successors shall have been duly elected, designated, or qualified or until their earlier death, resignation, or removal in accordance with the Surviving Corporation's Articles of Incorporation and Bylaws, and (iv) the Merger shall, from and after the Effective Time, have all the effects provided by the GBCC.

SECTION 2.04.  *Merger Consideration; Conversion of Company Preferred Stock and Cancellation of Company Common Stock.*

(a).     Merger Consideration.  Subject to adjustment as set forth in Section 2.13(f) below, the aggregate consideration to be paid by Parent and Merger Sub hereunder shall consist of (A) (i) that number of shares of Common Stock, par value $0.01 per share, of Parent ("*Parent Common Stock*") to be issued at the Closing, equal to 1,500,000 shares minus (ii) a number of shares of Parent Common Stock equal to the Senior Secured Promissory Notes Repayment Amount divided by the Closing Price, minus (iii) a number of shares of Parent Common Stock equal to the Senior Unsecured Promissory Note Repayment Amount divided by the Closing Price, minus (iv) that number of shares of Parent Common Stock that constitutes the Balance Sheet Escrow Fund (as defined below), and minus (v) that number of shares of Parent Common Stock equal to the Non-Accredited Shareholders' Consideration (as defined below) divided by the Closing Price ((i), (ii), (iii), (iv) and (v) are collectively referred to herein as the "*Initial Merger Consideration*"), and (B) up to 2,050,000 shares of Parent Common Stock to be paid at the Earn-Out Closing (as defined below) in accordance with the provisions of Section 2.04(b) below (the "*Earn-Out Merger Consideration*"), (C) 500,000 shares of Parent Common Stock which shall be deposited at the Closing into the Indemnity Escrow Fund (as defined and more fully described in Section 2.12 below) and (D) the Non-Accredited Shareholders' Consideration. The Initial Merger Consideration, the Earn-Out Merger Consideration, the shares held in the Indemnity Escrow Fund, the Non-Accredited Shareholders' Consideration (as defined below) and any adjustment to the Initial Merger Consideration necessitated by Section 2.13 (the Balance Sheet adjustment) shall collectively be referred to as the "*Aggregate Merger Consideration*". Each share of Company Preferred Stock and Company Common Stock issued and outstanding immediately prior to the Effective Time (excluding Dissenting Shares (as defined below), treasury stock and those owned by any wholly-owned subsidiary of the Company) and all rights in respect thereof shall automatically be canceled and retired and shall forthwith cease to exist, and each holder of a certificate which immediately prior to the Effective Time represented any such shares of Company Preferred Stock or Company Common Stock shall cease to have any rights with respect thereto, except the right to receive a portion of the Aggregate Merger Consideration as provided in Sections 2.04(d), 2.04(e), 2.04(f) and 2.04(g) below.

(b)     Earn-Out Merger Consideration.

(i)     As part of the Aggregate Merger Consideration, the Shareholders may be entitled to receive up to 2,050,000 shares of Parent Common Stock (the "*Earn-Out Payment*"), subject, however, to all of the terms and conditions of this Section 2.04(b). Specifically, the Shareholders may be entitled to receive, at the Earn-Out Closing (as defined below), (I) up to 2,000,000 shares of Parent Common Stock, based upon the following formula: (W) 0.93 shares of Parent Common Stock for each $1.00 of Net Annualized Revenue (as more fully described below), less (X) 2,000,000 shares of Parent Common Stock, but (Y) in the event that the foregoing calculation results in a negative number, no additional shares of Aggregate Merger Consideration shall be payable as set forth in an Earn-Out Notice (as more fully described below), and (Z) in the event that the foregoing calculation results in a figure in excess of 2,000,000 shares of Parent

Common Stock, only 2,000,000 shares of Parent Common Stock shall be payable under this section; and (II) an additional 50,000 shares of the Aggregate Merger Consideration shall be payable to the Shareholders in the event that Net Annualized Revenue equals or exceeds $4,500,000.

(ii)     The certificates for the Earn-Out Merger Consideration shall be delivered to the Shareholders, c/o the Shareholders' Representative, at a closing (the *"Earn-Out Closing"*) to occur on a date not later than May 15, 2007 (the *"Earn-Out Payment Date"*), subject to the provisions of Section 2.04(b)(vi) below. The amount of any Earn-Out Payment calculated pursuant to this Section 2.04(b) shall be rounded up to the nearest whole share of Common Stock. The Earn-Out Payment shall be subject to the provisions of Article VII hereunder. At Parent's sole option, any Earn-Out Payment may be made on a date prior to the Earn-Out Payment Date.

(iii)     On or before the Earn-Out Payment Date, Parent shall deliver to the Shareholders' Representative a memorandum (the *"Earn-Out Notice"*) in substantially the form attached as Section 2.04(d) hereto, specifying in reasonable detail (i) the calculation of Net Annualized Revenue, and (ii) the amount of the Earn-Out Payment, if any, due to the Shareholders.

(iv)     During a period beginning on the Earn-Out Payment Date and ending two months thereafter (the *"Review Period"*), the Shareholders' Representative shall have the right to request and promptly receive all documentation and records used in, or that reasonably should have been considered for use in, the preparation of any Earn-Out Notice, including, but not limited to, copies of all contracts with Company Existing Customers, Company Business Development Customers and Company Pipeline Customers and related agreements, documentation and payments to Parent, Company or any of their respective Affiliates (*"Supporting Documentation"*).

(v)     At any time during the Review Period, the Shareholders' Representative shall have the right to object in writing to any item (or any calculation thereof) on the Earn-Out Notice (an *"Earn-Out Dispute Notice"*). If the Shareholders' Representative delivers an Earn-Out Dispute Notice to Parent, the Shareholders' Representative and Parent shall first endeavor to resolve the dispute between themselves. If the Shareholders' Representative and Parent are unable to resolve the dispute within fifteen (15) Business Days of delivery of the Earn-Out Dispute Notice to Parent, the dispute shall be submitted to a firm of regionally or nationally recognized certified public accountants, or other party acceptable to both parties (an *"Accounting Referee"*). If the parties cannot agree upon the Accounting Referee within ten (10) calendar days of the conclusion of the foregoing 15 Business Day period, each party shall have the right to petition courts within the State of New York, County of New York or the United States District Court for the Southern District of New York to so appoint an Accounting Referee. The Accounting Referee shall use its best efforts to resolve the dispute within thirty (30) calendar days of the date such matter was submitted to it. The

fees and expenses of the Accounting Referee shall be paid by the party against whom the Accounting Referee substantially rules. In the event that the Accounting Referee determines that an Earn-Out Payment was underpaid by Parent, Parent shall pay to the Shareholders, within five (5) Business Days of receipt of written notice of such determination from the Accounting Referee, the amount of such determined underpayment (the "*Underpayment Amount*"). In the event that the Accounting Referee determines that an Earn-Out Payment was overpaid by Buyer, the Shareholders who receive Parent Common Stock shall refund to Parent, within five (5) Business Days of receipt of written notice of such determination from the Accounting Referee, an amount of cash equal to (x) the number of shares subject to the overpayment of an Earn-Out Payment, multiplied by (y) the Closing Price.

(vi)    Notwithstanding anything in this Agreement to the contrary, if the Shareholders' Representative delivers an Earn-Out Dispute Notice to Parent pursuant to the provisions of Section 2.04(b)(v), then the Earn-Out Payment Date shall be postponed until such time as there is definitive resolution of such dispute.

(vii)    Notwithstanding anything in this Agreement to the contrary, simultaneously with a change of control of Parent or the Company after the Effective Time, the Shareholders shall be paid in shares of Parent Common Stock as follows: if the Normalized Monthly Revenue for the month immediately prior to the change of control of Parent or the Company equals or exceeds $300,000, then, 2,000,000 shares of Parent Common Stock shall be paid to the Shareholders contemporaneously with the closing of the transaction by which a change of control of Parent or the Company occurs.

(c)    Merger Sub Common Stock. At the Effective Time and on the terms and subject to the conditions of this Agreement, each share of Common Stock, par value $0.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of Parent, Merger Sub, or the Company, be converted into one (1) validly issued, fully paid and nonassessable share of common stock of the Surviving Corporation, with the same rights, powers and privileges as the shares so converted and, immediately after the Effective Time, shall constitute the only outstanding shares of capital stock of the Surviving Corporation. Each stock certificate of Merger Sub evidencing ownership of any such shares shall remain outstanding and evidence ownership of shares of Surviving Corporation Common Stock.

(d)    Company Preferred Stock.

(i)    At the Effective Time and on the terms and subject to the conditions of this Agreement, (A) each share of Series C Preferred Stock of the Company issued and outstanding immediately prior to the Effective Time (other than Dissenting Shares and shares held by Non-Accredited Shareholders) shall, by virtue of the Merger and without any action on the part of Parent, Merger Sub, or the Company, be converted into the right to receive a portion of the Aggregate Merger Consideration having a value (assuming a value of the Parent Common

Stock equal to the Closing Price) equal to its applicable Liquidation Preference; (B) each share of Series B Preferred Stock of the Company issued and outstanding immediately prior to the Effective Time (other than Dissenting Shares and shares held by Non-Accredited Shareholders) shall, by virtue of the Merger and without any action on the part of Parent, Merger Sub, or the Company, be converted into the right to receive a portion of the Aggregate Merger Consideration having a value (assuming a value of the Parent Common Stock equal to the Closing Price) equal to its applicable Liquidation Preference (as set forth in the Company's Third Amended and Restated Articles of Incorporation); and (C) each share of Series A Preferred Stock of the Company issued and outstanding immediately prior to the Effective Time (other than Dissenting Shares and shares held by Non-Accredited Shareholders) shall, by virtue of the Merger and without any action on the part of Parent, Merger Sub or the Company, be converted into the right to receive a portion of the Aggregate Merger Consideration having a value (assuming a value of the Parent Common Stock equal to the Closing Price) equal to its applicable Liquidation Preference (as set forth in the Company's Third Amended and Restated Articles of Incorporation).

(ii)    (A) At the Effective Time and on the terms and subject to the conditions of this Agreement, the Non-Accredited Shareholders shall receive their pro rata portion of the Initial Merger Consideration, as more fully described in the following sentence, to be paid in the Cash Equivalent Amount of the number of shares of Parent Common Stock such holders would have received if they were Accredited Holders and (B) at the Earn-Out Payment Date and on the terms and subject to the conditions of this Agreement, the Non-Accredited Shareholders shall receive their pro rata portion of the Earn-Out Payment, as more fully described in the following sentence, to be paid in the Cash Equivalent Amount of the number of shares of Parent Common Stock such holders would have received if they were Accredited Holders (collectively, the "*Non-Accredited Shareholders' Consideration*"). The Non-Accredited Shareholders' Consideration shall be allocated ratably among the Non-Accredited Shareholders in accordance with the Liquidation Preference of the shares of Series A Preferred Stock and Series B Preferred Stock of the Company held by each Non-Accredited Shareholder immediately prior to the Effective Time.

(e)    Company Common Stock.  At the Effective Time and on the terms and subject to the conditions of this Agreement, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than Dissenting Shares) shall, by virtue of the Merger and without any action on the part of Parent, Merger Sub, or the Company, be cancelled and shall be converted into the right to receive a portion of the Aggregate Merger Consideration having a value (assuming a value of the Parent Common Stock equal to the Closing Price) equal to its applicable Liquidation Preference (as set forth in the Company's Third Amended and Restated Articles of Incorporation).

(f)    Company Options.  At least 16 days prior to the Effective Time, the Company shall take, subject to and in accordance with the terms and conditions of the applicable Company Stock Option Plans and award agreements, all actions necessary to fully vest each