outstanding option to purchase shares of Company Common Stock under any Company Stock Option Plan (the "*Company Options*"), and provide appropriate notice to the holders of Company Options informing them that (i) all of their Company Options are fully vested, and (ii) their Company Options will all terminate if not exercised within 15 days following the date of the notice. Upon termination of the Company Options in accordance with the foregoing, the holders thereof shall cease to have any rights with respect thereto and shall not be entitled to receive any portion of the Aggregate Merger Consideration. The Company shall take all actions necessary to ensure that there are no outstanding options immediately prior to the Effective Time, including, without limitation, obtaining waivers from holders of Company Options and from holders of options granted by the Company outside of the Company Stock Option Plans whose options do not include the notice provision described in this Section 2.04(f). The provisions of this Section 2.04(f) shall be contingent upon the consummation of the Merger and shall be null and void in the event that the Merger is not consummated.

(g)    Company Warrants.    At the Effective Time, all warrants to purchase Company Capital Stock issued and outstanding at such time (the "*Company Warrants*") shall, by virtue of the Merger and without any action on the part of Parent, Merger Sub, or the Company, be cancelled and shall not be entitled to receive any amount from the Aggregate Merger Consideration or otherwise.

(h)    Treasury Stock.    At the Effective Time, each share of Company Preferred Stock and Company Common Stock held by the Company in its treasury shall be cancelled and extinguished without any conversion thereof.

(i)    Company Capitalization Schedules.    On the Closing Date, the Company shall deliver to Parent and Merger Sub separate schedules reflecting (i) a true and complete list of record holders of the issued and outstanding Company Preferred Stock, (ii) a true and complete list of record holders of the issued and outstanding Company Common Stock (iii) a true and complete list of record holders of the Company Options, and (iv) a true and complete list of record holders of the Company Warrants.

(j)    Maximum Consideration to be Paid.    Notwithstanding anything to the contrary contained in this Agreement, in no event shall Parent, Merger Sub or any Affiliate of Parent be required to pay to any and all holders of the capital stock and other equity interests (if any) of the Company, and all holders of all securities or other instruments that are convertible into, or exchangeable or exercisable for, capital stock or other equity interests (if any) of the Company any amount in excess of an aggregate of (A) 4,050,000 less the number of shares of Parent Common Stock that would have been paid to the Non-Accredited Shareholders were such Non-Accredited Shareholders not paid the Cash Equivalent Amount of the Initial Merger Consideration and the Cash Equivalent Amount of the Earn-Out Payment, and (B) the Cash Equivalent Amount of the Initial Merger Consideration and the Cash Equivalent Amount of the Earn-Out Payment to be paid to the Non-Accredited Shareholders. Without limiting the generality of the foregoing, in the event of any breach of the representations and warranties of the Company set forth in Section 3.03 of this Agreement, whether such breach is as a result of any misstatement or omission in respect of the information set forth in Section 3.03 of the Company Disclosure Schedule or otherwise, the portion of the Aggregate Merger Consideration to be paid to each such holder under this Agreement shall be automatically equitably adjusted

among the Shareholders to accurately reflect the capitalization of the Company as of the Effective Time.

SECTION 2.05.  *Exchange Procedures.*

(a)    As soon as reasonably practicable after the Effective Time (but in no event later than 5 days following the Effective Time), the Surviving Corporation shall cause Parent to mail (i) to each holder of a certificate or certificates which immediately prior to the Effective Time represented outstanding shares of Company Preferred Stock (the "*Certificates*") (A) a letter of transmittal, in customary form, which shall specify that delivery shall be effective only upon delivery of the Certificates to Parent and that risk of loss and title to the Certificates shall remain with the Shareholder until such delivery, and (B) instructions for effecting the surrender of such Certificates in exchange for a portion of the Aggregate Merger Consideration.  Upon surrender of a Certificate and/or letter of transmittal (or other documentation in compliance with Section 2.08 hereof), as applicable, to Parent together, with respect to holders of Certificates, with such letter of transmittal, duly executed and completed in accordance with the instructions thereto, and such other documents as may reasonably be required by Parent, the shareholder delivering such documents shall be entitled to receive in exchange therefor (A) its respective portion of the Aggregate Merger Consideration, less the portion of the Aggregate Merger Consideration allocable to such shareholder that has been deposited in the Indemnity Escrow Fund pursuant to Section 2.12 and (B) cash in lieu of fractional shares of Parent Common Stock pursuant to Section 2.07.  No later than 5 Business Days prior to the Closing Date, Parent shall deliver the form of letter of transmittal to the Company and the Shareholders' Representative and prior to the Closing shall make such changes to the form as either shall reasonably request.  The final form of letter of transmittal shall be in a form reasonably acceptable to the Company and the Shareholders' Representative.  If requested by the Shareholders' Representative, Parent shall promptly provide the Shareholders' Representative with copies of the executed letters of transmittal.

(b)    One Business Day prior to any time when Parent is obligated to deliver any portion of the Aggregate Merger Consideration to the Shareholders (including, without limitation, at the Closing, at the Earn-Out Payment Date, on the date on which any remaining amounts in the Balance Sheet Escrow Fund are released and on the date on which any remaining amounts in the Indemnity Escrow Fund are released), the Shareholders' Representative shall deliver to Parent a notarized certificate (the "*Shareholders' Representative Certificate*") stating exactly how many shares of Parent Common Stock (in the case of Accredited Holders) and exactly the Cash Equivalent Amount (in the case of Non-Accredited Shareholders) for each Shareholder entitled to receive any portion of the Aggregate Merger Consideration on such date.  Parent shall be entitled to rely exclusively on the instructions contained in such Shareholders' Representative Certificate, unless the aggregate number of Parent Common Shares or the aggregate amount of the Cash Equivalent Amounts contained in such Shareholders' Representative Certificate differs from the aggregate number of such shares or the aggregate amount of such payment, in which case Parent may notify the Shareholders' Representative that the aggregate amounts differ and that the Shareholders' Representative should revise the Shareholders' Representative Certificate accordingly.  As more fully described in Section 2.15, Shareholders hereby covenant and agree to defend, indemnify and hold harmless the members of the Parent Indemnified Group from and against any Losses arising out of any claim that

Shareholders' Representative failed to distribute to Shareholders (or properly allocate among them) any payments received by Shareholders' Representative under the Transaction Documents (other than the Trading Restriction Agreements and the Employment Offer Letters).

SECTION 2.06. *Dissenters Rights.* Notwithstanding any provision of this Agreement to the contrary, any issued and outstanding shares of Company Preferred Stock or Company Common Stock held by persons who have exercised and perfected dissenters rights for such shares of Company Preferred Stock or Company Common Stock, as applicable, in accordance with the GBCC ("*Dissenting Shares*") and as of the Effective Time have neither effectively withdrawn nor lost any right in such appraisal, shall not be converted into or represent a right to receive the Aggregate Merger Consideration payable under this Article II attributable to such Dissenting Shares. Such shareholders shall be entitled to receive payment of the appraised value of such shares of Company Preferred Stock or Company Common Stock held by them in accordance with the GBCC, unless and until such shareholders fail to perfect, effectively withdrew or otherwise lose their appraisal rights under the GBCC. Notwithstanding the foregoing, if any dissenting shareholder shall effectively withdraw or lose (through failure to perfect or otherwise) the right to appraisal, then as of the Effective Time or the occurrence of such event, whichever occurs later, such Dissenting Shares shall automatically be converted into and represent only the right to receive the Aggregate Merger Consideration and any other amounts payable under this Article II, without interest thereon, upon surrender of the Certificate or Certificates representing such Dissenting Shares in accordance with Section 2.05. The Company shall provide Parent notice, promptly after the Company's receipt thereof, of any written demands for appraisal or payment of the fair value of any shares of Company Preferred Stock or Company Common Stock, as applicable, the withdrawal of such demands and any other related instruments served pursuant to applicable Law.

SECTION 2.07. *Fractional Shares.* No fractional shares of Parent Common Stock will be issued pursuant to this Agreement, but in lieu thereof each holder of Company Preferred Stock who would otherwise be entitled to a fractional share of Parent Common Stock hereunder (after aggregating all fractional shares of Parent Common Stock to be received by each holder) shall receive from Parent an amount of cash (rounded to the nearest whole cent) equal to the product of (a) such fractional share multiplied by (b) the Closing Price, less the amount of any withholding taxes which may be required thereon. The "*Closing Price*" shall be equal to the average closing sale price on the Nasdaq Capital Market of a share of Parent Common Stock as reported in *The Wall Street Journal* or, if not available, such other authoritative publication as may be reasonably selected by the Parent, for the thirty calendar-day period ending on the trading date three Business Days preceding the Closing Date.

SECTION 2.08. *Lost, Stolen or Destroyed Certificates.* If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent, the posting by such person of a bond in such reasonable amount and for such reasonable period of time as Parent may direct as indemnity against any claim that may be made against Parent or the Surviving Corporation with respect to such Certificate, Parent will deliver in exchange for such lost, stolen or destroyed Certificate the portion of the Aggregate Merger Consideration and any other amounts payable under this Article II with respect to the Company Preferred Stock formerly represented thereby.

SECTION 2.09. *Withholding Rights.* Each of the Surviving Corporation and Parent shall be entitled, with respect to payments made by each such entity, to deduct and withhold from the Aggregate Merger Consideration and any other amounts otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, the rules and regulations promulgated thereunder or under any applicable Law. Upon delivery of the Aggregate Merger Consideration, Parent shall deliver to the Shareholders' Representative a statement of all amounts so withheld. To the extent that amounts are so withheld by the Surviving Corporation or Parent, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the shareholders or optionholders of the Company, as the case may be, in respect to which such deduction and withholding was made by the Surviving Corporation or Parent, as the case may be. Any amounts deducted and withheld pursuant to this Section 2.09 shall be remitted to the appropriate Taxing authority in accordance with applicable Law.

SECTION 2.10. *Stock Transfer Books.* The stock transfer books of the Company shall be closed on the day preceding the Closing Date (the "*Record Date*") and there shall be no further registration of transfers of Company Preferred Stock or Company Common Stock thereafter on the records of the Company. In the event of a transfer of ownership of Company Preferred Stock prior to the Record Date which is not registered in the transfer records of the Company, the Aggregate Merger Consideration and any other amounts payable under this Article II shall be payable to such transferee if the Certificate representing such shares of Company Preferred Stock is presented to Parent, accompanied by all documents required to evidence and effect such transfer, and the status of the transferee as an Accredited Investor, in the sole and reasonable discretion of Parent.

SECTION 2.11. *Certain Adjustments.* If between the date of this Agreement and the Effective Time, or after the Effective Time and on or before the Earn-Out Payment Date, the outstanding shares of Parent Common Stock or Company Common Stock shall be changed into a different number of shares by reason of any reclassification, recapitalization, split-up, combination or exchange of shares, or any dividend payable in stock or other securities shall be declared thereon with a record date within such period, then, (i) on or prior to the Effective Time, the exchange ratio between Company Preferred Stock and any shares of Parent Common Stock to be issued hereunder or (ii) after the Effective Time, in accordance with any such change, any shares of Parent Common Stock to be issued hereunder pursuant to the provisions of Section 2.04(a) shall, in either case, be adjusted accordingly to provide to Parent and/or to Company, as the case may be, the same economic effect as contemplated by this Agreement prior to such reclassification, recapitalization, split-up, combination, exchange, dividend or increase.

SECTION 2.12. *Indemnity Escrow Fund.* A portion of the Aggregate Merger Consideration equal to 500,000 shares of Parent Common Stock (the "*Indemnity Escrow Fund*"), shall be deposited in an escrow account pursuant to the Escrow Agreement. The portion of the Aggregate Merger Consideration that constitutes the Indemnity Escrow Fund shall be delivered to the Escrow Agent and not to the Shareholders. As more fully described in the Escrow Agreement, the Indemnity Escrow Fund shall be held by the Escrow Agent under the Escrow Agreement pursuant to the terms set forth therein and shall be available to compensate the Parent Indemnified Group pursuant to the indemnification obligations of the Accredited Holders.

SECTION 2.13. *Balance Sheet Escrow Fund*

(a)    A portion of the Aggregate Merger Consideration equal to the number of shares of Parent Common Stock equal to (I) $340,000 divided by (II) the Closing Price (the "*Balance Sheet Escrow Fund*") shall be deposited in an escrow account pursuant to the Escrow Agreement. The portion of the Aggregate Merger Consideration that constitutes the Balance Sheet Escrow Fund shall be delivered to the Escrow Agent and not to the Shareholders. As more fully described in this Section 2.13 and in the Escrow Agreement, the Balance Sheet Escrow Fund shall be held by the Escrow Agent under the Escrow Agreement pursuant to the terms set forth therein and shall be available to compensate the Parent (I) to the extent that the Net Assets as of the June 30, 2006 Balance Sheet (as defined below) is less than $340,000 (the "*Net Assets Shortfall*") or (B) to the extent that Cash and Cash Equivalents as of the June 30, 2006 Balance Sheet is less than $320,000 (the "*Cash and Cash Equivalents Shortfall*").

(b)    As soon as practicable, and in any event within 30 days after June 30, 2006, Parent shall cause the Company's historical accounting firm (Moore Stephens Tiller) to prepare and deliver to Parent and Shareholders' Representative an audited balance sheet of the Company as of June 30, 2006 (the "*June 30, 2006 Balance Sheet*"), which shall be prepared on a GAAP basis, consistent with the method used by the Company in the preparation of its previous financial statements. In addition, the Company's historical accounting firm shall deliver a certificate (the "*Balance Sheet Certificate*") to Parent and Shareholders' Representative calculating (i) the amount of Net Assets as of the June 30, 2006 Balance Sheet Date and (ii) the amount of Cash and Cash Equivalents as of the June 30, 2006 Balance Sheet Date.

(c)    The June 30, 2006 Balance Sheet shall be accompanied by the report of the Company's accounting firm thereon, which shall state that the June 30, 2006 Balance Sheet presents fairly in all material respects the financial condition of the Company at the Closing Date in conformity with GAAP on a basis consistent with the method used by the Company in the preparation of its previous financial statements and that the amount of Net Assets and the amount of Cash and Cash Equivalents stated in the Balance Sheet Certificate is accurate. Parent shall provide such accounting firm such access during normal business hours to the books and records of the Company as may reasonably be required for the preparation and/or review of the June 30, 2006 Balance Sheet. All fees, costs and expenses of such accounting firm relating to the preparation of the June 30, 2006 Balance Sheet shall be borne by the Company. The Company shall cause such accounting firm to make available to each of Shareholders' Representative and Parent or its respective accountants, upon either of their request, the work papers of such accounting firm generated in connection with the preparation or review of the June 30, 2006 Balance Sheet.

(d)    After receipt of the June 30, 2006 Balance Sheet and the Balance Sheet Certificate, each of Parent and Shareholders' Representative shall have 30 days to review them. After reviewing the June 30, 2006 Balance Sheet and the Balance Sheet Certificate, either of Parent or Shareholders' Representative shall deliver notice to the other specifying in reasonable detail all disputed items, if any, and the basis therefor. If either of them so notifies the other of any objections to the June 30, 2006 Balance Sheet or the Balance Sheet Certificate, the parties shall, within 30 days following the date of such notice, attempt to resolve their differences and

any written resolution by them as to any disputed amount shall be final, binding, conclusive and nonappealable for all purposes under this Agreement.

(e)    If at the conclusion of such 30-day period, the parties have not reached an agreement on Parent's objections, then all amounts and issues remaining in dispute may, at the election of either party, be submitted by the Shareholders' Representative and Parent to the Accounting Referee. All fees and expenses relating to the work, if any, to be performed by the Accounting Referee shall be borne equally by the Company Preferred Shareholders and Parent. Except as provided in the preceding sentence, all other costs and expenses incurred by the parties in connection with resolving any dispute hereunder before the Accounting Referee shall be borne by the party incurring such cost and expense. The Accounting Referee shall act as an arbitrator to determine only those issues still in dispute at the time of the election by either party to submit the objections to the Accounting Referee. The Accounting Referee's determination shall be made within 45 days after its engagement (which engagement shall be made no later than five Business Days after the time of the election by either party to submit the objections to the Accounting Referee), or as soon thereafter as possible, shall be set forth in a written statement delivered to Parent and the Shareholders' Representative, and shall be final, binding, conclusive and nonappealable for all purposes under this Agreement.

(f)    If (I) the amount of Net Assets, either as set forth in the Balance Sheet Certificate, or as determined by the Accounting Referee in the event that such matter is submitted to the Accounting Referee, is less than $340,000; or (II) the amount of Cash and Cash Equivalents, either as set forth in the Balance Sheet Certificate, or as determined by the Accounting Referee in the event that such matter is submitted to the Accounting Referee, is less than $320,000, then the amount of then the Initial Merger Consideration shall be adjusted in the greater of (X) or (Y) as follows: (X) a portion of the shares of Parent Common Stock held in the Balance Sheet Escrow Fund equal to (A) the Net Assets Shortfall, divided by (B) the Closing Price, shall be remitted by the Escrow Agent back to Parent, or (Y) a portion of the shares of Parent Common Stock held in the Balance Sheet Escrow Fund equal to (A) the Cash and Cash Equivalents Shortfall, divided by (B) the Closing Price, shall be remitted by the Escrow Agent back to Parent. The balance of the shares held in the Balance Sheet Escrow Fund, if any, shall be remitted by the Escrow Agent to the Shareholders' Representative for further distribution to the Shareholders. The Escrow Agent shall remit such shares to Parent and/or to the Shareholders' Representative within five (5) Business Days of the receipt of instructions to do so from Parent.

(g)    Notwithstanding anything to the contrary contained in this Section 2.13, to the extent Parent reasonably determines in the exercise of its good faith judgment that the Company has breached any of the covenants contained in Section 6.01 between the date of this Agreement and the Closing Date, and such breach has resulted in a reduction in the amount of Net Assets or in the amount of Cash and Cash Equivalents following the June 30, 2006 Balance Sheet Date, then the amount of the Initial Merger Consideration shall be adjusted by applying the formula set forth in Section 2.13(f) above to the extent that such breach reduces the amount of Net Assets or the amount of Cash and Cash Equivalents following the June 30, 2006 Balance Sheet Date. Any such adjustment pursuant to this Section 2.13(g) shall be limited to and satisfied out of the shares of Parent Common Stock to be deposited into the Balance Sheet Escrow Account.

SECTION 2.14. *Other Provisions Relating to Parent Common Stock.* The shares of Parent Common Stock to be issued to the Significant Shareholders pursuant to this Agreement are subject to the provisions of the Trading Restriction Agreements being signed by each Significant Shareholder.

SECTION 2.15. *Shareholders' Representative.* (a) Gregg Freishtat hereby is irrevocably constituted and appointed as the sole, exclusive, true and lawful agent, representative and attorney-in-fact of all Shareholders and each of them (*"Shareholders' Representative"*) with respect to any and all matters relating to, arising out of, or in connection with, the Transaction Documents (other than the Trading Restriction Agreements and the Employment Offer Letters), including for purposes of taking any action or omitting to take action on behalf of Shareholders thereunder. All actions, notices, communications and determinations by or on behalf of Shareholders under such documents shall be given or made by Shareholders' Representative and all such actions, notices, communications and determinations by Shareholders' Representative shall conclusively be deemed to have been authorized by, and shall be binding upon, any of and all of the Shareholders.

(b)    The Shareholders' Representative will not be liable to any Shareholder for any act taken or omitted by it as permitted under this Agreement, except if such act is taken or omitted in bad faith or by willful misconduct. The Shareholders' Representative will also be fully protected in relying upon any written notice, demand, certificate or document that it in good faith believes to be genuine (including facsimiles thereof). The Shareholders agree, severally but not jointly, to indemnify the Shareholders' Representative for, and to hold the Shareholders' Representative harmless against, any loss, liability or expense incurred without willful misconduct or bad faith on the part of the Shareholders' Representative, arising out of or in connection with the Shareholders' Representative's carrying out its duties as representative for the Shareholders under this Agreement, including costs and expenses of successfully defending the Shareholders' Representative against any claim of liability with respect thereto. The Shareholders' Representative may consult with counsel of its own choice and will have full and complete authorization and protection for any action taken and suffered by it in good faith and in accordance with the opinion of such counsel.

(c)    If Shareholders' Representative dies or becomes legally incapacitated, then those other Shareholders holding a majority of the Shares as of the date hereof promptly shall designate in writing to Parent a single individual to replace the deceased or legally incapacitated Shareholders' Representative as the successor Shareholders' Representative hereunder. If at any time there shall not be a Shareholders' Representative or Shareholders so fail to designate a successor Shareholders' Representative, then Parent may have a court of competent jurisdiction appoint a Shareholders' Representative hereunder. If the Shareholders' Representative becomes unable or unwilling, for any reason, to serve as representative for the Shareholders, such other Person or Persons as may be designated by Shareholders holding a majority of the voting interests of the Company Preferred Stock immediately prior to the Closing, shall succeed the Shareholders' Representative as the representative of the Shareholders in all matters under this Agreement and the transactions contemplated hereby.

(d)    Without limiting the generality of the foregoing, Shareholders' Representative is designated as the sole and exclusive agent, representative and attorney-in-fact

for Shareholders for all purposes related to this Agreement (including (i) service of process upon Shareholders, (ii) executing and delivering to Parent or any other Person on behalf of any of or all Shareholders any and all instruments, certificates, documents and agreements with respect to the transactions contemplated by the Transaction Documents (other than the Trading Restriction Agreements and the Employment Offer Letters), and any other instrument, certificate, document or agreement referred to in Section 8.02, and (iii) receipt of all notices on behalf of Shareholders with respect to any matter, suit, claim, action or proceeding arising with respect to the sale of the Shares or any transaction contemplated by the Transaction Documents (other than the Trading Restriction Agreements and the Employment Offer Letters), including the defense, settlement or compromise of any claim, action or proceeding pursuant to Article XI, and Shareholders may act, with respect to all matters under the Transaction Documents (other than the Lock-up Agreements and Employment Offer Letters), only through the Shareholders' Representative. Parent shall be entitled to rely on the authority of the Shareholders' Representative as the agent, representative and attorney-in-fact of Shareholders for all purposes under the Transaction Documents (other than the Trading Restriction Agreements and the Employment Offer Letters) and shall have no liability for any such reliance. None of Shareholders may revoke the authority of Shareholders' Representative. Each Shareholder hereby ratifies and confirms, and hereby agrees to ratify and confirm, any action taken by Shareholders' Representative in the exercise of the power-of-attorney granted to Shareholders' Representative pursuant to this Section 2.15, which power-of-attorney, being coupled with an interest, is irrevocable and shall survive the death, incapacity or incompetence of such Shareholder. Any payment made to Shareholders' Representative pursuant to any of the Transaction Documents (other than the Trading Restriction Agreements and the Employment Offer Letters) shall be deemed to have been made to Shareholders. Promptly after receiving any such payment, Shareholders' Representative shall deliver to each Shareholder his, her or its pro rata portion of such payment. Without limiting the foregoing, Shareholders hereby covenant and agree to defend, indemnify and hold harmless the members of the Parent Indemnified Group from and against any Losses arising out of any claim that Shareholders' Representative failed to distribute to Shareholders (or properly allocate among them) any payments received by Shareholders' Representative under the Transaction Documents (other than the Trading Restriction Agreements and the Employment Offer Letters).

III.

## REPRESENTATIONS AND WARRANTIES AS TO THE COMPANY

Company represents and warrants to Parent and Merger Sub, subject to the exceptions specifically disclosed in writing in the Company Disclosure Schedule, and further subject to any changes contemplated by or provided for in this Agreement or any Transaction Document, all such exceptions to be referenced to a specific representation set forth in this Article III, that:

SECTION 3.01. *Organization and Qualification; Subsidiaries.* (a) The Company has been duly incorporated and is validly existing and in good standing under the Laws of the jurisdiction of its incorporation and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted (the *"Business"*). The Company is duly qualified or licensed to do business, and is in good standing,

in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for such failures to be so qualified or licensed and in good standing that could not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)     Except for Proficient European Holdings Limited and Proficient Europe Limited (each, a "*Company Subsidiary*" and collectively, the "*Company Subsidiaries*"), the Company does not own an equity interest in any corporation, partnership or joint venture arrangement or other business entity.

SECTION 3.02.  *Articles of Incorporation and Bylaws.*  True, complete and correct copies of the Company's articles of incorporation and bylaws and the Company Subsidiaries' charter or memorandum and articles of association or other organizational documents and bylaws, each as in effect on the date hereof (the "*Organizational Documents*"), are included in Section 3.02 of the Company Disclosure Schedule. Such Organizational Documents are in full force and effect. Neither the Company nor either of the Company Subsidiaries is in violation of any of the provisions of its Organizational Documents.

SECTION 3.03.  *Capitalization.*  The authorized capital stock of the Company consists of 20,100,000 shares of Common Stock, par value $0.01 per share ("*Company Common Stock*"), and 10,000,000 shares of Preferred Stock, par value $0.01 per share ("*Company Preferred Stock*"), of which 230,395 shares of Company Common Stock, 1,589,639 shares of Series A Preferred Stock and 992,485 shares of Series B Preferred Stock are currently issued and outstanding. All of the currently issued and outstanding shares of Common Stock and Preferred Stock are duly authorized, validly issued, fully paid and nonassessable. The aggregate liquidation preference of each class of Company Preferred Stock is as set forth in Section 3.03 of the Company Disclosure Schedule. In addition, the Company intends to issue 2,000 shares of Series C Preferred Stock immediately prior to the Closing. The Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock are collectively referred to as Company Preferred Stock. Except as set forth in Section 3.03 of the Company Disclosure Schedule and except for the Company Preferred Stock, the Company Common Stock, the Company Options and the Company Warrants, there are no shares of capital stock or other equity securities of the Company outstanding. Other than the Senior Secured Promissory Notes, the Company Options and the Company Warrants, there are no options, warrants or other rights, agreements, arrangements or commitments of any character to which the Company is a party or by which the Company is bound relating to the issued or unissued capital stock of the Company or obligating the Company to issue or sell any shares of capital stock of, or other equity interests in, the Company. Except as set forth in Section 3.03 of the Company Disclosure Schedule, there are no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any shares of Company Common Stock. There are no material outstanding contractual obligations of the Company to provide funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any other Person. Each Shareholder is the lawful owner of record of the number of shares of Company Common Stock and/or Company Preferred Stock, as applicable, set forth opposite the name of such Shareholder in Schedule I to this Agreement.

SECTION 3.04.  *Authority Relative to this Agreement.*  The Company has all necessary corporate power and authority to execute and deliver this Agreement, the other

Transaction Documents, and all other instruments, certificates and agreements delivered or required to be delivered pursuant to this Agreement to which the Company is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by the Company of this Agreement and the other Transaction Documents to which it is a party and the consummation by the Company of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action, and, except as set forth in Section 3.04 of the Company Disclosure Schedule, no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or such Transaction Documents or to consummate the transactions contemplated hereby and thereby. This Agreement and the other Transaction Documents to which it is a party has been duly and validly executed and delivered by the Company. This Agreement and the other Transaction Documents to which it is a party constitutes the legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except to the extent that its enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

SECTION 3.05. *No Conflicts; Required Filings and Consents.* (a) The execution and delivery of this Agreement and the other Transaction Documents to which it is a party by the Company do not, and the performance by the Company of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate any provision of the Organizational Documents of the Company, (ii) conflict with or violate any Law applicable to the Company or by which any property or asset of the Company is bound or affected or (iii) except as set forth in Section 3.05(a) of the Company Disclosure Schedule, result in any breach of or constitute a default (or an event which with the giving of notice or lapse of time or both could reasonably be expected to become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or other encumbrance on any material property or asset of the Company pursuant to, any material note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation in each case, with respect to clauses (ii) and (iii) of this Section 3.05(a), which will result in a Company Material Adverse Effect.

(b)    No filing or registration with, or notification to, and no permit, authorization, consent or approval of, any Government Entity is necessary for the execution and delivery of this Agreement by the Company or the consummation by the Company of the transactions contemplated by this Agreement except (i) such filings and consents as may be required under any Environmental Law pertaining to any notification, disclosure or required approval triggered by the transactions contemplated by this Agreement, (ii) such filings, registrations, notifications, permits, authorizations, consents or approvals that result from the specific legal or regulatory status of the Parent or as a result of any other facts that specifically relate to the business or activities in which the Parent is engaged other than the business of the Company and (iii) such other filings, registrations, notices, permits, authorizations, consents and approvals that if not obtained, made or given would not, individually or in the aggregate, have a Company Material Adverse Effect or impair the Company's ability to consummate the transactions contemplated hereby.

(c)  Except as set forth in Section 3.05(c) of the Company Disclosure Schedule, no consent of any third party is required by reason of the transactions contemplated by this Agreement.

SECTION 3.06.  *Permits; Compliance with Laws.*  Except as set forth in Section 3.06 of the Company Disclosure Schedule, the Company is in possession of all franchises, grants, authorizations, licenses, establishment registrations, product listings, permits, easements, variances, exceptions, consents, certificates, identification and registration numbers, approvals and orders of any Governmental Entity necessary for the Company to own, lease and operate its properties or to offer or perform its services or to develop, store, distribute and market its products or otherwise to carry on its business as it is now being conducted (collectively, the *"Company Permits"*), and, as of the date of this Agreement, none of the Company Permits has been suspended or cancelled nor is any such suspension or cancellation pending or, to the Knowledge of the Company, threatened.  The Company is not in conflict with, or in default or violation of, (i) any Law applicable to the Company or by which any property or asset of the Company is bound or affected or (ii) any Company Permits.  Section 3.06 of the Company Disclosure Schedule sets forth, as of the date of this Agreement, all actions, proceedings or investigations pending or, to the Knowledge of the Company, threatened against the Company that could reasonably be expected to result in the suspension or cancellation of any other Company Permit.  Since January 1, 2006, the Company has not received from any Governmental Entity any written notification with respect to possible conflicts, defaults or violations of Laws.  The transactions contemplated hereby will not result in the suspension or cancellation of any Company Permit.

SECTION 3.07.  *Financial Statements.*  (a) Section 3.07 of the Company Disclosure Schedule includes copies of (i) the audited balance sheet of the Company and the Business at December 31, 2005, together with the related statement of operations, shareholders' equity and cash flows for the year ended December 31, 2005 and the notes thereto and (ii) the unaudited interim balance sheet of the Company and the Business at March 31, 2006, together with the related statement of operations, shareholders' equity and cash flows for the three months ended March 31, 2006 and the notes thereto along with a review report, reasonably satisfactory in form and substance to the Parent, from the Company's independent public accountants pursuant to Statement of Accounting Standards No. 100 (the *"Company Financial Statements"*).  The Company Financial Statements: (i) were prepared in accordance with GAAP (except, with respect to the unaudited balance sheet and income statement, for the absence of notes thereto and for year-end adjustments) applied on a consistent basis throughout the periods covered thereby; (ii) present fairly the financial position, results of operations and cash flows of the Company as of such dates and for the periods then ended; and (iii) are correct and complete in all material respects, and can be reconciled with the books of account and records of the Company.  The Company maintains and will continue to maintain an adequate system of internal controls established and administered in accordance with GAAP.

(b)  Except as and to the extent set forth or reserved against on the audited balance sheet of the Company at December 31, 2005, the Company does not have any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) that would be required to be reflected on a balance sheet or in notes thereto prepared in accordance with

GAAP, except for immaterial liabilities or obligations incurred in the ordinary course of business consistent with past practice since December 31, 2005.

SECTION 3.08. *Absence of Certain Changes or Events.* Except as set forth in Section 3.08 of the Company Disclosure Schedule, since December 31, 2005, the Company has conducted its business only in the ordinary course consistent with past practice and, since such date, there has not been (i) any Company Material Adverse Effect, (ii) any event that could reasonably be expected to prevent or materially delay the performance of the Company's obligations pursuant to this Agreement and the consummation of the transactions contemplated hereby by the Company, (iii) any change by the Company in its accounting methods, principles or practices, (iv) any declaration, setting aside or payment of any dividend or distribution in respect of the shares of Company Preferred Stock or Company Common Stock or any redemption, purchase or other acquisition of any of the Company's securities, (v) any grant of equity awards or any increase in the compensation or benefits payable or to become payable to any employees, officers, consultants or directors of the Company, or the establishment, amendment or termination of any Benefit Plan, (vi) any issuance or sale of any stock, notes, bonds or other securities, or entering into any agreement with respect thereto, (vii) any amendment to the Company's Organizational Documents, (viii) other than in the ordinary course of business consistent with past practice, any (x) purchase, sale, assignment or transfer of any material assets, (y) mortgage, pledge or existence of any lien, encumbrance or charge on any material assets or properties, tangible or intangible, except for liens for Taxes not yet delinquent and such other liens, encumbrances or charges which do not, individually or in the aggregate, have a Company Material Adverse Effect, or (z) waiver of any rights of material value or cancellation or any material debts or claims, (ix) any incurrence of any damage, destruction or similar loss, whether or not covered by insurance, materially affecting the Business or properties of the Company, (x) any entering into any transaction of a material nature other than in the ordinary course of business, consistent with past practice, or (xi) any negotiation or agreement by the Company to do any of the things described in the preceding clauses (i) through (x).

SECTION 3.09. *Employee Matters.* (a) Neither the Company nor any Company Subsidiary is a party to any Contract regarding collective bargaining or other Contract with any labor or trade union or collective bargaining group representing any employee of the Company or any Company Subsidiary, nor does any labor or trade union or collective bargaining agent represent any employee of the Company or any Company Subsidiary. No Contract regarding collective bargaining has been requested by, or is under discussion between management of the Company or any Company Subsidiary (or any management group or association of which the Company or any Company Subsidiary is a member or otherwise a participant) and any group of employees of the Company or any Company Subsidiary, nor are there any representation proceedings or petitions seeking a representation proceeding presently pending against the Company or any Company Subsidiary, nor, to the Knowledge of the Company, are there any other current activities to organize any employees of the Company or any Company Subsidiary into a collective bargaining unit. There are no unfair labor practice charges or complaints pending or, to the Knowledge of the Company, threatened against the Company or any Company Subsidiary. There are no controversies, strikes, work stoppages, slowdowns, lockouts, arbitrations or other labor disputes pending or threatened between the Company or any Company Subsidiary and any of their respective employees. There are no pending or threatened complaints, charges or claims against the Company or any Company Subsidiary brought or filed

with any Governmental Entity, arbitrator or court based on, arising out of, in connection with or otherwise relating to the employment or termination of employment by the Company or any Company Subsidiary of employees or other Persons providing services to or on behalf of the Company or any Company Subsidiary.

(b)    Section 3.09(b) of the Company Disclosure Schedule sets forth a true, accurate and complete list of (i) the Company's directors, officers, employees, consultants and independent contractors, and (ii) each individual holding outstanding equity awards granted under the Company Option Plans or any other equity arrangement with the Company, as well as the date of grant, applicable vesting schedule, exercise price and any other material terms of such equity awards. As of the date of this Agreement, there are 36 employees of the Company who reside or work in the United States, and 7 employees who reside or work in the United Kingdom. As of the date of this Agreement and as of the Closing Date, the Company and each Company Subsidiary are not delinquent in any material payment to any of their respective employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed by any such employees.

(c)    The Company has previously delivered or made available to Parent true and complete copies of all employment, consulting, termination, severance and similar Contracts with or for the benefit of, or otherwise relating to, any directors, officers, employees, consultants or independent contractors of the Company or any Company Subsidiary. Except as set forth in Section 3.09(c) of the Company Disclosure Schedule, none of the execution, delivery or performance of any Transaction Document by the Company or the consummation by the Company of the transactions contemplated hereby or thereby will result in any liability under any Benefit Plan, including, without limitation, liability for severance pay, retention pay, unemployment compensation, termination pay or withdrawal liability, or accelerate the time of payment or vesting or increase the amount of compensation or benefits due to any directors, officers, employees, consultants, or independent contractors, or former directors, officers, employees, consultants or independent contractors of the Company or any Company Subsidiary. No amount that could be received (whether in cash or property or the vesting of property), as a result of the consummation of the transactions contemplated by this Agreement, by any employee, officer, director or other service provider or Shareholder of the Company or any Company Subsidiary who is a "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) under any Benefit Plan or otherwise could be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).

(d)    Except as set forth in Section 3.09(d) of the Company Disclosure Schedule, no employee has given notice to, or received notice from, the Company or any Company Subsidiary or any of their Representatives that any such employee's employment or service may be terminated or advised the Company or any Company Subsidiary of an intention to give such notice to, or is expected to receive notice from, the Company or any Company Subsidiary or any of their Representatives that any such employee's employment or service may be terminated.

(e)    Neither the Company nor any Company Subsidiary has ever maintained, contributed to (or has been required to maintain or contribute to) or incurred any Liability under any Benefit Plan that is or was subject to Section 412 of the Code, Section 302 of ERISA or Title

IV of ERISA, including, without limitation, any "multiemployer plan" (within the meaning of Sections 3(37) or 4001(a)(3) of ERISA or Section 414(f) of the Code) or any single-employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) which is subject to Sections 4063, 4064 or 4069 of ERISA. Except as set forth in Section 3.09(e) of the Company Disclosure Schedule, there are no, nor have there ever been, any individuals, Persons or entities that together with the Company would be treated as a single-employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

(f)    Section 3.09(f) of the Company Disclosure Schedule sets forth a current, accurate and complete list of each Benefit Plan.

(g)    The Company has delivered or made available to Parent current, accurate and complete copies of (i) each Benefit Plan and all amendments thereto, and, in the case of an unwritten Benefit Plan, a written description thereof, (ii) all trust agreements, insurance contracts, investment management agreements, investment advisory agreements, administrative services agreements or similar agreements maintained in connection with any Benefit Plan, (iii) the three most recent annual reports (Form Series 5500), if any, required under ERISA or the Code in connection with each Benefit Plan, (iv) the most recent summary plan description, if any, required under ERISA with respect to each Benefit Plan or any other summary of any Benefit Plan, and (v) the most recent Internal Revenue Service determination or opinion letter issued with respect to each Benefit Plan intended to be qualified under Section 401(a) of the Code.

(h)    No person previously employed by the Company or any Company Subsidiary has now or may have a right to return to work or a right to be reinstated or re-engaged by any applicable Law. The Company and each Company Subsidiary has at all relevant times complied in all material respects with applicable Laws to which the Company and each Company Subsidiary and the employees or other Persons providing services to or on behalf of the Company and each Company Subsidiary is subject relating to the employment of labor or engagement of other service providers, including all such applicable Laws relating to wages, hours, employment standards, the WARN Act, collective bargaining, immigration, discrimination, civil rights, safety and health, and workers' compensation, and, except as set forth in Section 3.09(h) of the Company Disclosure Schedule, there are no claims pending or, to the Knowledge of the Company, capable of arising or being threatened by any party in respect of any accident or injury which is not fully covered by insurance of the Company or any Company Subsidiary. Any individual who performs services for the Company and who is not treated as an employee for federal income tax purposes by the Company is not an employee under applicable Law or for any purpose including, without limitation, for tax withholding purposes or Benefit Plan purposes.

(i)    Except as set forth in Section 3.09(i) of the Company Disclosure Schedule, to the Knowledge of the Company, no employees or former employees of the Company or any Company Subsidiary are currently in violation or have previously violated any term of any employment contract, non-disclosure agreement, non-competition agreement, or any restrictive covenant to a former employer relating to the right of any such employee to be employed by the Company or any Company Subsidiary because of the nature of the business conducted or presently proposed to be conducted by the Company or any Company Subsidiary or

to the use of trade secrets or proprietary information of others. No employees of the Company or any Company Subsidiary have given notice to the Company or any Company Subsidiary, nor is the Company or any Shareholder otherwise aware, that any such employee intends to terminate his or her employment with the Company or any Company Subsidiary.

(j)    Each person who is an employee of the Company on the date of this Agreement and each person who is an employee of the Company on the Closing Date has signed a non-competition agreement with the Company pursuant to which such persons are restricted in their ability to enter into an employment or consulting arrangement with a competing company for a period of at least one year following the cessation of their employment with the Company.

(k)    Each person who is an employee of the Company or any Company Subsidiary on the date of this Agreement and each person who is an employee of the Company or any Company Subsidiary on the Closing Date has signed an agreement with the Company or a Company Subsidiary pursuant to which such persons have assigned to the Company or any Company Subsidiary any and all rights associated with any invention or idea in any way connected to the employee's employment by the Company or any Company Subsidiary or in any way connected to the Company's business, research and development, or demonstrably anticipated research and development.

(l)    Each Benefit Plan intended to qualify under Section 401(a) of the Code is qualified and has received a determination letter from the IRS upon which it may rely regarding its qualified status (or such Benefit Plan utilizes a prototype form plan document and the prototype plan's sponsor has received a favorable opinion or advisory letter from the IRS upon which the Company may rely as to its qualified status pursuant to the IRS's Announcement 2001-77 and its progeny) and nothing has occurred, whether by action or by failure to act, that caused or would cause the loss of such qualification or the imposition of any penalty or tax liability. Each Benefit Plan that is intended to receive favorable tax treatment under applicable Law is designed and operated in a manner consistent with such treatment, and nothing has occurred, whether by action or by failure to act, that caused or could cause the loss of such favorable tax treatment. Each Benefit Plan complies in form and has been maintained and operated in all material respects in accordance with its terms and applicable Law, including without limitation, ERISA and the Code. The Company and each Company Subsidiary are not in default of any obligation relating to any Benefit Plan. No non-exempt "prohibited transaction," within the meaning of Section 4975 of the Code and Section 406 of ERISA, has occurred or is reasonably expected to occur with respect to any Benefit Plan.

(m)    Except as set forth in Section 3.09(m) of the Company Disclosure Schedule, neither the Company nor any Company Subsidiary has any obligation to provide post-termination health and welfare benefits of any kind to any of their current or former employees pursuant to any Benefit Plan, other than in accordance with Section 4980B of the Code or applicable state continuation coverage law.

(n)    All payments required by any Benefit Plan, any collective bargaining agreement or other agreement, or by law (including, without limitation, all contributions, insurance premiums or intercompany charges) with respect to all prior periods have been timely

made or provided for by the Company, in accordance with the provisions of each of the Benefit Plans, applicable Law and United States GAAP.

(o)    No claim, lawsuit, arbitration or other action has been asserted, instituted, or, to the Knowledge of the Company, is anticipated or has been threatened against any of the Benefit Plans (other than non-material, routine claims for benefits and appeals of such claims), any trustee or fiduciaries thereof, the Company, any Company Subsidiary, any employee, officer, director, stockholder or other service provider of the Company or any Company Subsidiary (whether current, former or retired), or any of the assets of any trust of any of the Benefit Plans. No Benefit Plan is under, and the Company has not received any notice of, an audit or investigation by the IRS, Department of Labor or any other Governmental Entity and no such completed audit, if any, has resulted in the imposition of any tax or penalty.

(p)    With respect to each Benefit Plan that is funded mostly or partially through an insurance policy, neither the Company nor any Company Subsidiary has any liability in the nature of retroactive rate adjustment, loss sharing arrangement or other actual or contingent liability arising wholly or partially out of events occurring on or before the date of this Agreement or is reasonably expected to have such liability with respect to periods through the Closing Date.

(q)    None of the Company, any Company Subsidiary, any employee, officer, director, stockholder or other service provider of the Company or any Company Subsidiary has made any promises or commitments, whether legally binding or not, to create any additional plan, agreement or arrangement, or to modify or change in any material way any existing Benefit Plan.

(r)    Neither the Company nor any Company Subsidiary has any unfunded liabilities pursuant to any Benefit Plan that is not intended to be qualified under Section 401(a) of the Code and is an employee pension benefit plan within the meaning of Section 3(2) of ERISA, a nonqualified deferred compensation plan or an excess benefit plan. Except as set forth in Section 3.09(r) of the Company Disclosure Schedule, each Benefit Plan that is a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) has been operated and administered in good faith compliance with Section 409A of the Code from the period beginning January 1, 2005 through the date hereof and has not been materially modified since October 2, 2004.

(s)    With respect to each Benefit Plan mandated by a government other than the United States or subject to the laws of a jurisdiction outside of the United States (each, a *"Foreign Benefit Plan"*), the fair market value of the assets of such plan, the liability of each insurer for any such plan funded through insurance or the book reserve established for any such plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the date of this Agreement, with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations. Each Foreign Benefit Plan has been maintained and operated in all material respects

in accordance with the applicable plan document and all applicable Laws and other requirements, and if intended to qualify for special tax treatment, satisfies all requirements for such treatment.

SECTION 3.10. *Contracts*. Except for the Contracts described in Section 3.10 of the Company Disclosure Schedule (individually, a "*Material Contract*" and collectively, the "*Material Contracts*"), the Company is not a party to or bound by any material Contract, including without limitation:

(a)     any sales, advertising, distribution or agency contract in excess of $24,000 over the life of the contract or in excess of $2,000 a month if the Contract is for a period of less than 12 months;

(b)     any continuing contract for the purchase of materials, supplies, equipment or services involving in the case of any such contact in excess of $24,000 over the life of the contract or in excess of $2,000 a month if the Contract is for a period of less than 12 months;

(c)     any contract for which the current term extends beyond one year after the date of this Agreement;

(d)     any trust indenture, mortgage, promissory note, loan agreement or other contract for the borrowing of money, any currency exchange, commodities or other hedging arrangement or any leasing transaction of the type required to be capitalized in accordance with GAAP;

(e)     any contract for capital expenditures in excess of $24,000 in the aggregate;

(f)     any contract limiting the freedom of the Company to engage in any line of business or to compete with any other corporation, partnership, limited liability company, trust, individual or other entity;

(g)     any confidentiality, secrecy or non-disclosure contract entered into by the Company with respect to which the Company is, or could reasonably be expected to have, ongoing obligations which could, if not complied with, result in a Company Material Adverse Effect;

(h)     any contract pursuant to which the Company is a lessor of any machinery, equipment, motor vehicles, office furniture, fixtures or other personal property, pursuant to which payments in excess of $24,000 remain outstanding;

(i)     any contract with an Affiliate;

(j)     any agreement of guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the obligations, liabilities (whether accrued, absolute, contingent or otherwise) or indebtedness of any other Person;

(k)     any foreign currency forward exchange contracts; or

(l)     any employment contract, arrangement or policy (including, without limitation any collective bargaining contract or union agreement) which may not be immediately terminated without penalty (or any augmentation or acceleration of benefits).

The Company has performed in all material respects all of the obligations required to be performed by it and is entitled to all benefits under, and has not received notice that it is in default in respect of any Material Contract. Each of the Material Contracts is valid and binding and in full force and effect, and there exists no default or event of default or event, occurrence, condition or act, with respect to the Company, or to the Knowledge of the Company, with respect to the other contracting party, which, with the giving of notice, the lapse of the time or the happening of any other event or conditions, would become a default or event of default under any Material Contract. True, correct and complete copies of all Material Contracts have been delivered to the Parent.

SECTION 3.11. *Litigation.* Except as set forth in Section 3.11 of the Company Disclosure Schedule, there is no private or governmental action, suit, proceeding, claim, arbitration or investigation pending before any agency, court or tribunal, foreign or domestic, or, to the Knowledge of the Company, threatened against the Company or any of its properties or any of its officers or directors (in their capacities as such) or relating to the Business. There is no judgment, decree or order against the Company or, or, to the Knowledge of the Company, any of its directors or officers (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the transactions contemplated by this Agreement, or that could reasonably be expected to have a Company Material Adverse Effect. Section 3.11 of the Company Disclosure Schedule also lists all litigation that the Company has pending against other parties.

SECTION 3.12. *Environmental Matters.* To the Company's Knowledge: (a) the Company is in material compliance with all applicable Environmental Laws and all Company Permits required by Environmental Laws; (b) all past noncompliance, if any, of the Company with Environmental Laws or Environmental Permits has been resolved without any pending, ongoing or future obligation, cost or liability; and (c) the Company has not released a Hazardous Material at, or transported a Hazardous Material to or from, any real property currently or formerly owned, leased or occupied by the Company, in violation of any Environmental Law.

SECTION 3.13. *Intellectual Property.* (a) Section 3.13(a) of the Company Disclosure Schedule contains a true and complete list of the Company's patents, patent applications, registered trademarks, trademark applications, trade names, registered service marks, service mark applications, Internet domain names, Internet domain name applications, copyright registrations and applications and other filings and formal actions made or taken pursuant to Federal, state, local and foreign Laws by the Company to protect its interests in the Company Intellectual Property, and includes details of all due dates for further filings, maintenance, payments or other actions falling due in respect of the Company Intellectual Property within twelve (12) months of the Closing Date. All of the Company's owned patents, patent applications, registered trademarks, trademark applications and registered copyrights remain in good standing with all fees and filings due as of the date hereof.

(b)     The Company Intellectual Property contains only those items and rights which are: (i) owned by the Company or the Company Subsidiary; (ii) in the public domain; or

(iii) rightfully used by the Company pursuant to a valid and enforceable license or other agreement (the "*Company Licensed Intellectual Property*"), the parties, date, term and subject matter of all licenses or other agreements in which the Company is licensed to use Intellectual Property owned by a third party (each, a "*License Agreement*") (other than for open source software, which is subject to Section 3.13(n)) being set forth in Section 3.13(b) of the Company Disclosure Schedule. The Company has all rights in the Company Intellectual Property which includes all rights necessary to carry out the Company's current activities and the Company's future activities to the extent such future activities are already planned, including without limitation, to the extent required to carry out such activities, rights to make, use, reproduce, modify, adopt, create derivative works based on, translate, distribute (directly and indirectly), transmit, display and perform publicly, license, rent and lease and, other than with respect to the Company Licensed Intellectual Property, assign and sell, the Company Intellectual Property.

(c)    The reproduction, manufacturing, distribution, licensing, sublicensing, sale or any other exercise of rights in any Company Intellectual Property, product, work, technology or process as now used or offered or proposed for use, licensing or sale by the Company does not infringe on any Intellectual Property or personal right of any Person anywhere in the world. The Company has not received notice of any pending or threatened claims (including offers to grant licenses) (i) challenging the right of the Company to use any Intellectual Property or alleging any violation, infringement, misuse or misappropriation by the Company of Intellectual Property or indicating that the failure to take a license would result in any such claim, (ii) challenging the validity, effectiveness or, other than with respect to the Company Licensed Intellectual Property, ownership by the Company of any Company Intellectual Property or asserting any opposition, interference, termination, abandonment, unenforceability, or infirmity of any Company Intellectual Property; or (iii) to the effect that the use, distribution, licensing, sublicensing, sale or any other exercise of rights in any product, work, technology or process as now used or offered or proposed for use, licensing, sublicensing or sale by the Company or its agents or use by its customers infringes or will infringe on or misappropriate any intellectual property or other proprietary or personal right of any Person. No such claims have been threatened by any Person, nor are there any valid grounds for any bona fide claim of any such kind. All of the rights within the Company Intellectual Property are enforceable and subsisting. To the Knowledge of the Company, there is no unauthorized use, infringement or misappropriation of any Company Intellectual Property by any third party, employee or former employee.

(d)    Except as set forth in Section 3.13(d) of the Company Disclosure Schedule, the Company has not made any claim of a violation, infringement, misuse or misappropriation by any third party (including any employee or former employee of the Company) of any Company Intellectual Property. Except as set forth in Section 3.13(d) of the Company Disclosure Schedule, the Company has not entered into any agreement to indemnify any other Person against any charge of infringement of any Intellectual Property, other than indemnification provisions contained in agreements entered into in the ordinary course of business.

(e)    The Company has taken commercially reasonable measures to maintain and protect the proprietary nature of the Company Intellectual Property, including the signing by all employees, agents, consultants, contractors or any other Persons who have contributed to or

participated in the conception and development of the Company Intellectual Property or have or had access to know-how or trade secret information, of valid and binding nondisclosure agreements. All such Persons who have contributed to or participated in the conception and development of the Company Intellectual Property have also (i) been a party to an enforceable agreement with the Company in accordance with applicable national and state Law that accords the Company full, effective, exclusive and original ownership of all tangible and intangible property as "works-for-hire," arising from the efforts of such personnel, and (ii) executed appropriate instruments of assignment in favor of the Company that have conveyed to the Company full, effective and exclusive ownership of all tangible and intangible property arising from the efforts of such personnel, which are not otherwise covered by (i).

(f)     The Company is not, nor as a result of the execution or delivery of this Agreement, or performance of the Company's obligations hereunder, will the Company be, in violation of any license, sublicense, agreement or instrument to which the Company is a party or otherwise bound, nor will execution or delivery of this Agreement, or performance of the Company's obligations hereunder, cause the diminution, termination or forfeiture of any the Company Intellectual Property.

(g)     Section 3.13(g) of the Company Disclosure Schedule contains a true and complete list of all the software programs used in connection with the Business (the "*Company Software Programs*") (other than for open source software, which is subject to Section 3.13(s)). The Company owns full and unencumbered right and good, valid and marketable title to such Company Software Programs that it owns, free and clear of all mortgages, pledges, liens, security interests, conditional sales agreements, encumbrances or charges of any kind. The Company has full and unrestricted rights to use the Company Software Programs that it licenses pursuant to license agreements listed in Section 3.13(h).

(h)     The source code and system documentation relating to the Company Software Programs have been maintained in strict confidence and (i) have been disclosed by the Company only to those of its employees who have a "need to know" the contents thereof in connection with the performance of their duties to the Company and who have executed nondisclosure agreements with the Company; and (ii) have been disclosed to only those third parties who have executed nondisclosure agreements with the Company. The source code and system documentation relating to the Company's Software Programs are not the subject of any escrow or similar agreement giving any third party rights in or to such source code and/or system documentation upon the occurrence of certain events.

(i)     Except as set forth in Section 3.13(i) of the Company Disclosure Schedule, the Company Intellectual Property is free and clear of any and all mortgages, pledges, liens, security interests, conditional sale agreements, encumbrances or charges of any kind.

(j)     Except as set forth in Section 3.13(j) of the Company Disclosure Schedule, the Company does not owe nor will owe any royalties or other payments to third parties in respect of the Company Intellectual Property. All royalties or other payments that have accrued prior to the Closing Date have been paid.

(k)    To the Knowledge of the Company, the Company Software Programs and other Company Intellectual Property contain no "viruses." For the purposes of this Agreement, "virus" means any computer code designed to disrupt, disable or harm in any manner the operation of any software or hardware including, without limitation, worms, bombs, backdoors, clocks, timers, or other disabling device code, designs or routines which causes the software to be erased, inoperable, or otherwise incapable of being used, either automatically or upon command by any party.

(l)    All data which has been collected, stored, maintained or otherwise used by the Company has been collected, stored, maintained and used in accordance with all applicable Laws and industry standards. The Company has not received a notice of noncompliance with applicable data protection laws, rules, regulations, guidelines or industry standards. The Company has made all registrations that the Company is required to have made in relation to the processing of data, and is in good standing with respect to such registrations, with all fees due prior to or as of the Closing Date duly made. The Company's practices are, and have always been, in compliance with (i) its then-current privacy policy, including the privacy statement posted on the Company's Web site, and (ii) its customers' privacy policies, when required to do so by Contract.

(m)    The Company has implemented standards which are commercially reasonable in the technology services industry to ensure the physical and electronic protection of its information assets from unauthorized disclosure, use or modification and there has been no breach of security involving any information assets.

(n)    (i) The Company is in compliance with all licenses and other requirements of all open source or public library software licenses (including any version of any software licensed pursuant to any GNU public license and all other similar public licenses) which is embodied or included or employed in any product marketed, licensed, sold or distributed by the Company; (ii) except as set forth in Section 3.13(n) of the Company Disclosure Schedule, no product currently marketed, licensed, sold, or distributed by the Company (or portion thereof) is, not, when delivered to the Parent, will be, in whole or in part, governed by an Excluded License (for purposes of this Agreement, an "Excluded License" is any license that requires, as a condition of modification and/or distribution of software subject to the Excluded License, that (a) such software and/or other software combined and/or distributed with such software be disclosed or distributed in source code form; or (b) such software and/or other software combined and/or distributed with such software and any associated intellectual property be licensed on a royalty free basis (including for the purpose of making additional copies or derivative works)); (iii) the Company has not incorporated into any product that is currently marketed, licensed, sold, or distributed by the Company (or any portion of any of the foregoing) any code, modules, utilities, or libraries that are covered in whole or in part by a license that triggers the discontinuance of some or all license rights if certain patent enforcement suits are brought by the Company, (iv) the Company has not incorporated into any product that is currently marketed, licensed, sold, or distributed by the Company (or any portion of any of the foregoing) any code, modules, utilities, or libraries that are covered in whole or in part by a license that requires that the Company give attribution for its use of such code, modules, utilities, or libraries.

SECTION 3.14. *Taxes.* (a) All material Tax Returns required to be filed by or on behalf of the Company and the Company Subsidiaries or any of their predecessor corporations, or any consolidated, combined, affiliated or unitary group of which the Company or a Company Subsidiary is or has ever been a member, have been timely filed with the appropriate tax authorities or requests for extensions have been timely filed and any such extensions have been granted and have not expired. All such Tax Returns were correct and complete in all material respects, except as otherwise set forth, reflected in, reserved against or disclosed in the Company Financial Statements.

(b)     All Taxes with respect to taxable periods or portions thereof covered by such Tax Returns and all other material Taxes (without regard to whether a Tax Return was or is required) for which the Company or a Company Subsidiary is otherwise liable that are due have been paid in full or are being contested in good faith (and such contest is disclosed in Section 3.14(b) of the Company Disclosure Schedule) and, to the extent the liabilities for such Taxes are not due or are being contested in good faith, adequate reserves have been established on the Company Financial Statements in accordance with GAAP.

(c)     To the Knowledge of the Company, there are no Liens on any of the assets of the Company or a Company Subsidiary that arose in connection with any failure (or alleged failure) to pay any Tax.

(d)     The Company and the Company Subsidiaries have timely withheld proper and accurate amounts from their employees, customers, shareholders and others from whom they are or were required to withhold Taxes, including social security, in compliance in all material respects with all applicable Laws and has timely paid all such withheld amounts to the appropriate taxing authorities.

(e)     The United Kingdom is the only country other than the United States of America in which the Company or a Company Subsidiary regularly conducts trade or business.

(f)     Neither the Company nor any Company Subsidiaries has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(g)     Parent has been furnished by the Company with true and complete copies of all federal, state local and foreign income or franchise Tax Returns and state sales and use Tax Returns for or including the Company and each of the Company Subsidiaries for all periods after December 31, 2000.

(h)     Neither the Company or any of the Company Subsidiaries has received notice that it has not filed a Tax Return or paid Taxes required to be filed or paid, and no tax authority of a jurisdiction in which it does not file Tax Returns has asserted that it may be obligated to file Tax Returns in that jurisdiction.

(i)     Neither the Company nor any of the Company Subsidiaries is a party to any tax sharing agreement.

(j)     Neither the Company nor any of the Company Subsidiaries has been or is required to make any adjustment pursuant to Code Section 481(a) or any similar provision of state, local or foreign tax law by reason of any change in any accounting methods; there is no application pending with any taxing authority requesting permission for any changes in any of its accounting methods for Tax purposes and no taxing authority has proposed any such adjustment or change in accounting method.

(k)     Neither the Company nor any of the Company Subsidiaries has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(l)     Neither the Company nor any of the Company Subsidiaries (1) has been a member of an affiliated or similar group filing a consolidated, combined, unitary or similar income Tax Return, other than a consolidated group of which the Company is the common parent or (2) has any liability for Taxes of any person (other than Company and the Company Subsidiaries) under Treasury Regulations section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by agreement or otherwise.

(m)     Since January 1, 2003, neither the Company nor any of the Company Subsidiaries has participated in a "reportable transaction" as described in Treasury Regulations section 1.6011-4.

(n)     There are no tax rulings, requests for rulings or closing agreements relating to the Company or any of the Company Subsidiaries that could affect their liability for Taxes for any period after the Closing Date. Neither the Company nor any of the Company Subsidiaries will be required to include in the gross income of a taxable period ending after the Closing Date income or gain attributable to a prior taxable period that was not recognized in that prior taxable period as a result of the installment method, the completed contract method or the cash method of accounting, any other method of accounting or section 263A of the Code.

(o)     The shares of the Company do not constitute a United States real property interest within the meaning of IRC Section 897.

(p)     Neither the Company nor any of the Company Subsidiaries has any obligation to pay and no payments will be made in connection with the transactions contemplated by this Agreement of any amount that constitutes an excess parachute payment within the meaning of Code section 280G.

(q)     Neither the Company nor any Company Subsidiary has treated as an independent contractor any Person not properly classified as such.

(r)     There is no outstanding power of attorney of the Company or any Company Subsidiary with respect to Taxes.

SECTION 3.15.  *Insurance.*  The Company is presently insured, and since inception has been insured, against such risks as companies engaged in a similar business would, in accordance with good business practice, customarily be insured. The policies of fire, theft,

liability and other insurance maintained with respect to the assets or businesses of the Company provide adequate coverage against loss. There is no material claim pending under any of such policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies. The Company has heretofore furnished to the Parent a complete and correct list as of the date hereof of all insurance policies maintained by the Company, and has made available to the Parent complete and correct copies of all such policies, together with all riders and amendments thereto. All such policies are in full force and effect and all premiums due thereon have been paid to the date hereof. The Company has complied in all material respects with the terms of such policies. The Company has no Knowledge of any threatened termination of, or material premium increase with respect to, any of such policies. The Company is not aware of any facts or circumstances which could reasonably be expected to result in the denial of insurance coverage under policies issued to the Company in respect of such suits, claims, actions, proceedings and investigations.

SECTION 3.16. *Properties.* Except as set forth in Section 3.16 of the Company Disclosure Schedule, the Company has good and marketable title to all of its properties and assets, free and clear of all material Liens, whether tangible or intangible, real, personal or mixed, reflected in the Company Financial Statements as being owned by the Company as of the date hereof, other than (i) any properties or assets that have been sold or otherwise disposed of in the ordinary course of business since the date of such financial statements, (ii) Liens disclosed in the notes to the Company Financial Statements and (iii) Liens arising in the ordinary course of business after the date of such financial statements. All properties used in the Company's operations are reflected in the balance sheets included in the Company Financial Statements to the extent GAAP require the same to be reflected. All buildings, and all fixtures, equipment and other property and assets that are material to its business on a consolidated basis, and held under leases or sub-leases by the Company, are held under valid instruments enforceable against the Company in accordance with their respective terms, subject to applicable Laws of bankruptcy, insolvency or similar Laws relating to creditors' rights generally and to general principles of equity (whether applied in a proceeding in law or equity). Substantially all of the Company's equipment in regular use has been reasonably maintained and is in serviceable condition, reasonable wear and tear excepted. The Company owns or has the valid and subsisting right to use all assets and properties necessary to operate the Company's business in the manner presently conducted.

SECTION 3.17. *Affiliates.* Section 3.17 of the Company Disclosure Schedule sets forth the names and addresses of each Person who is, in the Company's reasonable judgment, an Affiliate of the Company. The Company is not indebted to, nor does it owe any contractual commitment or arrangement to, with or for the benefit of, any director, officer, employee, Affiliate or agent of the Company (except for amounts due as normal salaries and bonuses and in reimbursement of ordinary expenses). To the Knowledge of the Company, no current or former director, officer, employee, Affiliate or agent of the Company is presently, or, in the last three years has been, the direct or indirect owner of an interest in any corporation, firm, association, or business organization which is a present (or potential) competitor, supplier or customer of the Company. Except for normal salaries and bonuses and reimbursement of ordinary expenses, since December 31, 2005, the Company has not made any payments, loans or advances of any kind, or paid any dividends or distributions of any kind, to or for the benefit of the Shareholders, or any of their respective affiliates, associates or family members.

SECTION 3.18. *Brokers.* No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company.

SECTION 3.19. *Certain Business Practices.* Neither the Company nor, to the Knowledge of the Company, any directors, officers, agents or employees of the Company (in their capacities as such) has (i) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or (iii) made any other unlawful payment.

SECTION 3.20. *Accounts Receivable.* Subject to any reserves set forth in the Company Financial Statements, the accounts receivable shown on the Company Financial Statements represent bona fide claims for sales and other charges, and are not subject to discount except for normal cash and immaterial trade discounts. The amount carried for doubtful accounts and allowances disclosed in the Company Financial Statements was calculated in accordance with GAAP and in a manner consistent with prior periods and is sufficient to provide for any losses which may be sustained on realization of the receivables.

SECTION 3.21. *Customers and Suppliers.* Except as set forth in Section 3.21 of the Company Disclosure Schedule, no customer which individually accounted for more than 5% of the Company's or the Business' gross revenues during the 12-month period preceding the date hereof has canceled or otherwise terminated, or made any written threat to the Company to cancel or otherwise terminate or decrease its relationship with the Company, or has decreased materially its relationship with the Company or its usage of the services or products of the Company, as the case may be.

SECTION 3.22. *Grants, Incentives and Subsidies.* The Company has not received any grants, incentive and subsidy programs ("*Grants*") from any Governmental Authority. The Company is not subject to any obligation to pay royalties in connection with sales of its products.

SECTION 3.23. *Bank Accounts.* Section 3.23 of the Company Disclosure Schedule contains a complete and correct list of each bank account or safe deposit box of the Company, the names and locations of all banks in which the Company has accounts or safe deposit boxes, and the names of all persons authorized to draw thereon or to have access thereto.

SECTION 3.24. *Books and Records.* The books of accounts, minute books, stock record books, and other records of the Company have been maintained in accordance with sound business practices in all material respects. The stock or ownership records of the Company is presented to Parent fairly and accurately reflect the record ownership of all of its outstanding shares of capital stock.

SECTION 3.25. *The Worker Adjustment and Retraining Act.* The Company and the Company Subsidiaries warrant and represent that they have and will continue to have fewer than 50 employees through the date of this Agreement. The Company and the Company

Subsidiaries further represent and warrant that they shall not take any actions on or prior to the date of this Agreement, and have not contemplated taking any actions between the date of this Agreement and the Effective Date that would implicate the notice provisions or any other provisions of the Worker Adjustment and Retraining Act or similar state law.

SECTION 3.26. *Representations Complete*. None of the representations or warranties made by the Shareholders or the Company herein or in any Company Disclosure Schedule hereto, or certificate furnished by the Shareholders or the Company pursuant to this Agreement, when all such documents are read together in their entirety, contains or will contain at the Closing Date any untrue statement of a material fact, or omits or will omit at the Closing Date to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading.

IV.

[INTENTIONALLY OMITTED]

V.

REPRESENTATIONS AND WARRANTIES OF PARENT

The Parent represents and warrants to the Company as follows:

SECTION 5.01. *Organization and Qualification Subsidiaries*. The Parent and each directly and indirectly owned Subsidiary of the Parent (the "*Parent Subsidiaries*") has been duly incorporated or otherwise organized and is validly existing and in good standing (to the extent applicable) under the Laws of the jurisdiction of its incorporation or organization, as the case may be, and has the requisite corporate power and authority and all necessary governmental approvals to own, lease and operate its properties and to carry on its business as it is now being conducted. The Parent, and each Parent Subsidiary is duly qualified or licensed to do business, and is in good standing (to the extent applicable), in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for such failures to be so qualified or licensed and in good standing that could not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

SECTION 5.02. *Capitalization*. (a) The authorized capital stock of the Parent consists of (i) 100,000,000 shares of the Parent Common Stock, of which 38,879,018 shares are issued and outstanding at March 31, 2006, and (ii) 5,000,000 shares of Preferred Stock, par value $0.001 per share, of which no shares are currently issued and outstanding. All of the outstanding shares of the Parent Common Stock have been validly issued and are fully paid and nonassessable and not subject to preemptive rights.

(b)    All of the shares of the Parent Common Stock to be issued to the Shareholders in connection with the transactions contemplated hereby, when issued in accordance with this Agreement, will be validly issued, fully paid and nonassessable and not

subject to any contractual restriction, preemptive rights or similar contractual rights granted by the Parent (other than the Trading Restriction Agreements).

SECTION 5.03. *Authority Relative to this Agreement.* The Parent has all necessary corporate power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each other Transaction Document to which it is a party by the Parent and the consummation by the Parent of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of the Parent are necessary to authorize this Agreement or any other Transaction Document to which the Parent is a party or to consummate such transactions. This Agreement has been, and each other Transaction Document to which it is a party will be, duly executed and delivered by the Parent. Assuming the due authorization, execution and delivery by the Company and the Shareholders, this Agreement constitutes, and each other Transaction Document to which it is a party will constitute, legal, valid and binding obligations of the Parent, enforceable against the Parent in accordance with their respective terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

SECTION 5.04. *No Conflict; Required Filings and Consents.* (a) The execution and delivery of this Agreement by the Parent and the execution and delivery of each other Transaction Document to which it is a party by the Parent, do not, and the performance by the Parent of its obligations hereunder and/or thereunder, as the case may be, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate any provision of the Organizational Documents of the Parent or any equivalent organizational documents of any Parent Subsidiary; (ii) conflict with or violate any Law applicable to the Parent or any other Parent Subsidiary or by which any property or asset of the Parent or any Parent Subsidiary is bound or affected or (iii) result in any breach of or constitute a default (or an event which with the giving of notice or lapse of time or both could reasonably be expected to become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or other encumbrance on any material property or asset of the Parent or any Parent Subsidiary pursuant to, any material note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation in each case, with respect to clauses (ii) and (iii) of this Section 5.04(a), which will result in a Parent Material Adverse Effect.

(b) Assuming the accuracy of the representations and warranties set forth in Article III, the execution and delivery of this Agreement by the Parent do not, and the execution of each other Transaction Document to which it is a party will not, and the performance by the Parent of its obligations hereunder and the consummation of the transactions contemplated hereby will not, require any consent, approval, authorization or permit of, or filing by the Parent with or notification by the Parent to, any Governmental Entity.

SECTION 5.05. *SEC Filings; Financial Statements.* (a) Parent has filed or furnished all forms, reports and documents (the *"Parent SEC Documents"*) required to be filed or furnished by it under the Exchange Act.