(b)      Except as is provided in the Parent SEC Documents, each of the consolidated financial statements (including, in each case, any notes thereto) contained in the Parent SEC Documents complied as to form in all material respects with applicable accounting requirements, was prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and each presented fairly, in all material respects, the consolidated financial position of the Parent and the consolidated Parent Subsidiaries as at the respective dates thereof and the consolidated results of operations and cash flows of the Parent and the consolidated Parent Subsidiaries for the respective periods indicated therein, except as otherwise noted therein (subject, in the case of unaudited statements, to normal and recurring year-end adjustments).

SECTION 5.06.  *Absence of Certain Changes or Events.*  Except as disclosed in the Parent SEC Documents filed prior to the date of this Agreement, since the date of Parent's most recently filed Form 10-Q, there has not been (a) any condition, event, occurrence or development that has had or would reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect or which would reasonably be expected to prevent, hinder or materially delay the ability of the Parent to consummate the transactions contemplated hereby, (b) any material change by the Parent or any Parent Subsidiary in its accounting methods, principles or practices, or (c) any event pursuant to which the Parent or any Parent Subsidiary has incurred any material liabilities (direct, contingent or otherwise) or engaged in any material transaction or entered into any material agreement, in each case, outside of the ordinary course of business which, individually or in the aggregate, would be reasonably expected to have a Parent Material Adverse Effect.

SECTION 5.07.  *Brokers.*  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Parent.

SECTION 5.08.  *Certain Tax Representations and Warranties.*

(a)      Parent has no present plan or intention to liquidate the Company following the Merger, to merge the Company into another corporation, or cause the Company to sell or otherwise dispose of any assets acquired in the Merger, except for dispositions made in the ordinary course of business or transfers described in Section 368(a)(2)(C) of the Code and the Treasury Regulations issued thereunder.

(b)      Parent has no present plan or intention to cause the Company, following the Merger, (A) to not continue its historic business or (B) to not use a significant portion of its historic business assets in a business, in each case within the meaning of Section 1.368-1(d) of the Treasury Regulations.

(c)      Parent has no present plan or intention, following the Merger, to issue additional shares that would result in Parent losing control of the Company within the meaning of Section 368(c) of the Code.

(d)    Neither Parent nor, to the Knowledge of Parent, any person related to Parent within the meaning of Treasury Regulations Section 1.368-1(e)(4), has a present plan or intention to acquire any of the Parent stock issued in the Merger.

(e)    Prior to the Merger, Parent will be in control of Merger Sub within the meaning of Section 368(c) of the Code.

SECTION 5.09.  *Representations Complete*.  None of the representations or warranties made by the Parent herein or in any certificate furnished by the Parent pursuant to this Agreement, when all such documents are read together in their entirety, contains or will contain at the Closing Date any untrue statement of a material fact, or omits or will omit at the Closing Date to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading.

VI.

COVENANTS

SECTION 6.01.  *Conduct of Business by the Company Pending the Closing*.  The Company agrees that, between the date of this Agreement and the Closing Date, unless contemplated by or provided for in this Agreement, or unless Parent shall otherwise agree in writing, (x) the businesses of the Company shall be conducted only in, and the Company shall not take any action except in, the ordinary course of business consistent with past practice and (y) the Company shall use its reasonable efforts to keep available the services of each of the current officers, significant employees and consultants of the Company and to preserve the current relationships of the Company with such of the corporate partners, customers, suppliers and other Persons with which the Company has significant business relations in order to preserve substantially intact its business organization. By way of amplification and not limitation, the Company shall not, between the date of this Agreement and the Closing Date, directly or indirectly, do, or agree to do, any of the following without the prior written consent of Parent:

(a)    amend or otherwise change its Organizational Documents, other than to adopt an amendment to its articles of incorporation to provide for the issuance of Series C Preferred Stock to the UK Minority Shareholders;

(b)    (i) other than with respect to the exercise of currently outstanding Company Options or Company Warrants, and other than with respect to the issuance of shares of a newly-created Series C Preferred Stock to the UK Minority Shareholders, issue or sell or authorize the issuance or sale of any shares of capital stock of the Company of any class, or securities convertible into or exchangeable or exercisable for any shares of such capital stock, or any options, warrants or other rights of any kind to acquire any shares of such capital stock, or any other ownership interest (including, without limitation, any phantom interest), of the Company, or (ii) pledge, dispose of, grant, transfer, lease, license, guarantee or encumber, or authorize the pledge, disposition, grant, transfer, lease, license or encumbrance of any property or assets of the Company, except sales of inventory in the ordinary course of business consistent with past practice;

(c)    (i) acquire (including, without limitation, by merger, consolidation, or acquisition of stock or assets) any interest in any corporation, partnership, other business organization or Person or any division thereof; (ii) other than the borrowing of the Senior Unsecured Promissory Notes, incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person for borrowed money or make any loans or advances material to the business, assets, liabilities, financial condition or results of operations of the Company; (iii) terminate, cancel or request any material change in, or agree to any material change in, any Material Contract or License Agreement; (iv) make or authorize any capital expenditure, other than capital expenditures in the ordinary course of business consistent with past practice that have been budgeted for fiscal year 2006 and disclosed in writing to the Parent and that are not, in the aggregate, in excess of $10,000 for the Company; or (v) enter into or amend any contract, agreement, commitment or arrangement that, if fully performed, would not be permitted under this Section 6.01(c);

(d)    declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock;

(e)    reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock;

(f)    amend the terms of, repurchase, redeem or otherwise acquire, any of its securities or propose to do any of the foregoing;

(g)    (i) grant or announce any stock option, equity or incentive awards or any increase in the compensation payable or to become payable to its directors, officers, consultants or employees; (ii) grant any rights to pension, retirement allowance, termination, severance pay, bonus or other employee benefits to its directors, officers, consultants or employees; (iii) hire any new employees, other than in the ordinary course of business and consistent with past practice with respect to employees with an annual base and incentive compensation opportunity not to exceed $75,000, (iv) enter into any employment or severance agreement which provides benefits upon a change in control of the Company that would be triggered by the transactions contemplated hereby with, any director, officer, consultant or other employee of the Company, in each case who is not currently entitled to such benefits; (v) establish, adopt, enter into, amend or terminate any collective bargaining agreement or any Benefit Plan, except to the extent required by applicable Law or the terms of a collective bargaining agreement; or (vi) enter into or amend any contract, agreement, commitment or arrangement between the Company and any of the Company's directors, officers, consultants or employees;

(h)    pay, discharge or satisfy any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction in the ordinary course of business and consistent with past practice of liabilities reflected or reserved against on the balance sheet of the Company dated as of March 31, 2006 previously presented to the Parent and only to the extent of such reserves;

(i).    make any change with respect to the Company's accounting policies, principles, methods or procedures, including, without limitation, revenue recognition policies, other than as required by GAAP;

(j)    make or change any material Tax election, adopt or change any Tax method of accounting, file any amended Tax Return or refund claim, or settle or compromise any material Tax liability;

(k)    cancel or terminate any insurance policy naming it as a beneficiary or a loss payee, except in the ordinary and usual course of business;

(l)    maintain the books and records of the Company in a manner not consistent with past business practices;

(m)    take any action which would materially adversely affect the goodwill of its suppliers, customers and others with whom it has business relations;

(n)    fail to pay and perform all of its debts, obligations and liabilities as and when due and all leases, agreements, contracts and other commitments to which it is a party in accordance with the terms and provisions thereof;

(o)    fail to comply in all material respects with all Laws that may be applicable to its business; or

(p)    authorize or enter into any formal or informal agreement or otherwise make any commitment to do any of the foregoing or to take any action which would make any of the representations or warranties of the Company contained in this Agreement untrue or incorrect or prevent the Company from performing or cause the Company not to perform its covenants hereunder or result in any of the conditions to the Closing set forth herein not being satisfied.

SECTION 6.02.  *Notices of Certain Events.*  Each of the Parent and the Company shall give prompt notice to the other of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated hereby; (ii) any notice or other communication from any Governmental Entity in connection with the transactions contemplated hereby; (iii) any actions, suits, claims, investigations or proceedings commenced or, to its Knowledge, threatened (in each case, after the date hereof) against, relating to or involving or otherwise affecting the Parent or the Company, or that relate to the consummation of the transactions contemplated hereby; (iv) the occurrence of a default or event that, with the giving of notice or lapse of time or both, will become a default under any Material Contract; and (v) any change that could reasonably be expected to have a Parent Material Adverse Effect or a Company Material Adverse Effect, or to delay or impede the ability of the Parent, the Company or any of the Shareholders to perform their respective obligations under this Agreement and to effect the consummation of the transactions contemplated hereby.

SECTION 6.03.  *Access to Information; Confidentiality.*  (a) Except as required pursuant to any confidentiality agreement or similar agreement or arrangement to which the Parent or the Company is a party or pursuant to applicable Law or the regulations or

requirements of any stock exchange or other regulatory organization with whose rules a party
hereto is required to comply, from the date of this Agreement to the Closing Date, the Parent and
the Company shall (i) provide to the other (and its officers, directors, employees, accountants,
consultants, legal counsel, agents and other representatives (collectively, "*Representatives*"))
access at reasonable times upon reasonable prior notice to its officers, employees, agents,
properties, offices and other facilities and to the books and records thereof, and (ii) furnish
reasonably promptly such information concerning its business, properties, contracts, assets,
liabilities and personnel as the other party or its Representatives may reasonably request. No
investigation conducted pursuant to this Section 6.03 shall affect or be deemed to modify any
representation or warranty made in this Agreement.

(b)    The parties hereto shall comply with, and shall cause their respective
Representatives to comply with, all of their respective obligations under the Confidentiality
Agreement with respect to the information disclosed pursuant to this Section 6.03 or pursuant to
the Confidentiality Agreement. The Shareholders hereby agree to be bound by the terms of the
Confidentiality Agreement as if they were parties thereto.

SECTION 6.04.  *No Solicitation of Transactions.*  The Company and the
Shareholders shall not, directly or indirectly, and shall cause the Company's Representatives not
to, directly or indirectly, solicit, initiate or encourage (including by way of furnishing nonpublic
information), any inquiries or the making of any proposal or offer (including, without limitation,
any proposal or offer to the Shareholders) that constitutes, or may reasonably be expected to lead
to, any Competing Transaction, or enter into or maintain or continue discussions or negotiate
with any Person in furtherance of such inquiries or to obtain a Competing Transaction, or agree
to or endorse any Competing Transaction, or authorize or permit any of the Company's
Representatives to take any such action. Any violation of the restrictions set forth in this
Section 6.04 by any Representative of the Company, whether or not such Person is purporting to
act on behalf of the Company or otherwise, shall be deemed to be a breach of this Section 6.04
by the Company. The Company shall notify the Parent promptly if any proposal or offer, or any
inquiry or contact with any Person with respect thereto, regarding a Competing Transaction is
made, such notice to include the identity of the Person making such proposal, offer, inquiry or
contact, and the terms of such Competing Transaction, and shall keep the Parent apprised, on a
current basis, of the status of such Competing Transaction. The Company immediately shall
cease and cause to be terminated all existing discussions or negotiations with any parties
conducted heretofore with respect to a Competing Transaction. The Company shall not release
any third party from, or waive any provision of, any confidentiality or standstill agreement to
which it is a party.

SECTION 6.05.  *Further Action; Consents; Filings.*  (a) Upon the terms and
subject to the conditions hereof, each of the parties hereto shall use commercially reasonable
efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done, all
things necessary, proper or advisable under applicable Law or otherwise to consummate and
make effective the transactions contemplated hereby, (ii) obtain from Governmental Entities any
consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained
or made by the Parent or the Company in connection with the authorization, execution and
delivery of this Agreement and the consummation of the transactions contemplated hereby and
(iii) make all necessary filings, and thereafter make any other required or appropriate

submissions, with respect to this Agreement and the transactions contemplated hereby required under any applicable Laws. The parties hereto shall cooperate and consult with each other in connection with the making of all such filings.

(b)     Each of the Company and the Parent will give any notices to third Persons, and use commercially reasonable efforts to obtain any consents from third Persons necessary, proper or advisable (as determined in good faith by the Parent with respect to such notices or consents to be delivered or obtained by the Company) to consummate the transactions contemplated by this Agreement.

SECTION 6.06.  *Certain Tax Matters.*  (a) *Transfer Taxes.*  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement, shall be paid by the Shareholders when due, and the Shareholders will, at their own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable law, The Parent will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b)     *Tax Returns.*  The following provisions shall govern the allocation of responsibility as between the Parent and the Shareholders for certain tax matters following the Closing Date:

(i)     *Tax Periods Ending on or Before the Closing Date.*  The Parent shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company and its Subsidiaries for all periods ending on or prior to the Closing Date which are filed after the Closing Date. The Parent shall permit the Shareholders' Representative to review and comment on each such Tax Return described in the preceding sentence prior to filing. The Shareholders shall reimburse the Parent for Taxes of the Company and its Subsidiaries with respect to such periods within fifteen (15) days after payment by the Parent or the Company of such Taxes to the extent such Taxes are not reflected in the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) shown on the face of the Company's balance sheet as of March 31, 2006.

(ii)     *Tax Periods Beginning Before and Ending After the Closing Date.*  The Parent shall prepare or cause to be prepared and file or cause to be filed any Tax Returns of the Company and its Subsidiaries for Tax periods which begin before the Closing Date and end after the Closing Date. The Parent shall permit the Shareholders' Representative to review and comment on each such Tax Return described in the preceding sentence prior to filing. The Shareholders shall pay to the Parent within fifteen (15) days after the date on which Taxes are paid with respect to such periods an amount equal to the portion of such Taxes which relates to the portion of such Taxable period ending on the Closing Date to the extent such Taxes are not reflected in the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book

and Tax income) shown on the face of the Company's balance sheet as of March 31, 2006. For purposes of this Section, in the case of any Taxes that are imposed on a periodic basis and are payable for a Taxable period that includes (but does not end on) the Closing Date, the portion of such Tax which relates to the portion of such Taxable period ending on the Closing Date shall (x) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in the entire Taxable period, and (y) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant Taxable period ended on the Closing Date. Any credits relating to a Taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant Taxable period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with prior practice of the Company and its Subsidiaries.

(iii) *Cooperation on Tax Matters.* The Parent, the Shareholders' Representative and the Shareholders shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Company and the Shareholders agree (A) to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Parent or the Shareholders, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority; and (B) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, the Company or the Shareholders, as the case may be, shall allow the other party to take possession of such books and records.

(iv) The Parent and the Shareholders further agree, upon request, to use their reasonable efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

(v) The Parent and the Shareholders further agree, upon request, to provide the other party with all information that either party may be required to report pursuant to Section 6043 of the Code and all Treasury Department Regulations promulgated thereunder.

(c)  *Tax Sharing Agreements*.  All tax sharing agreements or similar agreements with respect to or involving the Company shall be terminated as of the Closing Date and, after the Closing Date, the Company shall not be bound thereby or have any liability thereunder.

(d)  *FIRPTA Certificate*.  At the Closing, the Company shall provide Parent with a statement pursuant to Treasury Regulations Section 1.897-2(h), dated no more than 30 days prior to Closing, certifying that the shares of the Company do not constitute a U.S. real property interest.

SECTION 6.07.  *Public Announcements*.  Until the earlier of termination of this Agreement or the Closing Date, the Parent, on the one hand, and the Company and the Shareholders, on the other hand, will consult with each other before issuing any press release or otherwise making any public statements with respect to the Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such public statement that is not approved by the other party, except as may be required by Law or the rules of the Nasdaq Capital Market, in which case the parties will make reasonable efforts to consult with each other prior to the making of such public statement.

SECTION 6.08.  *Trading Restriction Agreement Legend*.  Each Parent Certificate Stock issued to a Significant Shareholder shall bear the following legend:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRADING RESTRICTION AGREEMENT, A COPY OF WHICH MAY BE OBTAINED FROM THE SECRETARY OF LIVEPERSON, INC."**

SECTION 6.09.  *Certain Covenants of Parent*.  Parent covenants and agrees in favor of the Shareholders that (i) it shall use commercially reasonable efforts to maintain and grow the customer base of the Company consistent with the practices of Parent and the Company prior to the Closing Date, including, without limitation, supporting the efforts to secure the prospective customers set forth on Annex II and Annex III hereto, and (ii) it shall make timely severance payments to those employees of the Company whose employment is terminated consistent with the Company's prior severance policies, as set forth on Section 6.09.

SECTION 6.10.  *Certain Covenants of Company*.  Company covenants and agrees in favor of Parent to (i) payoff all amounts owed pursuant to the Loan and Security Agreement by and between PSI and RBC Centura Bank, (ii) cause to be repaid in Parent Common Stock, out of the Aggregate Merger Consideration, all of the Senior Secured Promissory Notes Repayment Amount, and (iii) cause to be repaid in Parent Common Stock, out of the Aggregate Merger Consideration, all of the Senior Unsecured Promissory Notes Repayment Amount.

VII.

STOCK MATTERS

SECTION 7.01.  *Required Registration*.  As promptly as practicable after the Closing, unless prohibited by Law, but in no event later than ten (10) calendar days after the Closing Date (or, if such date is any day on which the filing of documents with the SEC pursuant

to the Exchange Act or the rules and regulations thereunder may not be made; then the next day thereafter on which the filing of such documents with the SEC may be made), Parent agrees to file a Registration Statement on Form S-3 or other applicable registration statement (the "*Re-Sale Registration Statement*") to register the resale of any and all of the shares of Parent Common Stock issued or issuable pursuant to this Agreement (together, the "*Shares*"). Parent shall use its commercially reasonable efforts to cause the SEC to declare the Re-Sale Registration Statement effective as promptly as possible, but in any event no later than the 90th day after the Closing; provided, however, that not less than two Business Days prior to the filing of the Re-Sale Registration Statement or any amendment thereto or any supplement to the prospectus included therein, Parent shall provide the Shareholders' Representative with a copy of the Re-Sale Registration Statement or amendment or supplement proposed to be filed and Parent agrees to consider all appropriate comments provided by the Shareholders' Representative with respect to the Re-Sale Registration Statement for inclusion in the Re-Sale Registration Statement; provided, further, that Parent shall have no liability to the Company or the Shareholders' Representative for the failure of the SEC to declare the Re-Sale Registration Statement effective no later than the 90th day after the Closing if such failure is a result, directly or indirectly, of the Company's or the Shareholders' Representative's failure to cooperate with Parent pursuant to the terms of this Agreement. Parent shall thereafter maintain the effectiveness of the Re-Sale Registration Statement until the earlier of (a) the date on which all the Shares have been sold pursuant to the Re-Sale Registration Statement or Rule 144 promulgated under the Securities Act ("*Rule 144*"), and (b) such time as Parent reasonably determines, based on an opinion of counsel, that the holders of the Shares will be eligible to sell under Rule 144 all of the Shares then owned by them within the volume limitations imposed by paragraph (e) of Rule 144 in the three-month period immediately following the termination of the effectiveness of the Re-Sale Registration Statement. Parent's obligations contained in this Section 7.01 shall terminate on the second anniversary of the last date on which shares of Common Stock are issued or released from escrow pursuant to this Agreement.

SECTION 7.02. *Registration Procedures.* (a) In case of the Re-Sale Registration Statement effected by Parent subject to this Article VII, Parent shall keep the Company and its counsel advised in writing as to the initiation of such registration, the effectiveness thereof, any correspondence from the SEC with respect thereto, and the completion thereof. In addition, subject to Section 7.01 above, Parent shall, to the extent applicable to the Re-Sale Registration Statement:

(i)    prepare and file with the SEC such amendments and supplements to the Re-Sale Registration Statement as may be necessary to keep such registration continuously effective and free from any material misstatement or omission necessary to make the statements therein, in light of the circumstances in which they are made, not misleading, and comply with provisions of the Securities Act with respect to the disposition of all securities covered thereby at all times during the period referred to in Section 7.01;

(ii)    update, correct, amend and supplement the Re-Sale Registration Statement as necessary;

(iii)    notify the Shareholders' Representative promptly when the Re-Sale Registration Statement or any amendment thereto is declared effective by the SEC and upon the filing of any amendment to the Re-Sale Registration Statement or any supplement to the prospectus included therein, and furnish such number of prospectuses, including preliminary prospectuses, and other documents incident thereto as the Shareholders' Representative may reasonably request from time to time;

(iv)    use its commercially reasonable efforts to register or qualify the Shares under such other securities or blue sky laws of such jurisdictions of the United States where an exemption is not available and as the Shareholders' Representative may reasonably request to enable it to consummate the disposition in such jurisdiction of the Shares (provided, however, that Parent will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this provision, or (B) consent to general service of process in any such jurisdiction, or (C) subject itself to taxation in any jurisdiction where it is not already subject to taxation);

(v)    notify the Shareholders' Representative at any time when a prospectus relating to the Shares is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus included in the Re-Sale Registration Statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading, and subject to Section 7.02(d), Parent will promptly prepare a supplement or amendment to such prospectus, so that, as thereafter delivered to purchasers of such shares, such prospectus will not contain any untrue statements of a material fact or omit to state any fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vi)    cause all such Shares to be listed or qualified for trading on each securities exchange or market on which similar securities issued by Parent are then listed or qualified and obtain all necessary approvals from such exchange or market for trading thereon;

(vii)    provide a transfer agent and registrar for all such Shares not later than the effective date of the Re-Sale Registration Statement and at all times during the period specified in Section 7.02;

(viii)    upon the sale of any Shares pursuant to the Re-Sale Registration Statement, direct the transfer agent to remove the Securities Act legend from all certificates or other instruments evidencing the Shares;

(ix)    With a view to making available to the Shareholders the benefits of certain rules and regulations of the SEC that at any time permit the sale of the Shares to the public without registration, so long as any Shares are outstanding, Parent shall use its commercially reasonable efforts for a period of two years

following the last date on which shares of Common Stock are issued or released from escrow pursuant to this Agreement:

    (a)    to make and keep public information available, as those terms are understood and defined in Rule 144(c) under the Securities Act;

    (b)    to file with the SEC in a timely manner all reports and other documents required of Parent under the Exchange Act; and

    (c)    to furnish to the Shareholders' Representative upon any reasonable request a written statement by Parent as to its compliance with the public information requirements of Rule 144(c) under the Securities Act; and

    (x)    To advise the Shareholders' Representative promptly after it has received notice or obtained knowledge of the existence of any stop order by the SEC delaying or suspending the effectiveness of the Re-Sale Registration Statement or of the initiation or threat of any proceeding for that purpose, and to make every commercially reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the Re-Sale Registration Statement at the earliest possible time.

    (b)    Notwithstanding anything stated or implied to the contrary in Section 7.02(a) above, Parent shall not be required to consent to any underwritten offering of the Shares or to any specific underwriter participating in any underwritten public offering of the Shares.

    (c)    The holders of the Shares agree that upon receipt of any notice from Parent of the happening of any event of the kind described in Section 7.02(a)(v), and subject to Section 7.02(d), such holders will forthwith discontinue their disposition of Shares pursuant to the registration statement relating to such Shares until the receipt by such holders of the copies of the supplemented or amended prospectus contemplated by Section 7.02(a)(v) (such interim period in which the holders of the Shares are unable to dispose of the Shares is hereinafter referred to as the "*Blocked Period*") and, if so directed by Parent, will deliver to Parent at Parent's expense all copies, other than permanent file copies, then in such holders' possession, of the prospectus relating to such Shares current at the time of receipt of such notice. However, if during the Blocked Period, Parent proposes to register on a registration statement (other than a resale registration statement on Form S-3 or a registration statement on Form S-8 or Form S-4, or their successors, or any other form for a similar limited purpose, or any registration statement covering only securities proposed to be issued in exchange for securities or assets of another corporation) any of its stock or other securities in connection with the public offering of such stock or securities, then Parent shall use its best efforts to include such Shares as requested by the holders thereof in such registration statement filed by Parent with the SEC; provided, however, that in the case of an underwritten public offering, if the underwriters advise Parent that marketing factors require a limitation of the number of shares to be underwritten, Parent and its underwriters shall allocate the number of shares to be registered in such offering as follows: (i) first, to Parent; (ii) second, to the holders of the Shares; and (ii) thereafter, to the extent

additional securities may be included in such offering, to any other holders of Parent securities other than the holders of the Shares.

(d)     In addition to any discontinuance of the disposition of Shares under Section 7.02(c) above, Parent, upon the happening of any pending corporate development, public filing with the SEC or similar event, that, in the good faith judgment of Parent's Board of Directors based on the advice of counsel, renders it advisable to suspend use of the prospectus, may, for no more than forty-five (45) days in the aggregate per event and no more than ninety (90) days in the aggregate in any 180-day period (each a "*Suspension Event*"), suspend use of the prospectus, on written notice to the holders of the Shares (which notice will not disclose the content of any material non-public information and will indicate the date of the beginning and end of the intended period of suspension, if known), in which case the holders of the Shares shall discontinue disposition of Shares covered by the registration statement related to such Shares or prospectus until copies of a supplemented or amended prospectus are distributed to them or until they are advised in writing by Parent that sales of Shares under the applicable prospectus may be resumed and have received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in any such prospectus, provided that in any event holders of Shares will not be required to discontinue disposition of the Shares for more than the aggregate period(s) set forth in this Section 7.02(d) above. The suspension and notice thereof described in this Section 7.02(d) shall be subject to the confidentiality provisions of Section 6.03 herein and the Nondisclosure Agreement and shall not be disclosed by the Seller. Parent may not utilize the suspension described in this Section 7.02(d) for more than two (2) Suspension Events in any twelve-month period. Parent will use commercially reasonably efforts to ensure that the use of the Re-Sale Registration Statement and prospectus may be resumed as promptly as practicable.

(e)     Except as required by Law, all expenses incurred by Parent in complying with this Article VII, including but not limited to, all registration, qualification and filing fees, printing expenses, fees and disbursements of counsel and accountants for Parent, blue sky fees and expenses (including fees and disbursements of counsel related to all blue sky matters) incurred in connection with any registration, qualification or compliance pursuant to this Article VII shall be borne by Parent. All underwriting discounts and selling commissions applicable to a sale incurred in connection with any registration of Shares and the legal fees and other expenses of the holders of the Shares shall be borne by such holders.

If Shares are included in any registration, the holder(s) of such Shares shall furnish Parent such information regarding itself or themselves as Parent may reasonably request and as shall be required in connection with any registration (or amendment or supplement thereto), referred to in this Agreement, and the holders of such Shares shall indemnify Parent with respect thereto in accordance with Article IX hereof. The holders of such Shares agree and acknowledge that Parent may rely on such information as being true and correct for purposes of preparing and filing the Re-Sale Registration Statement at the time of filing thereof and at the time it is declared effective, unless the holders of such Shares have notified Parent in writing to the contrary prior to such time.

SECTION 7.03.  *Transfer of Shares.*  A holder of the Shares may transfer all or any part of his or its Shares to any Affiliate of such holder; provided, that any such transfer shall

be effected in full compliance with all applicable federal and state securities laws, including, but not limited to, the Securities Act, and further provided, that in any such case, it shall be a condition to any such transfer that the transferee execute an agreement stating that the transferee is receiving and holding the Shares subject to the provisions of this Agreement, and there shall be no further transfer of such Shares except in accordance with this Agreement. Parent will effect such transfer of restricted certificates and will promptly amend the Prospectus forming a part of the Re-Sale Registration Statement to add the transferee to the selling shareholders in the Re-Sale Registration Statement; provided that the transferor and transferee shall be required to provide Parent with the information requested by Parent in this Agreement as provided for in the last paragraph of Section 7.02, and information reasonably necessary for Parent to determine that the transfer was effected in accordance with all applicable federal and state securities laws, including, but not limited to, the Securities Act, and all other information reasonably requested by Parent from time to time in connection with any transfer, registration, qualification or compliance referred to in this Article VII.

SECTION 7.04. *Restricted Securities, Stock Certificate Legend.* The holders of the Shares acknowledge that the issuance by Parent of the shares of Common Stock to such holders hereunder has not and will not be registered under the Securities Act by reason of their contemplated issuance in transactions exempt from the registration and prospectus delivery requirements of the Securities Act pursuant to Section 4(2) thereof, and that such shares will be deemed "restricted securities" for purposes of the Securities Act. The holders of the Shares acknowledge that any certificate or certificates representing shares of Common Stock issued pursuant to this Agreement initially shall bear the following legend, in addition to any legend that may be required by any Law or any other provisions of this Agreement:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF (i) AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER SAID ACT OR (ii) AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SUCH ACT."

SECTION 7.05. *Reservation of Stock; Certain Adjustments.* Parent shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of issuance of the shares of Common Stock hereunder, a sufficient number of shares of Common Stock to issue such shares, and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to issue the shares of Common Stock that Parent is required to issue pursuant to the terms of this Agreement, in addition to such other remedies as shall be available to the holders of the Shares, Parent will use its reasonable efforts to take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes. In addition, if any of the types of adjustment contemplated by Section 2.11 shall occur, Parent shall modify the number of shares of its common stock reserved under this Section 7.05 to account for such adjustment.

SECTION 7.06. *No Shareholder Rights.* Prior to the issuance of the shares of Common Stock pursuant to the terms of this Agreement, the holders of the Shares shall not be entitled, by virtue of this Agreement, to any rights of a stockholder of Parent, including (without limitation) the right to vote, receive dividends or other distributions or be notified of stockholder meetings, and except as otherwise provided herein, the holders of the Shares shall not be entitled to any notice or other communication concerning the business or affairs of the Buyer, except as required by Law.

SECTION 7.07. *Compliance with Law or Stock Exchange.* If at any time after Closing, any new Law, rule or regulation is enacted or promulgated by (i) any national securities exchange or Nasdaq; or (ii) any federal or state securities authority having jurisdiction over Parent, which must be satisfied in the good faith determination of the Parent as a condition of the issuance of any shares of Common Stock pursuant to the terms of this Agreement, or if the consent or approval of a Governmental Entity to the issuance of any shares of Common Stock must be obtained as a condition to such issuance, in whole or in part, then Parent may delay such issuance until such condition has been satisfied. Parent and the holders of the Shares mutually agree to cooperate with one another to satisfy any such condition as promptly as possible and to provide any information, representations and agreements as are required for such purpose.

SECTION 7.08. *Limitation on Resale.* The provisions of the Trading Restriction Agreement limiting the resale of the Shares shall not apply to any transfer permitted pursuant to Section 7.03 hereunder.

VIII.

CONDITIONS PRECEDENT

SECTION 8.01. *Conditions Precedent to the Obligations of Each Party.* The obligations of the parties hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, if permitted by applicable Law, waiver of the following conditions:

(a)    no court of competent jurisdiction shall have issued or entered any order, writ, injunction or decree, and no other Governmental Entity shall have issued any order, which is then in effect and has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting its consummation;

(b)    all consents, approvals and authorizations legally required to be obtained to consummate the transactions contemplated hereby shall have been obtained from all Governmental Entities, except where the failure to obtain any such consent, approval or authorization could not reasonably be expected to result in a Parent Material Adverse Effect or a Company Material Adverse Effect; and

(c)    the Parent, the Shareholders' Representative and the Escrow Agent shall have executed and delivered an Escrow Agreement.

SECTION 8.02. *Conditions Precedent to the Obligation of the Parent.* The obligation of the Parent to consummate the transactions contemplated by this Agreement is

subject, at the option of the Parent, to the satisfaction at or prior to the Closing Date of each of the following conditions:

(a)    *Accuracy of Representations and Warranties.* The representations and warranties of the Company contained in this Agreement or in any certificate or document delivered to the Parent pursuant hereto shall be true and correct in all material respects (other than representations and warranties subject to "materiality" or "material adverse effect" qualifiers, which shall be true and correct in all respects) both when made and on and as of the Closing Date as though made at and as of the Closing Date (other than representations and warranties which address matters only as of a certain date which shall be so true and correct as of such certain date), and, if the Closing Date shall occur on a date other than the date hereof, the Company shall have so certified to the Parent in writing.

(b)    *Compliance with Covenants.* The Company and the Shareholders' Representative shall have performed and complied in all material respects with all terms, agreements, covenants and conditions of this Agreement to be performed or complied with by him or her at or prior to the Closing Date, and, if the Closing Date shall occur on a date other than the date hereof, the Company and the Shareholders' Representative shall have so certified to the Parent in writing.

(c)    *All Proceedings To Be Satisfactory.* All proceedings to be taken by the Company and the Shareholders' Representative in connection with the transactions contemplated hereby and all documents incident thereto shall be reasonably satisfactory in form and substance to the Parent and its counsel, and the Parent and said counsel shall have received all such counterpart originals or certified or other copies of such documents as they may reasonably request.

(d)    *No Material Adverse Change.* There shall not have occurred since December 31, 2005 any Company Material Adverse Effect, and, if the Closing Date shall occur on a date other than the date hereof, the Company shall have so certified to the Parent in writing.

(e)    *Opinion of Counsel.* The Parent shall have received the opinion of Kilpatrick Stockton LLP, counsel to the Company, in substantially the form of **Exhibit B** hereto.

(f)    *Consents and Approvals.* The authorizations, consents, waivers and approvals set forth in Section 3.05(c) of the Company Disclosure Schedule shall have been duly obtained and shall be in form and substance satisfactory to counsel for the Parent.

(g)    *SAS 100.* The Parent shall have received a review report, reasonably satisfactory in form and substance to the Parent, from the Company's independent public accountants, pursuant to Statement of Accounting Standards No. 100.

(h)    *Contractual Severance Waiver Employees.* Each Contractual Severance Waiver Employee shall have signed a letter agreement in form and substance satisfactory to the Parent and its counsel pursuant to which such person shall waive any and all rights he may have to receive severance payments from the Company.

(i)    *Board Resignations.* The Parent shall have received from each Person who is, immediately prior to the Closing Date, a director of the Company or any of its Subsidiaries, his or her written resignation, effective as of the Closing Date, from such position.

(j)    *Termination of Agreements.* All agreements between any Shareholder and the Company shall have been terminated and of no further force or effect as of the Closing Date.

(k)    *Trading Restriction Agreements.* Trading Restriction Agreements in substantially the form set forth in Exhibit C hereto and otherwise in form and substance satisfactory to the Parent and its counsel shall have been executed by the Parent and each of the Shareholders.

(l)    *Identification of Non-Accredited Shareholders.* At least one Business Day prior to the scheduled Closing, the Company shall revise Schedule I hereto to indicate, based on the responses to information the Company has received from the Shareholders, which Shareholders are Accredited Holders and which Shareholders are Non-Accredited Shareholders.

(m)    *Maximum Amount of Non-Accredited Shareholder Consideration.* The Non-Accredited Shareholders' Consideration shall not exceed $200,000.

(n)    *Maximum Dissenters' Rights.* The holders of no more than ten percent (10%) of the outstanding shares of any class of capital stock of the Company shall have exercised their dissenters rights pursuant to Section 2.06, and have not, as of the Closing Date, effectively withdrawn or become ineligible for their dissenters' rights under the GBCC.

(o)    *Waivers from Certain Holders of Options.* The Company shall have obtained waivers from holders of Company Options and from holders of options granted by the Company outside of the Company Stock Option Plans whose options do not include the ration provision described in Section 2.04(f).

(p)    *Supporting Documents.* On or prior to the Closing Date, the Parent and its counsel shall have received copies of the following supporting documents:

(i)    (A) the Third Amended and Restated Articles of Incorporation of the Company certified as of a recent date by the Secretary of State of the state in which the Company is incorporated and (B) a certificate of the Secretary of State of the state in which the Company is incorporated as to the due incorporation and existence of the Company and listing all documents on file with said official;

(ii)    a certificate of the Secretary of the Company, dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the By-laws of the Company as in effect on the date of such certification; and (B) that the Third Amended and Restated Articles of Incorporation of the Company have not been amended since the date of the last amendment referred to in the certificate delivered pursuant to clause (i)(B) above;

(iii)    a consent and waiver in the form of Exhibit D attached hereto signed by each of the UK Minority Shareholders;

(iv)    a UK Exchange Agreement in the form of Exhibit E attached hereto signed by each of the UK Minority Shareholders; and

(v)    such additional supporting documents and other information with respect to the operations and affairs of the Company as the Parent or its counsel may reasonably request.

All such documents shall be satisfactory in form and substance to the Parent and its counsel.

SECTION 8.03.  *Conditions Precedent to the Obligations of the Company and the Shareholders.*  The obligations of the Company and the Shareholders to consummate the transactions contemplated by this Agreement are subject, at the option of the Company and the Shareholders, to the satisfaction at or prior to the Closing Date of each of the following conditions:

(a)    *Accuracy of Representations and Warranties.*  The representations and warranties of the Parent contained in this Agreement or in any certificate or document delivered to the Company and the Shareholders pursuant hereto shall be true and correct in all material respects (other than representations and warranties subject to "materiality" or "material adverse effect" qualifiers, which shall be true and correct in all respects) both when made and on and as of the Closing Date as though made at and as of the Closing Date (other than representations and warranties which address matters only as of a certain date which shall be so true and correct as of such certain date), and, if the Closing Date shall occur on a date other than the date hereof, the Parent shall have so certified to the Company and the Shareholders in writing.

(b)    *Compliance with Covenants.*  The Parent shall have performed and complied in all material respects with all terms, agreements, covenants and conditions of this Agreement to be performed or complied with by it at or prior to the Closing Date, and, if the Closing Date shall occur on a date other than the date hereof, the Parent shall have so certified to the Company and the Shareholders in writing.

(c)    *All Proceedings to Be Satisfactory.*  All proceedings to be taken by the Parent in connection with the transactions contemplated hereby and all documents incident thereto shall be reasonably satisfactory in form and substance to the Company and the Shareholders and their respective counsel, and the Company and the Shareholders and said counsel shall have received all such counterpart originals or certified or other copies of such documents as they may reasonably request.

IX.

INDEMNIFICATION

SECTION 9.01.  *Survival of Representations and Warranties.*  The representations and warranties set forth in Articles III and IV and elsewhere in this Agreement or in any other Transaction Document will survive until the first anniversary of the Closing Date. This Section 9.01 shall not limit any covenants or agreements of the parties hereto that by its terms contemplated performance after the Closing Date.

SECTION 9.02. *Tax Indemnity.* (a) Subject to the terms and conditions of this Article IX, the Accredited Holders jointly and severally agree to and will indemnify, defend and hold harmless the Parent, the Company and the Company Subsidiaries, and their respective officers, directors, advisors, Affiliates, agents, employees and each Person, if any, who controls or may control the Parent within the meaning of the Securities Act (the "*Parent Indemnified Group*") from and against any and all Taxes incurred by, imposed upon or attributable to the Company or the Company Subsidiaries, including, without limitation, reasonable legal fees and expenses incurred by the Company and the Company Subsidiaries or any party hereto and relating thereto, for any period (or portion thereof) prior to and including the Closing Date to the extent that such Taxes were not reflected on the Company Financial Statements as a reserve for the payment of Taxes for the period (or portion thereof) ending on or prior to the Closing Date, including without limitation any amount due for sales and use Taxes payable as a result of an audit conducted by state or local governmental authorities.

(b)    For purposes of this Section 9.02, any interest, penalty or additional charge included in Taxes shall be deemed to be a Tax for the period to which the item or event giving rise to such interest, penalty or additional charge is attributable, and not a Tax for the period during which such interest, penalty or additional charge accrues.

(c)    The indemnity provided for in this Section 9.02 shall be independent of any other indemnity provision hereof. Any Taxes, legal fees and expenses subject to indemnification under this Section 9.02 shall not be subject to indemnification under Section 9.03 hereof.

SECTION 9.03. *General Indemnity.* (a) Subject to the terms and conditions of this Article IX, the Accredited Holders agree to and will, jointly and severally, indemnify, defend and hold the Parent Indemnified Group harmless from and against all demand so claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including without limitation interest, penalties and reasonable attorneys' fees and expenses (hereinafter collectively called "*Damages*"), asserted against, resulting to, imposed upon or incurred by the Company, the Company Subsidiaries or the Parent, by reason of, resulting from or arising out of (without duplication):

(i)    a breach of any representation or warranty of the Company or any Shareholder contained in or made pursuant to this Agreement, or any facts or circumstances constituting such a breach, except as and to the extent that Section 9.02 above shall be applicable thereto, in which case the provisions of said Section 9.02 shall govern;

(ii)    any breach of any covenant or agreement of the Company or any Shareholder contained in or made pursuant to this Agreement or the Escrow Agreement; or

(iii)    any claim of infringement of a patent, copyright, trademark, trade secret or other intellectual property right by or on behalf of Company in connection with providing products or services (at any time) to Company Existing

Customers, Company Pipeline Customers, and/or Company Business Development Customers.

(b)    Subject to the terms and conditions of this Article IX, the Parent agrees to and will indemnify, defend and hold the Company (prior to the Closing Date) and the Shareholders (following the Closing Date) harmless from and against all Damages asserted against, resulting to, imposed upon or incurred by them by reason of or resulting from or arising out of (i) a breach of any representation or warranty of the Parent contained in or made pursuant to this Agreement, or any facts or circumstances constituting such a breach, or (ii) any breach of any covenant or agreement of the Parent contained in or made pursuant to this Agreement or the Escrow Agreement.

SECTION 9.04.  *Conditions of Indemnification.*  The respective obligations and liabilities of the Accredited Holders, on the one hand, and the Parent, on the other hand (herein sometimes called the *"indemnifying party"*), to the other (herein sometimes called the *"party to be indemnified"* or the *"indemnified party"*) with respect to claims resulting from the assertion of liability by third parties shall be subject to the following terms and conditions:

(a)    within 30 days after receipt of notice of commencement of any action or the assertion of any claim by a third party, the party to be indemnified shall give the indemnifying party written notice thereof together with a copy of such claim, process or other legal pleading (provided that failure so to notify the indemnifying party of the assertion of a claim within such period shall not affect its indemnity obligation hereunder except as and to the extent that such failure shall adversely affect the defense of such claim), and the indemnifying party shall have the right to undertake the defense thereof by representatives of its own choosing;

(b)    in the event that the indemnifying party, by the 30th day after receipt of notice of any such claim (or, if earlier, by the tenth day preceding the day on which an answer or other pleading must be served in order to prevent judgment by default in favor of the Person asserting such claim), does not elect to defend against such claim, the party to be indemnified will (upon further notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk of the indemnifying party, subject to the right of the indemnifying party to assume the defense of such claim at any time prior to settlement, compromise or final determination thereof;

(c)    anything in this Section 9.04 to the contrary notwithstanding, (i) if there is a reasonable probability that a claim may materially and adversely affect the indemnified party other than as a result of money damages or other money payments, the indemnified party shall have the right, at its own cost and expense, to compromise or settle such claim, but (ii) the indemnified party shall not, without the prior written consent of the indemnifying party, settle or compromise any claim or consent to the entry of any judgment which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the indemnifying party a release from all liability in respect of such claim;

(d)    any rights of the indemnified party under this Article IX based on the breach of a representation, warranty or covenant or based on the failure of such representation or warranty to be true as of the date hereof or the Closing Date shall not be diminished or otherwise affected in any way as a result of the existence of such indemnified party's Knowledge of such breach or untruth as of the date hereof or as of the Closing Date, regardless of whether such Knowledge exists as a result of the indemnified party's investigation or as a result of disclosure by the Company (or any other Person), unless such disclosures were set forth in this Agreement or in any applicable schedules hereto; and

(e)    in connection with any such indemnification, the indemnified party will cooperate in all reasonable requests of the indemnifying party.

In the event that the "indemnifying party" or the "party to be indemnified" as described in this Section 9.04 is the Shareholders as a group, then any notices required to be given to or by, and all other actions or decisions required to be taken or made by, such "indemnifying party" or the "party to be indemnified" as provided in this Section 9.04, may be given to or by, or may be taken or made by, the Shareholders' Representative.

SECTION 9.05.  *Threshold for Damages.*  Notwithstanding the foregoing, an Indemnified Person may not make a claim for Damages until the aggregate amount of claims by Indemnified Persons exceeds $50,000 (the "*Threshold Amount*"); *provided, however,* that once the aggregate amount of Damages of Indemnified Persons exceeds the Threshold Amount, then the Indemnified Persons shall have the right to recover the full amounts due without regard to the threshold.  In determining the amount of any Damage attributable to a breach, any materiality standard contained in a representation, warranty or covenant of the Shareholders or the Company shall be disregarded.  Notwithstanding anything contained in this Section 9.05, any breach of the representations, warranties or covenants contained in Section 2.05 or Section 3.03 shall not be subject to the foregoing Threshold Amount.

SECTION 9.06.  *Escrow Funds.*  On the Closing Date, the Parent shall deliver to the Escrow Agent the Indemnity Escrow Fund and the Balance Sheet Escrow Fund.  The Indemnity Escrow Fund and the Balance Sheet Escrow Fund shall be held by the Escrow Agent under the Escrow Agreement pursuant to the terms set forth therein.  Except in the case of fraud, criminal activity, intentional misrepresentation or intentional misconduct, the sole and exclusive monetary remedy for any breach or alleged breach of any representation, warranty, covenant or agreement in this Agreement or any Transaction Document shall be indemnification in accordance with this Article IX and any recovery for Damages related thereto shall be limited to the Parent Common Stock held in the Indemnity Escrow Fund from time to time.  Except in the case of fraud, criminal activity, intentional misrepresentation or intentional misconduct, no Shareholder shall have any personal liability whatsoever to any Parent Indemnified Person in respect of or in connection with this Agreement or any of the transactions contemplated hereby or herein.  Except as set forth above, and in furtherance of the foregoing, each party hereby waives, to the fullest extent permitted by applicable Law, any and all other rights, claims and causes of action (including rights of contribution, if any) known or unknown, foreseen or unforeseen, which exist or may arise in the future, that it may have against the Shareholders or the Parent, as the case may be, arising under or based upon any federal, state or local Law.

SECTION 9.07. *Escrow Period.* The Parent shall release to the Shareholders on a pro rata basis any portion of the Indemnity Escrow Fund remaining in escrow on the first anniversary of the Closing Date (the *"Indemnity Escrow Period"*); *provided, however,* that a portion of the Indemnity Escrow Fund that is necessary to satisfy any unsatisfied claims on the Indemnity Escrow Fund prior to termination of the Escrow Period with respect to facts and circumstances existing prior to expiration of the Escrow Period, shall remain in escrow until such claims have been resolved.

SECTION 9.08. *Claims upon Escrow.* Upon simultaneous delivery to the Shareholders' Representative and to the Escrow Agent on or before the last day of the Escrow Period of a certificate signed by any officer of the Parent (an *"Officer's Certificate"*):

      (i)      stating that Damages exist in an aggregate amount greater than $50,000; and

      (ii)      specifying in reasonable detail the individual items of such Damages included in the amount so stated, the date each such item was paid, or properly accrued or arose, and the nature of the misrepresentation or breach of representation, warranty, covenant or agreement made by the Company or the Shareholders under this Agreement,

the Escrow Agent shall, subject to the provisions of Sections 9.09 and 9.10 hereof, remove for the benefit of the Parent, or the benefit of the other indemnified Persons, a portion of the Indemnity Escrow Fund having a value equal to such Damages in accordance with the Escrow Agreement. The per share value of the Escrow Shares shall be deemed to be the Closing Price.

SECTION 9.09. *Objections to Claims.* At the time of delivery of any Officer's Certificate to the Shareholders' Representative and for a period of thirty (30) days after delivery to the Shareholders' Representative of such Officer's Certificate, the Parent shall not remove any portion of the Indemnity Escrow Fund unless it shall have received written authorization from the Shareholders' Representative to make such delivery. After the expiration of such thirty (30) day period, the Parent shall remove the appropriate portion of the Indemnity Escrow Fund in accordance with Section 9.06 hereof, provided that no such delivery may be made if the Shareholders' Representative shall object in a written statement to the claim made in the Officer's Certificate, and such statement shall have been delivered to the Parent prior to the expiration of such thirty (30) day period.

SECTION 9.10. *Resolution of Conflicts; Arbitration.* (a) In the event the Shareholders' Representative shall so object in writing to any claim or claims by the Parent made in any Officer's Certificate, the Parent shall have thirty (30) days after receipt of an objection by the Shareholders' Representative to respond in a written statement to the objection of the Shareholders' Representative. If after such thirty (30) day period there remains a dispute as to any claims, the Shareholders' Representative and the Parent shall attempt in good faith for forty-five (45) days to agree upon the rights of the respective parties with respect to each of such claims. If the Shareholders' Representative and the Parent should so agree, a memorandum setting forth such agreement shall be prepared, signed by both parties and delivered to the Escrow Agent.

(b)    If no such agreement can be reached after good faith negotiation, either the Parent or the Shareholders' Representative may, by written notice to the other, demand arbitration of the matter unless the amount of the damage or loss is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained or both parties agree to arbitration; and in either such event the matter shall be settled by arbitration conducted by three arbitrators. Within fifteen (15) days after such written notice is sent, the Parent and the Shareholders' Representative shall each select one arbitrator, and the two arbitrators so selected shall select a third arbitrator. The decision of the arbitrators as to the validity and amount of any claim in such Officer's Certificate shall be binding and conclusive upon the parties to this Agreement.

(c)    Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction. Any such arbitration shall be held in the State of New York under the commercial rules then in effect of the American Arbitration Association. For purposes of this Section 9.10, in any arbitration hereunder in which any claim or the amount thereof stated in the Officer's Certificate is at issue, the Parent shall be deemed to be the "Non-Prevailing Party" unless the arbitrators award the Parent at least one-half (1/2) of the amount in dispute, plus any amounts not in dispute; otherwise, the Accredited Holders shall be deemed to be the Non-Prevailing Party. The Non-Prevailing Party to an arbitration shall pay its own expenses, the fees of each arbitrator, the administrative fee of the American Arbitration Association, and the expenses, including without limitation, attorneys' fees and costs, reasonably incurred by the other party to the arbitration.

## X.

## TERMINATION AND ABANDONMENT

SECTION 10.01. *Termination.* This Agreement may be terminated at any time prior to the Closing on the Closing Date:

(a)    by the mutual consent of the Company and the Parent;

(b)    by the Parent, on the one hand, or the Company, on the other hand, if the Closing shall not have occurred on or before August 31, 2006, or such later date as may be agreed upon by the parties hereto, *provided, however,* that the right to terminate this Agreement under this clause (b) shall not be available to any party (a "*Defaulting Party*") whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in the failure of the Closing to occur on or before such date;

(c)    by the Parent, upon a breach of any representation, warranty, covenant or agreement on the part of the Company or any Shareholder set forth in this Agreement, or if any representation or warranty of the Company shall have become untrue, incomplete or incorrect, in either case such that the conditions set forth in Section 8.02 would not be satisfied (a "*Terminating Company Breach*"); *provided, however,* that if such Terminating Company Breach is curable by the Company through the exercise of its reasonable efforts within twenty (20) days and for so long as the Company continues to

exercise such reasonable efforts, the Parent may not terminate this Agreement under this Section 10.01(c); or

(d)    by the Company or the Shareholders, upon breach of any representation, warranty, covenant or agreement on the part of the Parent set forth in this Agreement, or if any representation or warranty of the Parent shall have become untrue, incomplete or incorrect, in either case such that the conditions set forth in Section 8.03 would not be satisfied (a "*Terminating Parent Breach*"); *provided, however*, that if such Terminating Parent Breach is curable by the Parent through the exercise of its reasonable efforts within twenty (20) days and for so long as the Parent continues to exercise such reasonable efforts, the Company may not terminate this Agreement under this Section 10.01(d).

If the Closing shall not have occurred, or this Agreement shall not have been terminated in accordance with this Section 10.01, by December 31, 2006, this Agreement shall automatically terminate on said date, *provided, however*, that such termination shall not affect the liability hereunder of any Defaulting Party.

SECTION 10.02.  *Procedure and Effect of Termination*.  In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by any or all of the parties pursuant to Section 10.01 above, written notice thereof shall forthwith be given to the other parties to this Agreement (other than in the event of an automatic termination as provided in such Section) and this Agreement (except for this Section and Sections 10.01 and 11.01, which shall continue) shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided in this Agreement:

(a)    the parties hereto will promptly redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

(b)    no party shall have any liability or further obligation to any other party to this Agreement pursuant to this Agreement except as provided in this Article X.

XI.

## MISCELLANEOUS

SECTION 11.01.  *Expenses, Etc.*  (a) All Expenses shall be paid by the party incurring such Expenses.

(b)    The Shareholders, on the one hand, and the Parent, on the other hand, will indemnify the other and hold it or them harmless from and against any claims for finders' fees or brokerage commissions in relation to or in connection with such transactions as a result of any agreement or understanding between such indemnifying party and any third party.

SECTION 11.02. *Notices.* All notices which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient and deemed to be received if (i) on the date of delivery, if delivered personally, (ii) 3 days after mailing, if mailed by registered or certified mail, return receipt requested and postage prepaid, (iii) the day after mailing, if sent via a nationally recognized overnight courier service or (iv) the day after transmission, if sent via facsimile or e-mail confirmed in writing to the recipient, in each case as follows:

if to the Parent, to:

> LivePerson, Inc.
> 462 Seventh Avenue, 3rd Floor
> New York, New York 10018
> Attention: Timothy E. Bixby

with a copy (which shall not constitute notice) to:

> Proskauer Rose LLP
> 1585 Broadway, 23rd Floor
> New York, New York 10036
> Attention: Brian B. Margolis, Esq.

If to the Company (prior to Closing), or to the Shareholders' Representative (after Closing), to:

> Proficient Systems, Inc.
> 2859 Paces Ferry Road, Suite 820
> Atlanta, Georgia 30339
> Attention: Chief Executive Officer

with a copy (which shall not constitute notice) to:

> Kilpatrick Stockton LLP
> 1100 Peachtree Street, Suite 2800
> Atlanta, Georgia 30309
> Attention: James Steinberg, Esq.
>             Gregory K. Cinnamon, Esq.

if to any Shareholder, to the address appearing under the name of such Shareholder in Schedule 1 hereto;

or such other address or addresses as any party shall have designated by notice in writing to the other parties.

SECTION 11.03. *Waivers.* Either the Shareholders' Representative, on the one hand, or the Parent, on the other hand, may, by written notice to the other, (i) extend the time for the performance of any of the obligations or other actions of the other under this Agreement, (ii) waive any inaccuracies in the representations or warranties of the other contained in this

Agreement or in any document delivered pursuant to this Agreement, (iii) waive compliance with any of the conditions or covenants of the other contained in this Agreement, or (iv) waive performance of any of the obligations of the other under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

SECTION 11.04. *Amendments, Supplements, Etc.* At any time this Agreement may be amended or supplemented by such additional agreements, articles or certificates, as may be determined by the parties hereto to be necessary, desirable or expedient to further the purposes of this Agreement, or to clarify the intention of the parties hereto, or to add to or modify the covenants, terms or conditions hereof or to effect or facilitate any governmental approval or acceptance of this Agreement or to effect or facilitate the filing or recording of this Agreement or the consummation of any of the transactions contemplated hereby. Any such instrument must be in writing and signed by the Parent, the Company and the Shareholders' Representative.

SECTION 11.05. *Governing Law; Submission to Jurisdiction.* This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York other than conflict of laws principles thereof directing the application of any law other than that of New York. Courts within the State of New York, County of New York or the United States District Court for the Southern District of New York will have jurisdiction over all disputes between the parties hereto arising out of or relating to this agreement and the agreements, instruments and documents contemplated hereby. The parties hereby consent to and agree to submit to the jurisdiction of such courts. Each of the parties hereto waives, and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party is not personally subject to the jurisdiction of such courts, (ii) such party and such party's property is immune from any legal process issued by such courts or (iii) any litigation commenced in such courts is brought in an inconvenient forum.

SECTION 11.06. *Waiver of Jury Trial.* Each party hereto hereby irrevocably waives all right to trial by jury in any proceeding (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or any transaction or agreement contemplated hereby or the actions of any party hereto in the negotiation, administration, performance or enforcement hereof.

SECTION 11.07. *Headings; Interpretation.* The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

SECTION 11.08. *Counterparts*. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

SECTION 11.09. *Entire Agreement*. This Agreement (including the Exhibits, Schedules, Annexes and the Company Disclosure Schedule) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto. No addition to or modification of any provision of this Agreement shall be binding upon any party hereto unless made in writing and signed by all parties hereto. Parent hereby agrees to use its best efforts to ensure that the Company Disclosure Schedule is not filed with the SEC or any stock exchange; *provided*, *however*, that if such a filing or disclosure is required under applicable rules or regulations, Parent will use its best efforts to seek confidential treatment of those portions of the Company Disclosure Schedule that Parent and/or the Shareholders' Representative reasonably believes are appropriate provisions for confidential treatment.

SECTION 11.10. *Binding Effect; Benefits*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

SECTION 11.11. *Assignability*. Neither this Agreement nor any of the parties' rights hereunder shall be assignable by any party hereto without the prior written consent of the other parties hereto, except (i) in the case of the Parent, to any Person who shall acquire substantially all of the assets of the Parent or a majority of the voting securities of the Parent, whether pursuant to a merger, consolidation, sale of stock or otherwise, and (ii) in the case of an individual Shareholder, to the estate of such Shareholder upon death.

SECTION 11.12. *Severability*. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the parties hereto as of the day and year first above written.

LIVEPERSON, INC.

By:  /s/ Robert P. LoCascio
Name:  Robert P. LoCascio
Title:  Chief Executive Officer

SOHO ACQUISITION CORP.

By:  /s/ Robert P. LoCascio
Name:  Robert P. LoCascio
Title:  President

PROFICIENT SYSTEMS, INC.

By:  /s/ Gregg Freishtat
Name:  Gregg Freishtat
Title:  Chairman and Chief Executive Officer

SHAREHOLDERS' REPRESENTATIVE

By:  /s/ Gregg Freishtat
Name:  Gregg Freishtat



IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the parties hereto as of the day and year first above written.

LIVEPERSON, INC.

By: _____
Name:
Title:

PROFICIENT SYSTEMS, INC.

By: _____
Name:
Title:

SHAREHOLDERS' REPRESENTATIVE

By: _____
Name:

SOHO ACQUISITION CORP.

By: _____
Name:
Title:

## Annex I
## Existing Customers

*US Customers*

AllergyBuyers
Allstate
Carlston (Saturn – GM)
CarMax
JP Morgan Chase
Cisco
Collegiate Funding Services
Comparison Market
CorCell
E-Loan
E*Trade
First Citizens Bank
Geico
Home Depot
HomeBanc
Huntington
IntsyTel
National City
SelectQuote
Siebel/Oracle
H&R Block
Ohio Savings Bank
Trilogy (Cars Complete)
web.com (Interland)

*UK Customers*

Alliance & Leicester
Barclays
Citibank
HBOS
HSBC
MD Nationwide
Nationwide
RBS

<u>Annex II</u>
<u>Pipeline Prospects</u>

IBM
Polymedica / Liberty Medical
AARP
Assurant
Hartford Financial
Hilton Vacations
Inphonic / VMC / Wirefly.com
Echostar
American Century
Compass Bank
Mark Travel, for itself and on behalf of several related
    brands

United Vacations, MGM Mirage
Vacations, Midwest Airlines
Vacations, Spirit Airlines
Vacations, Trisept Solutions,
Southwest Airline Vacations,
Funjet Vacations, Transglobal

Enterprise Rent a Car
College Loan (w/ affiliates)
Egg Substitute for Symantec
Three Mobile Substitute for EMC
Lloyds TSB
www.kuoni.co.uk
www.statravel.co.uk
Ingram Micro
The AA
Gateway, Sallie Mae, Vodafone UK Buisness, Adobe
Let's Talk
Sky.com
AAA Life
Zions Bank
First Choice

(The least of any of the four)

## Annex III
## Business Development Partner Prospects

Carlson
- GM
- Hummer
- Saab
- Carlson Wagonlit Travel

Sykes
- Nokia

Lumley
- Americanas
- FastShop
- CVC
- Submarino
- Tecnicea
- Cyrella
- BRA Airlines
- Fravega
- Falabella
- Gala
- Banco de Santiago
- Wong
- Bosch
- Banco de Pechincha
- La Curacao
- Elektra
- Liverpool
- Palacio de Hierro

Trilogy
- AutoNation

Lincoln Consulting (now known as Talent)
- UCG and its affiliates (www.ucg.com)
- East West Mortgage
- XM Radio

Teletech
- AON Insurance
- FirstGov.Gov
- GMAC Insurance
- Internal Revenue Service / Dept of Treasury
- Mutual of Omaha
- St. Paul Insurance

Planexis
- Cogeco
- Videotron