```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
GREGG FREISHTAT, as Shareholders'
Representative,
                                        07 Civ. 6838 (JGK)
                  Plaintiff,
                                        MEMORANDUM OPINION
        - against -                     AND ORDER

LIVEPERSON, INC.,

                  Defendant.
------------------------------------
```

**JOHN G. KOELTL, District Judge:**

This case arises out of a dispute over a merger agreement between LivePerson, Inc. ("LivePerson" or the "defendant") and Proficient Systems, Inc. ("Proficient"). Gregg Freishtat, as Shareholders' Representative for Proficient shareholders, (the "plaintiff") moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. The plaintiff seeks summary judgment as to the meaning of "cancel" as used in the Merger Agreement. LivePerson opposes the motion.

I

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v.

Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Adams v. City of New York, No. 08 Civ. 5263, 2010 WL 743956, at *1 (S.D.N.Y. Mar. 2, 2010).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source

from which a reasonable inference could be drawn in favor of the non-moving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases); Adams, 2010 WL 743956, at *1.

## II

The following facts are undisputed, except where noted.

LivePerson is a provider of online instant messaging and business analytics technologies that its customers use to provide online sales assistance and customer services to consumers on the Internet.  Proficient had similar messaging technology and an existing customer base.  Freishtat is the Proficient shareholders' representative.

In June 2006, LivePerson acquired all the outstanding capital stock of Proficient.  Under the Agreement and Plan of Merger (the "Merger Agreement"), the acquisition price included an Earn-Out Payment, which entitled Proficient shareholders to receive up to 2,050,000 shares of LivePerson common stock.  The

Earn-Out Payment was calculated according to a formula based on LivePerson's net annualized revenue.  The net annualized revenue was based on revenue LivePerson received from customers in March 2007.

In order to calculate the revenue for March 2007, the parties used the formula set forth in the Merger Agreement for the Normalized Monthly Revenue.  Normalized Monthly Revenue for any month was defined to mean "the monthly recurring revenue which [LivePerson] books as revenue in that month . . ." with certain explicit exclusions and additions.  (Pl.'s Ex. 1 at 8-9.)  The revenue calculation specifically excluded, among other things, "any revenue booked by [LivePerson] from [Proficient] Existing Customers, [Proficient] Business Development Customers or [Proficient] Pipeline Customers that have indicated to [LivePerson] in writing that they <u>intend to cancel</u> their contract." (Pl.'s Ex. 1 at 9.)(emphasis added).  The parties dispute the meaning of "cancel" in this provision.

As a result of the Merger Agreement, LivePerson acquired the contracts of various Proficient customers.  At issue here are the contracts of two former Proficient customers, Allstate Insurance Company ("Allstate") and H&R Block Mortgage Corporation ("H&R Block"), and whether these contracts were cancelled within the meaning of the Normalized Monthly Revenue.

4

In a January 17, 2007 email, John Amidei of Allstate informed LivePerson, "Based on your request, we are supplying you with this written notice for the termination of your ProChat service(s), effective Decmember 31, 2006." (Pl.'s Ex. 14.) In response, Mark Engel of LivePerson wrote, "The nature of my guidance was to alert Don and Craig [of Allstate] that we needed a written notice of your intention to NOT renew. Absent that written notice, the terms of [Allstate's] contract stipulated that it would automatically renew for a one year period. This email from you should suffice as notice of intent to NOT renew." (Pl.'s Ex. 14.) In email correspondence among LivePerson personnel concerning Allstate's notice, Jim Disco, LivePerson's Senior Vice-President of Sales, wrote, "It is my understanding that [Allstate] can opt not to renew at end of term, but can't cancel during the term for a refund." (Pl.'s Ex. 14.)

In a March 29, 2007 email, Monique Hoppe of H&R Block informed LivePerson that, "as of today, we will need to terminate the use of live chat." (Pl.'s Ex. 20.) When asked by Jennifer Clark of LivePerson about the effective date of H&R Block's cancellation, Disco wrote, "I think the effective date of the termination should be May 22, 2007. Their original agreement called for an annual term . . . . They signed renewal addendum on May 22, 2006. I believe that their contract should be one year from that date." (Pl.'s Ex. 21.)

5

There is no dispute here that the Allstate and H&R Block contracts both provided for automatic renewals. (Pl.'s 56.1 Stmt ¶¶ 25, 38; Def.'s 56.1 Stmt ¶¶ 25, 38; Pl.'s Exs. 12, 9.) Similarly, there is no dispute that both of these clients advised LivePerson in writing that they would not be renewing their contracts. (Pl.'s 56.1 Stmt ¶¶ 33, 47; Def.'s 56.1 Stmt ¶¶ 33, 47; Pl.'s Exs. 14, 20.) It is undisputed that Allstate and H&R Block continued to pay LivePerson in accordance with their contracts during March 2007, but both had made it clear that their contracts would be terminated at the end of their terms. (Pl.'s 56.1 Stmt ¶¶ 34, 47-48; Def.'s 56.1 Stmt ¶¶ 34, 47-48.) The parties dispute whether LivePerson distinguished between a cancellation and a non-renewal in their email correspondence concerning Allstate's and H&R Block's notices.

When LivePerson calculated the Normalized Monthly Revenue, it did not include revenue received from Allstate and H&R Block for March 2007. (Pl.'s 56.1 Stmt ¶¶ 34, 48; Def.'s 56.1 Stmt ¶¶ 34, 48.; Pl.'s Ex. 3.) On May 11, 2007, LivePerson sent the plaintiff the Earn-Out Notice that set forth the calculation of the Earn-Out Payment. (Pl.'s 56.1 Stmt ¶ 7; Def.'s 56.1 Stmt ¶ 7; Pl.'s Ex. 3.) On July 9, 2007, the plaintiff sent LivePerson the Earn-Out Dispute Notice that disputed LivePerson's calculation of the Earn-Out Payment. (Pl.'s 56.1 Stmt ¶ 15; Def.'s 56.1 Stmt ¶ 15; Pl.'s Ex. 5.) The plaintiff

claimed that LivePerson should have recognized $75,701 of March 2007 revenue from various customers, including both Allstate and H&R Block.  (Pl.'s 56.1 Stmt ¶ 16; Def.'s 56.1 Stmt ¶ 16; Pl.'s Ex. 5.)

Freishtat argues that the revenue realized by LivePerson from the Allstate and H&R Block contracts in March 2007 was improperly excluded from the Earn-Out Payment calculation because these contracts were not cancelled, but rather only non-renewed.  LivePerson disputes this and argues that this revenue was properly excluded because the written notices from Allstate and H&R Block were properly construed as intent to cancel their contracts.

The plaintiff now moves for partial summary judgment pursuant to Rule 56 arguing that the meaning of cancel as used in the Normalized Monthly Revenue is unambiguous and does not apply to contracts that were simply not renewed.

                                III

There is no dispute that New York law applies to the interpretation of the Merger Agreement. (See Pl.'s Ex. 1 at 68.)  Under New York law, "[t]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous."  Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000).  If a contract is unambiguous, a court is "required to give effect to the contract as written and may not

7

consider extrinsic evidence to alter or interpret its meaning." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993); see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998). Contractual language "whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990). Where the contractual language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of interpretation should be submitted to the trier of fact. See Alexander & Alexander, 136 F.3d at 86; Consarc, 996 F.2d at 573; see also S.W. v. New York City Dep't of Educ., 646 F. Supp. 2d 346, 356-57 (S.D.N.Y. 2009).

The language of a contract is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Revson, 221 F.3d at 66 (internal quotations omitted). Contract language is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs,

8

practices, usages and terminology as generally understood in the particular trade or business." Id. (quoting Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)); see also S.W., 646 F. Supp. 2d at 357.

"[T]he essence of contract interpretation is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract." Vtech Holdings Ltd. v. Lucent Techs., Inc., 172 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (internal quotation marks and citation omitted). "[A] court should avoid construing a contractual provision in a manner that renders contractual language meaningless or superfluous." Eastman Kodak Co v. STWB Inc., 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2002).

Relying on both insurance case law and dictionary definitions, Freishtat argues that the Merger Agreement is unambiguous and that "cancel" exclusively means to end a contract during its term so that part of the contract is unperformed. See Allcity Ins. Co. v. Atoulon, 678 N.Y.S.2d 327, 328 (App. Div. 1998); Victor v. Turner, 496 N.Y.S.2d 761, 765 (App. Div. 1985); see also Webster's II New Riverside Univ. Dictionary 105 (Houghton Mifflin 1984) (defining cancel as "to annul; invalidate"); Black's Law Dictionary 233-34 (9th ed. 2009) (defining cancel as "to terminate a promise, obligation, or right"). The plaintiff contrasts this definition with non-

9

renewal where a party decides not to renew the contract for an additional period. Freishtat reasons that because Allstate and H&R Block announced that they would not renew their contracts, but still completed performance under their contracts, their actions were non-renewals and not cancellations. Freishtat argues that the revenue realized from the Allstate and H&R Block contracts should therefore have been included in the Earn-Out Payment calculation.

In response, LivePerson argues that the plaintiff draws an artificial distinction between "cancel" and "non-renew" and that neither term has a plain and unambiguous meaning in the Merger Agreement. LivePerson maintains that the terms "cancel," "terminate," and "non-renew" are used interchangeably in various contractual settings. LivePerson argues that "cancel" can mean the ending of an otherwise ongoing contractual relationship, including a party's decision not to renew an otherwise automatically renewable contract. Thus, because both Allstate and H&R Block notified LivePerson that they did not intend to renew their contracts, LivePerson argues that it properly excluded their revenue from the Normalized Monthly Revenue calculation. In addition, the defendant argues that the plaintiff's interpretation is not in accordance with the expectations of the parties and the purposes of the Earn-Out Payment.

Here, "cancel" as used in the Merger Agreement is ambiguous because it is susceptible to more than one reasonable interpretation.  As an initial matter, neither "cancel" nor "non-renew" is defined in the Merger Agreement.  In this absence of specified definitions, Freishtat points to dictionary definitions and insurance law where "cancel" and "renew" have the meanings he alleges.  However, insurance case law is not dispositive that "cancel" can only mean to end a contract during its term so that part of the contract is unperformed.  Indeed, the cases that the plaintiff cites demonstrate that the specialized and regulated nature of insurance law limits its applicability outside of the insurance context.  See e.g. Atoulon, 678 N.Y.S.2d at 328 (explaining how state law insurance regulations require different terms of notice for cancellation and non-renewal); Victor, 496 N.Y.S.2d at 764-66 (noting that insurance law statutes reflect "the broad proposition that insurance industry transactions with consumers are not governed by ordinary contract law" and that cancellation and renewal have assigned statutory meanings).  While Freishtat may be correct in stating that "cancellation" and "non-renewal" have separate and distinct meanings in the insurance context, see, e.g., N.Y. Ins. Law § 3426 (McKinney 2006) (setting out separate notice requirements for cancellation and non-renewal of commercial lines insurance), these constructions cannot necessarily be

11

transposed onto other contracts, like the Merger Agreement here. There is no indication that the parties here intended to use these terms as those terms are understood in the context of insurance.

LivePerson's proposed broader interpretation of cancel is also reasonable. Outside of the insurance context, case law does not provide for the rigid distinction between "cancellation" and "non-renewal" that Freishtat maintains is present in the Merger Agreement. Rather, as LivePerson argues, parties and courts outside of the insurance context have used "cancel" and "non-renew" interchangeably. Case law illustrates that "cancel" or "terminate" could also refer to a party's decision not to renew an otherwise renewable contract. See Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J., 08-CV-7069, 08-CV-11107, 2009 WL 1154094, at *7 (S.D.N.Y. Mar. 19, 2009) (construing a contract where a party's written notice of termination would suspend automatic renewal); McCracken v. Best Buy Stores, L.P., 248 F.R.D. 162, 165 (S.D.N.Y. 2008) (discussing magazine subscriptions that would automatically renew if customers did not cancel); Arnold Weiss Corp. v. Manisha Sportswear, Inc., 882 F. Supp. 58, 59-60 (S.D.N.Y. 1991) (holding that contract provided that without timely prior notice of cancellation, the contract was automatically renewed for an additional year). As these cases

12

demonstrate, it is also reasonable to interpret "cancel" as applicable not only to a party's failure to complete performance, but also to a party's decision not to renew at the end of a contract's term.  Because both LivePerson's and Freishtat's interpretations are reasonable, "cancel" is ambiguous and summary judgment is not warranted.

Moreover, because the meaning of cancel is ambiguous, extrinsic evidence of the parties' intent can be considered, and summary judgment is not warranted.  See Alexander & Alexander, 136 F.3d at 86.  LivePerson has pointed to sufficient evidence to demonstrate that there is a genuine issue of material fact regarding how the parties interpreted Allstate's and H&R Block's written notices.  LivePerson points to email correspondence from Jim Disco, LivePerson's Senior Vice-President of Sales, and argues that he treated both Allstate's and H&R Block's written notices that they did not intend to renew their contracts as cancellations of their contracts.  (See Pl.'s Exs. 14, 21.) Freishtat attempts to cast these same emails as affirmative evidence that LivePerson made a distinction between cancellation and non-renewal.  These emails illustrate the disputed nature of the factual issues underlying the proper interpretation of the Merger Agreement.

The ambiguous nature of the word "cancel" is highlighted by the parties' conflicting explanations for the exclusion of

13

contracts that are cancelled.  LivePerson argues that the Earn-Out Payment was included to compensate former Proficient shareholders for recurring revenue from customers who would continue to use LivePerson's services in the future.  LivePerson also argues that the calculation formula used March 2007 as a snapshot to predict the amount of revenue LivePerson would recognize for the year.  Thus, LivePerson excluded revenue from Allstate and H&R Block because that revenue, although recognized in March 2007, was not recurring because it would not continue to be recognized into the future.

Freishtat argues that because LivePerson continued to receive revenue from Allstate and H&R Block for the duration of their contracts, even though they had notified LivePerson that they were not going to renew their contracts, that revenue was recurring.  Thus, this revenue was properly included in the Normalized Monthly Revenue, which was defined to include "the monthly recurring revenue which [LivePerson] books as revenue in that month . . . ."  (Pl.'s Ex. 1 at 8.)  The plaintiff also argues that if the parties had intended that the Earn-Out Payment only include revenue received from customers into the future, they would have used a multi-year earn-out, rather than the Normalized Monthly Revenue used in the Merger Agreement here.

14

The Merger Agreement does not explicitly define "recurring" as used in the Normalized Monthly Revenue definition.  However, the Merger Agreement does make it clear that certain categories of revenue would either be excluded or included.  The Normalized Monthly Revenue calculation explicitly excluded "(X) any one-time or non-recurring revenues such as testing or training fees" and "(Z) any revenue recognized by [LivePerson] in connection with the provision of professional services (unless such professional services fess are ongoing rather than one time in nature)."  (Pl.'s Ex. 1 at 9.)  In addition, revenue from customers who have given written notice "that they intend to cancel their contract" was also excluded.  (Pl.'s Ex. 1 at 9.)  Looking at the plain language of the contract, it is clear that the parties intended to exclude revenue that would be one-time in nature and to include revenue that was ongoing or recurring.

It is not clear from the plain language of the contract how tightly the parties intended "recurring" to be interpreted.  If, as LivePerson contends, the Earn-Out Payment was meant to include only revenue from those customers who would be a continuing source of income for LivePerson, then it would be consistent for the parties to exclude revenue from customers who had decided not to renew their contracts because they would no longer be a source of continuing revenue.  On the other hand, under the more literal reading of "recurring" endorsed by

15

Freishtat, any revenue that occurred more than once, regardless of how long it would continue into the future, would be included. The interpretation of the contractual term cannot be decided on a motion for summary judgment.

## Conclusion

For the reasons explained above, the plaintiff's motion for partial summary judgment is **denied**. The Clerk is directed to close Docket No. 61.

**SO ORDERED.**

**Dated:** New York, New York
April 16, 2010

John G. Koeltl
United States District Judge