IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

GREGG FREISHTAT, as
Shareholders' Representative

Plaintiff

v.

LIVEPERSON, INC.

Defendant

Civil Case No. 1:07-CV-6838-JGK
ECF Case

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S PRETRIAL MEMORANDUM**

Stacie F. Dubnow (SD7011)
William Michael Mullen, *Pro Hac Vice*

FREISHTAT, MULLEN & DUBNOW, LLC
Executive Plaza I, Suite 1000
11350 McCormick Road
Hunt Valley, Maryland 21031

(410) 727-7740
(410) 727-7356 (Facsimile)
E-mail: sfdubnow@freishtatlaw.com

*Attorneys for Plaintiff, Gregg Freishtat, as
Shareholders' Representative*

# TABLE OF CONTENTS

                          Page

Introduction ...................................................................................................1

I.     Because a Non-Renewal of a Contract is Legally Distinct from a Cancellation, LivePerson Breached the Merger Agreement by Failing to Include in the Earn-Out Payment the Revenue it Booked in March 2007 from Allstate and H&R Block ............................................................2

        A.     The Customer Contracts Acquired By LivePerson Expressly Distinguish Between Termination Before the Contract's Expiration Date (Cancellation) and Non-Renewal Upon Completion of the Contract's Term...................................................................................3

        B.     A "Cancellation" of a Contract is Legally Distinct from a "Non-Renewal" of a Contract .......................................4

        C.     The Absence of an Exclusion in the Merger Agreement of Revenue from Customers that Elect not to Renew Their Contracts Means That the Parties Did Not Intend to Exclude Such Revenues From the Earn-Out ...................................................................................9

        D.     A Party's Own Practical Construction of Its Contract Is Strong Evidence of Its Meaning .........................11

II.    Plaintiff's Damages Are Measured on the Date Plaintiff Should Have Received the Additional Shares of LivePerson Common Stock...................................................................................12

CONCLUSION ..............................................................................................13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GREGG FREISHTAT, as Shareholders' Representative | * | |
| | * | |
| Plaintiff | | |
| | * | Civil Case No. 1:07-CV-6838-JGK |
| v. | | ECF Case |
| | * | |
| LIVEPERSON, INC. | | |
| | * | |
| Defendant | | |

\* \* \* \* \* \* \* \* \* \* \* \*

## **PLAINTIFF'S PRETRIAL MEMORANDUM**

Plaintiff Gregg Freishtat, as Shareholders' Representative ("Freishtat" or "Plaintiff"), by his undersigned counsel, pursuant to Your Honor's Individual Practices 4(B) (iv), submits this Pretrial Memorandum in the above-captioned action.

### Introduction

Freishtat alleges that LivePerson, Inc. ("LivePerson") breached the express provisions of a June 22, 2006 Merger Agreement governing the post-closing compensation (the "Earn-Out Payment") due Plaintiff from the sale of Plaintiff's company, Proficient Systems, Inc. ("Proficient"). LivePerson failed to include in its computation of the Earn-Out Payment substantial revenue that LivePerson recognized, or that Generally Accepted Accounting Principles ("GAAP") required LivePerson to recognize, in March 2007 from customers Allstate Insurance Company ("Allstate"), H&R Block Mortgage Company ("H&R"), Mark Travel Corporation ("Mark Travel"), MD Nationwide, The Governor and Company of the Bank of Scotland ("HBOS"), GEICO and Adobe Systems, Inc. ("Adobe"). As a result, LivePerson breached the Merger

FREISHTAT, MULLEN & DUBNOW, LLC
Executive Plaza I, Suite 1000
11350 McCormick Road
Hunt Valley, Maryland 21031

(410) 727-7740

Agreement by failing to deliver to Plaintiff on the Earn-Out Payment Date all of the shares of LivePerson stock due pursuant to the formula set forth in the Merger Agreement.

### I.

**Because a Non-Renewal of a Contract is Legally Distinct from a Cancellation, LivePerson Breached the Merger Agreement by Failing to Include in the Earn-Out Payment the Revenue it Booked in March 2007 from Allstate and H&R Block**

Subsection (Y) of the definition of Normalized Monthly Revenue ("NMR") in §1.01 of the Merger Agreement excludes from the computation of NMR the revenue LivePerson recognized in March 2007 from customers that have provided written notice of an intent to "cancel" their contracts. LivePerson contends it properly excluded the revenues it recognized in March 2007 from customers Allstate and H&R Block on the ground that when they notified LivePerson they did not intend to renew their contracts, these customers "canceled" their contracts. However, Allstate and H&R Block both completed the terms of their respective contracts, performed all obligations under their contracts, and LivePerson enjoyed monthly revenue from both customers for the entirety of their contract terms, which ran through March 2007. As a result, Plaintiff contends that neither of these customers canceled its contract and that LivePerson breached the Merger Agreement by failing to include these customers' revenues in its calculation of the Earn-Out Payment.

Plaintiff previously moved for summary judgment on this issue and the Court denied this Motion. This question will be at issue again at trial and this Pretrial Memorandum is submitted to assist the Court in ruling on what it means to "cancel a

2

contract."[1] Extensive case law in New York and elsewhere supports Plaintiff's position that to cancel a contract means to end the contract during its term so that part of the contract is unperformed. In contrast, LivePerson has not shown any support, absent the colloquial use of the word "cancel", for its contention that a decision not to renew a contract for an additional term constitutes a "cancellation".

### A. The Customer Contracts Acquired By LivePerson Expressly Distinguish Between Termination Before the Contract's Expiration Date (Cancellation) and Non-Renewal Upon Completion of the Contract's Term

LivePerson acquired a total of 32 customer contracts from Proficient. (Merger Agreement, Annex 1). Some of the Proficient contracts, as well as the subsequent contracts between LivePerson and these customers, had provisions that allowed the customers to terminate their contracts without cause for the customer's convenience during the contract terms.[2] However, other Proficient contracts acquired by LivePerson only allowed termination before the expiration of the stated term of the contract in the event of a material breach. Absent a breach of contract that was not cured, the customer was required to complete its contract term.

All of the customer contracts LivePerson acquired from Proficient expressly distinguished between termination of the contract during its term and non-renewal. The provisions addressing renewal specified whether the contract term would automatically renew upon the expiration date absent written notice of non-renewal, or conversely, whether the contract would terminate on its expiration date absent written notice of an

---

[1] To avoid duplication, Plaintiff respectfully incorporates its previously filed Motion for Summary Judgment, Memorandum in Support and Plaintiff's Reply to Defendant's Opposition.
[2] LivePerson is familiar with such cancellation clauses. Its Form 10-Q filed with the Securities & Exchange Commission for the period ending June 30, 2006 confirms that its service agreements typically have twelve-month terms that are terminable upon 30 to 90 days notice, without penalty.

intent to renew. In all instances, renewal referred to an agreement to enter into a new contract for an additional term upon the lapse of the initial term of the contract.

In contrast, the provisions in Proficient's customer contracts addressing cancellation (set forth in a section of the contract captioned "Termination") specified the circumstances under which the contract could be ended before the contract's expiration date. As stated above, some of these contracts permitted the customers to end their contracts before the completion of the contract term upon as little as 14 days written notice without cause, but others did not authorize termination before completion of the contract term absent an uncured material breach of the contract.

Parties represented by experienced counsel are presumed to have carefully and purposely selected the language in their contract and to have intended what is plainly stated.[3] *General Motors Corp., v. Villa Marin Chevrolet, Inc., et al.*, 2000 WL 271965, *7 (E.D.N.Y., 2000). Clear contractual language does not become ambiguous merely because the parties argue different interpretations. *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Since the Merger Agreement does not specially define the term "cancel", this term should be given its dictionary definition and the meaning that numerous courts across the country have assigned this term.

### B. A "Cancellation" of a Contract is Legally Distinct from a "Non-Renewal" of a Contract

A party's decision not to begin a new contract for an additional period of time (a non-renewal) is clearly distinct from a party's decision to revoke or annul an existing

---

[3] Proskauer Rose LLP represented LivePerson in connection with the Merger Agreement and Kilpatrick Stockton LLP represented the Plaintiff.

4

contract (a cancellation).[4]  Plaintiff's definition of the word "cancel" is the meaning assigned this word in countless authoritative English language dictionaries.  "To cancel" is defined as to make void, revoke, annul, nullify, abdicate or destroy the force or validity of.  *See e.g.* Jess Stein, *Random House Dictionary of The English Language*, 215 (Unabridged ed. 1973); *The New Webster's Comprehensive Dictionary of the English Language* 144 (American International Press, 1985 Ed.); *Funk & Wagnall's Standard Desk Dictionary* 90 (Funk & Wagnall's Pub. Co. 1969 Ed.); *Black's Law Dictionary* 186 (5th ed. 1979).[5]

In contrast, Random House defines the word "renew" as "to begin or take up again" or "to make effective for an additional period", and Black's Law Dictionary defines "renew" as to make new again, to begin again, to recommence, or to reestablish. Jess Stein, *Random House Dictionary of The English Language*, 1215 (Unabridged ed. 1973); *Black's Law Dictionary* 1165 (5th ed. 1979).  As a result, the phrase "non-renew" means *not* to begin again or not to make effective for an additional period.

Although the majority of the courts that have addressed the legal distinction between cancellations and non-renewals have done so in the context of interpreting insurance contracts, courts across the country, including in New York, distinguish between the legal meaning of the terms cancellation and non-renewal in cases

---

[4] Upon a party's decision not to renew its contract, LivePerson already has obtained the financial benefit of the full term of the party's contract.

[5] *Merriam-Webster's Dictionary of Law* defines the word "cancel" as: 1: "to destroy the force, validity, or effectiveness of...", and:
2: "to put an end to (a contract): as
(a) to end (a contract) by discharging the other party from *obligations as yet unperformed*
(b) to end (a contract) in accordance with the provisions of U.C.C. section 2-106 or a similar statute because *the other party has breached...*
(c) to put an end to (a lease contract) because of *the default of the other party...*
(d) to terminate (an insurance policy) *before the end of policy period...*" (emphasis added).

5

interpreting membership, distribution, employment and purchase agreements, licenses, leases, letters of credits and other contracts.

In the insurance context, cancellation terminates an insurance contract *during* its term, while non-renewal occurs *at the end* of the insurance contract's duration.[6] *See e.g. Allcity Insurance Company v. Atoulon*, 254 A.D.2d 59, 678 N.Y.S.2d 327 (1st Dept. 1998) (notice of cancellation sent by insurer was a mid-term cancellation, not a notice of non-renewal); *Teeter, Jr. v. Allstate Insurance Company*, 9 A.D.2d 176, 181, 192 N.Y.S.2d 610 (1959) ("The word 'cancel' is defined *as an ordinary word of the English language*, as meaning 'to annul or destroy; to revoke or recall'…" and means a termination of coverage under a policy prior to the expiration date) (emphasis added); *Otterbein v. Babor & Comeau Co. et al*, 272 N.Y. 149, 152 (1936) (according to its accepted definition, to cancel means to annul, revoke or recall); *see also Blackwell v. Farmers Insurance Exchange et al.*, 2005 WL 1595246 *5-6 (Ohio App. 4 Dist. 2005) (the plain, ordinary meaning of the words 'cancel' and 'cancellation' does not include a non-renewal); *Unruh v. Prudential Property and Casualty Insurance Company*, 3 F.Supp.2d 1204, 1206 (D.Kan. 1998) (contract is "cancelled" when it is ended during its term); *American Casualty Company of Reading, Pennsylvania v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 (Vt. 1994) (confirming insurance industry usage of the term "cancellation" as meaning the termination of an existing policy coverage within the policy period and "non-renewal" as meaning the right not to extend another contract of insurance to the insured); *Safeco Ins. Co. v. Irish*, 681 P.2d 1294, 1297 (Wash.App. 1984) (distinguishing

---

[6] Insurance contracts are no different from any other contracts in the principles applied to their construction. *Throgs Neck Bagles, Inc. v. GA Ins. Co. of New York*, 241 A.D.2d 66, 69, 671 N.Y.S.2d 66 (1st Dep't 1998) (insurance contracts are interpreted by same general rules as govern construction of any other written contracts).

6

cancellation of a policy, which occurs before expiration of the policy, from non-renewal, which occurs at the end of the policy period); *Farmer's Ins. Exchange v. Vincent*, 248 Cal.App.2d 534, 541 (Cal.Ct.App. 1967) (non-renewal of policy at end of policy term is not "cancellation" of policy).

Case law outside of the insurance context also distinguishes between the legal import of a cancellation and a non-renewal. As in the insurance context, a cancellation occurs during the term of a contract and involves an abrogation or non-performance of some portion of the contract, whereas a non-renewal occurs at the expiration of an existing contract and is an election not to enter into a new contract for an additional term. *See e.g. 3Com Corp. v. Banco de Brasil, S.A.*, 2 F.Supp.2d 452, 459 (S.D.N.Y. 1998) (court recognized difference between cancelling a letter of credit before the term of the letter of credit expired and not renewing the letter of credit); *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F.Supp.2d 444, 449 (S.D.N.Y., 2001) (distinguishes between cancellation and non-renewal of memberships); *Stuart Cromwell, Inc. v. Hoffman*, 283 A.D.2d 333, 334, 724 N.Y.S.2d 420 (1st Dept. 2001) (distinguishes between cancellation and non-renewal of a cabaret license); *South End Distributing Corp. v. Hornell Brewing Co., Inc.*, 179 Misc.2d 576, 579, 685 N.Y.S.2d 594 (Sup.Ct. 1999) (distinguishes between cancellation and non-renewal of a distribution agreement); *Waldbaum, Inc. v. Fifth Ave. of Long Island Realty Associates*, 85 N.Y.2d 600, 650 N.E.2d 1299 (1995) (distinguishes between cancellation and non-renewal of a lease); *Shore Haven Lounge, Inc. v. New York State Liquor* Authority, 37 N.Y.2d 187, 189, 332 N.E.2d 883 (1975) (distinguishes between cancellation and non-renewal of liquor license); *Glenram Wine & Liquor Corp. v. O'Connell et al.*, 295 N.Y. 336, 342 (1946) ("cancellation", as applied to the

termination and surrender of a license, is merely a form of revocation, or the vacating of an instrument previously made); *Schwartz v. Van Winkle*, 47 N.Y.S.2d 264, 265 (Sup.Ct. 1944) ("As applied to a *lease*, policy of insurance, *or other contract*, the word 'cancellation' refers to the termination of the agreement, prior to the date of its expiration and in accordance with its provisions.") (emphasis added); *accord Acme Mills, Inc. v. Tanner-Brice Co.*, 112 F.2d 910, 911 (5th Cir. 1940) ("…the infinitive to cancel is embraced by the infinitive to terminate. A contract cannot be cancelled without being terminated, although it may be terminated in any of several methods, one of which is cancellation."); *Hill et al. v. Talladega College*, 502 So2d 735, 738 (Ala. 1987) (in construing whether college professors were dismissed or their employment contracts non-renewed, court distinguished between completion of all obligations under an existing contract, on the one hand, and cancellation of a contract before its stated term and before performance was completed, on the other); *Mamula v. McCulloch*, 275 Cal.App.2d 184, 197, 79 Cal.Rptr. 571, 578 (Cal.App. 1969) (in contract for purchase of hospital property, cancellation refers to the abrogation of so much of the contract as remains unperformed); *Haltom Oil Co. v. Phillips Petroleum Co.*, 304 F.2d 95, 98 (C.A. Tex. 1962) (most states seem to agree that a 'cancellation' means an abrogation of any duties under the contract remaining unperformed); *Grant v. Aerodraulics Co.*, 91 Cal.App.2d 68, 73 (Cal.App.2 Dist. 1949) (in action to recover damages for breach of a contract granting license to produce and sell a product, "[t]he words "terminate," "revoke" and "cancel," as used in the contract all mean to abrogate that portion of the contract that remains executory at the time notice is given); *F&M Drilling Co. v. M.&T. Oil Co.*, 192 Okl. 372, 137 P.2d 575, 577 (1943) (to "cancel" is to abrogate that portion of contract that remains unperformed

8

or do away with an existing agreement on the terms set forth in the agreement); *Sanborn v. Ballanfonte et al.*, 98 Cal.App. 482, 488 (Cal.App.1 Dist. 1929) (in action to recover royalties under oil drilling contract, "cancellation" of executory contract means to abrogate that portion of the contract that remains unperformed, doing away with existing agreement).

In contrast to the numerous cases and dictionaries cited by Plaintiff in support of its position, LivePerson does not offer an iota of legal support for its sweeping definition of the term "cancel". Counsel's reliance on the colloquial use of the word "cancel" in the spoken language, and its own use of the word "cancel" to refer to non-renewals in the post-Merger updates prepared by a LivePerson employee who had no role in negotiating or drafting the Merger Agreement are insufficient to create an ambiguity concerning the legal meaning of the word "cancel"– a precise term with a precise meaning selected by counsel for inclusion in a critical earn-out provision in a $20,000,000 transaction.[7]

### C. The Absence of an Exclusion in the Merger Agreement of Revenue from Customers that Elect not to Renew Their Contracts Means That the Parties Did Not Intend to Exclude Such Revenues From the Earn-Out

The Allstate and H&R Block contracts had separate termination provisions and non-renewal provisions, with a specific mechanism for informing LivePerson of a non-renewal. The parties and their counsel had access to these contracts when they drafted

---

[7] The fact that the parties may have loosely referred to Allstate's and H&R Block's notices of non-renewal as "cancellations" is immaterial. *Blackwell v. Farmers Insurance Exchange et al.*, 2005 WL 1595246 *6 (Ohio App. 4 Dist. 2005) ("It is well settled that courts do not decide the legal effect of a written instrument based on the label the parties attach to it, but instead must examine the language used to determine the legal effect.").

9

the Merger Agreement.[8] Yet the Merger Agreement makes no mention of notices of non-renewal.

Had the parties intended to exclude from the definition of NMR the revenues recognized from customers that notified LivePerson of an intention not to renew their contracts, they would have included a specific exclusion of such revenues in the definition of NMR, which itemizes the revenues to be included and excluded in the calculation of the Earn-Out Payment. Alternatively, the parties would have defined the term "cancel" to include non-renewal or would have selected broader language such as "customers that notify LivePerson of an intention to terminate their contract for any reason at any time." Instead, the parties selected the term "cancel", a term that has a precise meaning.

That the Merger Agreement is silent concerning notices of non-renewal despite the fact that the parties could have foreseen this contingency confirms that they did not intend to exclude such revenues from the computation of NMR. *Greenfield v. Philles Records*, 98 N.Y.2d 562, 570, 750 N.Y.S.2d 565 (2002) (silence on an issue does not create ambiguity in the contract); *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (so long as agreement can be enforced according to what is written, court will not imply a term in a contract where circumstances surrounding its formation indicate the parties could have foreseen the contingency they failed to address); *Rowe v. Great Atlantic & Pacific Tea Company, Inc., et al.*, 46 N.Y.2d 62, 72, 412 N.Y.S.2d 827 (1978) ("…the courts should be extremely reluctant to interpret an agreement as impliedly

---

[8] As a result, counsel for LivePerson was aware that the customer contracts at issue in the definition of Normalized Monthly Revenue provided for two distinct types of terminations: (1) the termination of customers' contracts *before* their expiration dates; and (2) the termination of customers' contracts upon an election not to renew contracts that had automatic renewal provisions.

stating something which the parties have neglected to specifically include. As we have previously declared in a similar context, 'such lack of foresight does not create rights or obligations'") (citations omitted); *Trustees of Freeholders & Commonalty of Town of Southhampton v. Jessup*, 173 N.Y. 84, 90 (N.Y. 1903) ("an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful.").

That the parties chose to use the word "cancel" in subsection (Y) of the definition of NMR in §1.01 demonstrates an intention to *restrict* the revenue excluded from the definition of NMR to those customers that gave written notice of an intent to end their contracts before their expiration dates.[9] That is what "cancel" means. A new or different meaning cannot now be added or implied. *See Schwartz v. Van Winkle*, 47 N.Y.S.2d at 266.[10]

### D. A Party's Own Practical Construction of Its Contract Is Strong Evidence of Its Meaning

LivePerson's own conduct demonstrates its understanding that a decision not to renew a contract is *not* a cancellation. *3Com Corp.*, 2 F.Supp.2d at 459 (citations omitted) ("the practical construction put on a contract by the parties performing under it is of great importance in determining its meaning."); Restatement (Second), Contracts §202(4) & cmt. g (the way parties behave under an agreement is often the strongest evidence of the meaning of the agreement). LivePerson repeatedly distinguished in its own internal communications between a customer's cancellation of its contract and its

---

[9] LivePerson discloses this risk of early termination of its customer contracts in its SEC filings.

[10] *In re Rivas' Trust*, 100 N.Y.S.2d 357, 365 (N.Y.Sup. 1950) (where contract is prepared with care, it is presumed that the words included were deliberately chosen and, for this reason, words evidencing a different intent not expressed in the contract cannot be read into the contract); *Sperling v. Great Am. Indem. Co.*, 166 N.E.2d 482, 486 (N.Y. 1960) (in construing contract, court must give effect to parties' intentions as evidenced by their writing and may not supply missing terms under the guise of construction).

11

non-renewal of its contract. When Allstate and H&R Block attempted to cancel their respective contracts before the expiration of their stated terms, LivePerson concluded that neither had the right to do so because their contracts lacked a provision permitting cancellation without cause before the expiration of their contract terms.

James Dicso's January 17, 2007 email to Michael Kovach and others ("It is my understanding that [Allstate] can opt not to renew at end of term, but can't cancel during the term for a refund") establishes that despite LivePerson's current contention, LivePerson fully appreciated the distinction between cancellation and non-renewal. Precisely because LivePerson knew that cancellation was *not* the same as non-renewal, LivePerson refused to allow Allstate to cancel its contract mid-term, refused Allstate's request for a refund, and treated Allstate's attempted cancellation as a notice of non-renewal.

LivePerson made the identical determination with regard to H&R Block's attempted cancellation. Upon determining that H&R Block's Subscription Agreement lacked a provision permitting cancellation for convenience prior to the expiration of its contract term, LivePerson refused H&R Block's request to terminate LivePerson's services mid-term and treated H&R's attempted cancellation of its contract as a notice not to renew its contract.

## II.

### Plaintiff's Damages Are Measured on the Date Plaintiff Should Have Received the Additional Shares of LivePerson Common Stock

The proper measure of damages for the failure to deliver the correct number of shares of stock is the loss suffered at the time and place of the breach. *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225 (N.Y. 1971); *see Maxim*

12

*Group LLC v. Life Partners Holdings, Inc.*, 690 F.Supp.2d 293, 301-302 (S.D.N.Y. 2010) (in breach of contract case for failure to deliver stock, stock's value on the date of the breach is the mean between the highest and lowest quoted selling prices of the stock on that date, as provided by the public exchange on which the stock is traded); *Direction Associates, Inc. v. Programming and Systems, Inc.*, 412 F. Supp. 714, 718 (S.D.N.Y. 1976) (damages for failure to deliver correct number of earn-out shares to plaintiff was the market value of the earn-out shares on the date they should have been delivered, multiplied by the number of earned shares plaintiff was entitled to receive).

Here, LivePerson was required by §2.04(b) of the Merger Agreement to deliver to Freishtat the Earn-Out Payment by no later than May 15, 2007 (defined in the Merger Agreement as the "Earn-Out Payment Date"). LivePerson delivered the Earn-Out Notice as well as the Earn-Out Payment to Freishtat on May 11, 2007. As a result, May 11, 2007 is the date of LivePerson's breach of contract and the date on which Plaintiff sustained its loss as a result of LivePerson's failure to pay Plaintiff the full number of LivePerson shares of common stock due under the Merger Agreement. The highest selling price on May 11, 2007 was $6.74 and the lowest selling price was $6.34, resulting in a mean price of $6.54 per share. When the total number of shares due the Proficient former shareholders in the Earn-Out (976,388.40 shares) is multiplied by the mean share price of $6.54, the Plaintiff's damages total $6,385,580.10.

## Conclusion

Freishtat, as Shareholders' Representative of the former Proficient shareholders, respectfully requests that this Court find in his favor on his breach of contract claim against LivePerson and award damages of $6,385,580.10, the value of the additional

shares of LivePerson stock that should have been delivered on May 11, 2007 to Plaintiff pursuant to the Earn-Out provision in the Merger Agreement, plus pre-judgment and post-judgment interest.

_____
Stacie F. Dubnow (SD7011)

_____
William Michael Mullen, *Pro Hac Vice*

FREISHTAT, MULLEN & DUBNOW, LLC
Executive Plaza I, Suite 1000
11350 McCormick Road
Hunt Valley, Maryland 21031

(410) 727-7740
(410) 727-7356 (Facsimile)
E-mail: sfdubnow@freishtatlaw.com

*Attorneys for Plaintiff, Gregg Freishtat, as Shareholders' Representative*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of September, 2010, a copy of Plaintiff's Pretrial Memorandum was sent via Federal Express, for delivery on Monday, September 27, 2010, to:

Douglas F. Curtis, Esq.
Paul Winke, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY  10022

*Attorneys for Defendant*

_____
Stacie F. Dubnow

14