UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

GREGG FREISHTAT, as Shareholders'
Representative,                                    07 Civ. 6838 (JGK)

                        Plaintiff,                OPINION AND ORDER

        — against –

LIVEPERSON, INC.

                        Defendant.

————————————————————————————

JOHN G. KOELTL, District Judge:


                        INTRODUCTION

        This is an action alleging breach of an Agreement and Plan

of Merger dated June 22, 2006 ("Merger Agreement") by which the

defendant, LivePerson, Inc. ("LivePerson"), acquired Proficient

Systems, Inc. ("Proficient").  Pursuant to the Merger Agreement,

roughly 50% of the merger consideration was contingent and

payable only if certain conditions were satisfied.  The

plaintiff, Gregg Freishtat, the former Chief Executive Officer

of Proficient, acting as representative of the Proficient

shareholders, claims that LivePerson failed to comply with the

provisions of the Merger Agreement governing the computation of

the compensation to be paid to the Proficient shareholders

following the closing (the "Earn-Out Payment"), which was based

on a multiple of recurring revenue in the month of March, 2007.

The plaintiff claims that LivePerson failed to include properly

revenue from seven Proficient customers.  LivePerson claims that it properly calculated the revenue and that the plaintiff is raising these challenges in an effort to obtain payment for the Proficient shareholders to which those shareholders are not entitled.  LivePerson contends that it in fact overpaid the Proficient shareholders and requests a refund for the amount of the Earn-Out Payment that it allegedly overpaid for one customer and for certain other errors that were allegedly made in favor of the Proficient shareholders.

Jurisdiction is based on diversity of citizenship.

The Court conducted a non-jury trial and now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I.    Parties

1.    Plaintiff Gregg Freishtat is a citizen of the State of Georgia.  The plaintiff is the representative of the shareholders of the former corporation Proficient. (Stipulations of Fact ("SF") 1.)

2.    Proficient was a provider of hosted proactive chat solutions that assisted companies to generate revenue on their websites.  It was based in Atlanta, Georgia.  (SF 4.)

3.     Defendant LivePerson is a publicly-traded Delaware corporation (NASDAQ Symbol: LPSN) with its principal place of business in New York, New York.  (SF 2.)

4.     LivePerson is a provider of online conversation solutions that facilitate real-time assistance and expert advice.  LivePerson's business solutions consist mainly of instant messaging and business analytics technologies that LivePerson customers use to provide online sales assistance and customer service to their own customers and consumers on the web.  Its hosted software enables companies to identify and proactively engage online visitors to increase sales, satisfaction, and loyalty while reducing service costs.  (SF 3.)

## II.  Long-Term Recurring Subscription Revenue as the Fundamental Business Model for Both Proficient and LivePerson

5.     Both Proficient and LivePerson are or were service providers in the "software as a service" industry.  (Tr. 161, 558-59, 664.)  LivePerson provides its software from a hosted facility and charges for that software on a subscription basis. (Tr. 774.)

6.     The business model of Proficient and LivePerson, as with other "software as a service" companies, is based on securing long-term, recurring monthly revenue on a subscription basis.  (Tr. 160-61, 663-64.)  Robert LoCascio, the Chief Executive Officer and Chairman of LivePerson, testified that

"long-term contracts" are critical to LivePerson's revenue model because:

> It's basically how we are valued.  If you look at revenues today we do about 110 million in sales.  We have a little over $400 million market cap.  So our investors say, we are willing to give you 4 times the amount of revenue you make, because they assume that revenue will recur into the future. . . . It's the heart of our business model, all software as a service business model.  We get what we call a very high premium for our revenues on a valuation because it's all recurring.

(Tr. 663-64.)

7.    Timothy Bixby, the President and Chief Financial Officer of LivePerson, testified that LivePerson's "primary type of revenue is hosting the fees for recurring services.  We also collect and earn professional services fees.  And that's the vast majority of the revenue."  (Tr. 727, 729.)  James Dicso, a Senior Vice President of LivePerson, testified that, as a sales executive, he measured the success of the "software as a service" model by the "[l]ongevity of a customer relationship and increase in the recurring monthly revenue."  The two components are therefore "[a]dding prospects into customers, and then growing relationships with existing customers."  (Tr. 773-74.)

## III.  Merger Agreement Negotiations

8.    Proficient and LivePerson engaged in merger negotiations in the spring of 2006.  In the context of these

negotiations, Proficient's representatives based the value of
Proficient to LivePerson primarily on Proficient's long-term
recurring revenues, understood as revenues that would continue
without expectation of stopping.  Mr. Freishtat testified that
he would use the definition of "recurring revenue" as revenue
that "would continue into the future at least without a fixed
stopping point" in order "to describe the status of my business
when I sold it." (Tr. 161-62.)  Mr. Freishtat also acknowledged
that he was selling Proficient to LivePerson on the basis of
Proficient's "good and healthy customer base," and that
Proficient would get credit for revenue that occurred "over and
over again." (Tr. 268-69.)  Stephen Hufford, the former
Executive Vice President of Proficient, understood the "revenue
base" in the context of the "software as a service industry" to
mean "the revenue that you would see month after month." (Tr.
557-59.)

     9.   Proficient initially presented a very optimistic
projection of its annual revenues, both internally and to
LivePerson.  Mr. Freishtat included a figure of $6,816,976 in
projected revenue from Proficient in an attachment to an email
he sent to Proficient's Board in June, 2006.  (Pl. Ex. ("PX") 23
at PL0000773.)  Mr. Freishtat testified that this figure was "a
guidance number that says, yes, this is what we're hopeful will
happen in March of 2007." (Tr. 177-78.)  Mr. Freishtat

testified that he would not have any reason to disagree that he had told Mr. LoCascio during merger negotiations that "there was $8 to $10 million of annualized revenue in Proficient." (Tr. 180.) Mr. LoCascio testified credibly that after an initial meeting with Mr. Freishtat to discuss the sale of Proficient to LivePerson, the two men started to "talk very loosely about revenue, because we want to know how much revenue do you have and then we know there's a value for that revenue." Mr. LoCascio testified that, in those discussions, "originally, Proficient was supposed to have eight to ten million in revenues, and we thought that was worth somewhere around 20 or 30 million dollars . . . ." (Tr. 670-71.)

10. LivePerson's initial nonbinding purchase price of four million LivePerson shares was based on Proficient's initial optimistic projections. The term sheet that LivePerson provided to Proficient on May 15, 2006 included a purchase price of four million shares and the disclaimer that "[t]he following summary of terms is intended solely as a basis for further discussion and does not constitute a legally binding obligation except for the confidentiality provision set forth at the end of this term sheet, which is binding on and enforceable against the parties." (Def. Ex. ("DX") 21 at PL0000710.) Mr. LoCascio testified that the preliminary four million share figure was "[b]ased on this

6

revenue number from our conversation [with Proficient] of around $10 million . . . ."  (Tr. 674.)

11.  LivePerson's doubts about the certainty of Proficient's existing and potential revenues led to its proposal of an earn-out provision, approximately two weeks after the introduction of the initial term sheet.

12.  Mr. Freishtat and Mr. LoCascio travelled to London as part of the due diligence process sometime between the initial term sheet, which was sent to Mr. Freishtat on May 15, 2006, and the closing of the deal in July, 2006.  (Tr. 79; DX-21.)

13.  Mr. LoCascio testified that he attended a meeting in London at which Abe Smith, Proficient's European head of sales, presented Proficient's sales projections.  Mr. LoCascio "felt that a lot of the things that [Mr. Smith] was reporting were not accurate, and I think he wanted to make it look like he had this great business going but it wasn't."  In particular, "a lot of the deals that [Mr. Smith] thought were going to close or that were certain to have as full-time customers were not legit because [LivePerson] had closed them or [LivePerson was] in the middle of the deal, and we got a verbal agreement of closure."  Mr. LoCascio also testified that "after that meeting, I sat with my head of sales and we evaluated it, and I realized that this was not going to be a $10 million deal, there's not $10 million of revenue that I can see in this company now that I've seen

U.S. and now the final, which was the U.K. revenues." (Tr. 680-81.)

14. Mr. Freishtat testified that it was in London that "Mr. LoCascio informed me that he was not willing to move forward with the structure that we had and would require what he called at that point an earn-out." (Tr. 80.)

15. According to Mr. Freishtat, "the reason that [Mr. LoCascio] wanted an earn-out was that the nature of the agreements with these customers were not all locked-in agreements that had long-term value and this was true because there were many early-stage pilot agreements for Europe because this was still a nascent market . . . ." (Tr. 81.)

16. As a result of Mr. LoCascio's lack of confidence in the Proficient UK revenue projections, he proposed an earn-out because "in an earnout situation the company's protected . . . . So I wanted to protect the company, and I said, OK, if you think these revenues are going to close and you believe this guy, great, either way it's going to get structured as an earnout." (Tr. 680-82.)

## IV.  Executed Merger Agreement and Earn-Out Provision

17. On or about June 22, 2006, LivePerson, SOHO Acquisition Corp., Proficient and Mr. Freishtat, as agent and

attorney-in-fact for each shareholder of the Company, entered

into the Merger Agreement.  (PX-30.)

18.  The Merger Agreement provided that LivePerson would

acquire all of the outstanding capital stock of Proficient in

exchange for, among other things, 2,000,000 shares of LivePerson

common stock to be paid at closing, as well as up to 2,050,000

shares of LivePerson common stock to be contingently paid based

on the number of customers still engaged in long-term contracts

as of the measurement date, and the expected long-term,

recurring revenue streams produced by those customers (the

"Earn-Out Payment").  (PX-30 at §§ 2.04(a), (b); SF 6.)

19.  The amount of shares issued as Earn-Out Consideration

was to be determined by taking the "Normalized March 2007

Revenue," which is defined as the "Normalized Monthly Revenue

for March 2007," multiplying that number by 12 to calculate the

"Net Annualized Revenue," multiplying that number by "0.93

shares," and subtracting the 2,000,000 shares that were already

delivered to the Proficient shareholders at the Closing Date.

(PX-30 at §§ 1.01, 2.04(b).)

20.  Section 1.01 of the Merger Agreement states, in

relevant part:

> "Normalized Monthly Revenue" for any given month means (A)
> the monthly recurring revenue which [LivePerson] books as
> revenue in that month, according to [Generally Accepted
> Accounting   Principles   ("GAAP")],   generated   from
> [Proficient] Existing Customers, [Proficient] Business
> Development Customers and [Proficient] Pipeline Customers

```
        (which explicitly excludes (X) any one-time or non-
        recurring revenues such as testing or training fees and
        (Y) any revenue booked by [LivePerson] from [Proficient]
        Existing Customers, [Proficient] Business Development
        Customers or [Proficient] Pipeline Customers that have
        indicated to [LivePerson] in writing that they intend to
        cancel their contract and (Z) any revenue recognized by
        [LivePerson] in connection with the provision of
        professional services (unless such professional service
        fees are ongoing rather than one-time in nature)) plus (B)
        one-half of the monthly recurring revenue which
        [LivePerson] books as revenue in that month, according to
        GAAP, generated by [Proficient] Business Development
        Customers or [Proficient] Pipeline Customers that are on a
        90-day paid trial contract, plus (C) the monthly recurring
        revenue which [LivePerson] books as revenue in that month,
        according to GAAP, generated from the customer, if any, of
        [LivePerson] that is listed on Annex II . . . that
        generates the least amount of revenue for [LivePerson] in
        that month . . . .
```

(PX-30 at § 1.01.)

21.   Section 2.04(b)(iii) of the Merger Agreement states

that:  "On or before the Earn-Out Payment Date, [LivePerson]

shall deliver to the Shareholders' Representative a memorandum

. . . specifying in reasonable detail (i) the calculation of Net

Annualized Revenue, and (ii) the amount of the Earn-Out Payment,

if any, due to the Shareholders."  (PX-30 at § 2.04(b)(iii).)


**V.    Earn-Out Notice**

22.   On or about May 11, 2007, LivePerson furnished to the

plaintiff a formal notice setting forth its calculation of Net

Annualized Revenue and the amount of the Earn-Out Payment (the

"Earn-Out Notice").  (SF 13; PX-203 at PL0000344.)

23.   The Earn-Out Notice stated that the Net Annualized
Revenue, as defined in the Merger Agreement, was $3,368,108, and
the amount of the Earn-Out Payment due to Shareholders was
1,132,341 shares of LivePerson Common Stock.  (SF 14.)  This was
about 870,000 shares less than the 2,000,000 shares that were
potentially available under the Earn-Out Provision, not
including the additional 50,000 shares which were only available
if an additional revenue target was met.

24.   On or about May 11, 2007, LivePerson delivered the
number of shares of LivePerson Common Stock reflected in the
Earn-Out Notice to the Shareholders' Representative.  (SF 17.)

## VI.  Disputed Revenue Calculations

25.   The plaintiff contends that LivePerson failed to
include, in its computation of the Earn-Out Payment, revenue
that LivePerson in fact recognized, or that LivePerson should
have recognized under GAAP, in March, 2007 revenue.  The dispute
centers around seven former Proficient customers:  (1) Allstate
Insurance Co. ("Allstate"); (2) H&R Block Mortgage Corp. ("H&R
Block"); (3) MD Nationwide; (4) Adobe Systems, Inc. ("Adobe");
(5) Mark Travel Corp. ("Mark Travel"); (6) Government Employees
Insurance Co. ("GEICO"); and (7) The Governor and Company of the
Bank of Scotland ("HBOS").  In addition, LivePerson contends
that it erroneously provided an earn-out based on revenue from

CorCell, Inc. that should not have been included and that LivePerson is therefore entitled to a refund.  Some of the amounts involved are quite small but the parties, unable to resolve the disputes, have pressed them in this litigation and expended considerable effort in pursuing them.

26.  The disputes can be grouped under four general categories.  First, LivePerson contends that when it received notices of intent not to renew contracts prior to the end of March, 2007, the revenue from those contracts should not have been included in the computation of the Earn-Out Payment, while the plaintiff asserts that the revenue should be included because a notice of an intent not to renew a contract is not a notice of cancellation that would trigger the exclusion of revenue.  Second, LivePerson excluded certain revenue that it claimed was non-recurring revenue, while the plaintiff asserts it should not have been excluded.  Third, LivePerson excluded certain revenue from trial or proof of concept contracts that the plaintiff claims should have been included.  Finally, the parties dispute whether certain additional revenue was required to be recognized under GAAP in March, 2007.

**A.  Cancellation**

27.  The credible evidence establishes that the exclusion in the Merger Agreement for revenue from LivePerson customers

"that have indicated to [LivePerson] in writing that they intend
to cancel their contract" was intended to cover, among other
things, customers who indicated to Liveperson that they would
not be continuing their contracts at the end of an automatically
renewable term, as shown by the plain language of the contract
and the course of dealing between the parties.  While the
plaintiff asserts that such revenue should have been included,
even though it was clear that the customers would not be
continuing customers of LivePerson, that contention is not
supported by the structure of the deal, the contemporaneous
documents, and the credible testimony.  Customers would not be
producing continuing income for LivePerson whether they
cancelled contracts before the terms ended, or whether they
indicated before the end of March, 2007 that they were not
renewing their contracts.  In either event, it was clear that
LivePerson would not have the bargained-for benefit of recurring
income from those contracts and therefore the income from those
contracts should not have been included in revenue for earn-out
purposes.

28.  The Merger Agreement expressly excludes from the earn-
out calculation "any revenue booked by [LivePerson] from
[Proficient] Pipeline Customers that have indicated to
[LivePerson] in writing that they intend to cancel their

contract . . . ."  (PX-30 at § 1.01.)  The words "cancel" and
"non-renew" are not defined in the Merger Agreement.

29.  Given that the acquisition of long-term revenue
streams was a key motivation for the merger, LivePerson was
concerned about whether Proficient's existing or pipeline
customers would continue on as LivePerson customers after the
acquisition.  Mr. LoCascio testified credibly that LivePerson
engaged Proficient in negotiations because it desired the
latter's customer base.  Later in London, when Mr. LoCascio
discovered that several of Proficient's purported "full-time
customers were not legit because [LivePerson] had closed them or
[LivePerson was] in the middle of the deal," Mr. Locascio
requested that an earn-out provision be included in the Merger
Agreement.  (Tr. 669-70, 680.)

30.  The earn-out provision was designed to protect
LivePerson in the event that ongoing revenue streams acquired by
LivePerson as a result of the Proficient acquisition were lower
than expected.  Mr. LoCascio testified credibly that he
requested incorporation of an earn-out provision in the Merger
Agreement because it allowed for Proficient to receive
compensation for the deals it contributed to the acquisition,
while ensuring that LivePerson was "protected" in the event that
not all the ongoing revenue streams materialized as Mr.
Freishtat predicted.  (Tr. 681-84.)  Mr. Freishtat acknowledged

that Mr. LoCascio was not pleased with the events that transpired in London and stated that, at the time, he assured Mr. LoCascio that if Mr. LoCascio had concerns about Proficient's future value, pipeline, and European pilots, Mr. Freishtat would be willing to incorporate a provision into the Merger Agreement which, while not a traditional earn-out, would reflect the value of Proficient at a point in the future.  (Tr. 81-83, 195-98.)

31.  Specifically, the earn-out provision was designed to give credit to the Proficient shareholders only for revenue that was expected to "recur" into the future for LivePerson, measured using March, 2007 as a proxy and then annualizing March, 2007 to yield an expected ongoing annual revenue stream.  By definition, the earn-out calculation was designed to exclude revenue recognized in March if it was not expected to be ongoing revenue.  See PX-30 at § 1.01.

32.  Mr. LoCascio testified that the earn-out provision looked at three buckets of revenue.  "One is the contracts that were going to be long-term contracts and signed paper for like a year, [LivePerson was] going to pay one time that revenue. [Second, i]f they were going to be looked at as proof of concepts, or tests — we knew sometimes there's a 50/50 chance of these things becoming full-time, long-term recurring contracts —

we were going to give 50 percent."  Finally, "one-time fees"
were very minimal "because they don't recur."  (Tr. 686.)

33.  Mr. LoCascio testified that LivePerson would not
"count things . . . if a customer is going to cancel with us,
because it will not continue on, it will not recur."  Mr.
LoCascio also stated that "a customer can cancel any time that
he wants to, and if they come to us and tell us they're
canceling for contractual reasons or they want to stop paying us
and they don't want to continue on in a one-year deal or two-
year deal, then we look at that as canceled revenue."  (Tr. 691-
92.)

34.  Mr. Freishtat agreed that it would be reasonable to
define recurring revenue as revenue that is predictable, stable
and can be counted on in the future with a high degree of
certainty.  Mr. Freishtat also agreed that LivePerson sought
such recurring revenue in the acquisition with Proficient.  (Tr.
161-62, 268-69.)

35.  The Merger Agreement itself excludes from the earn-out
calculation any revenue from former Proficient customers "that
have indicated to [LivePerson] in writing that they intend to
cancel their contract . . . ."  (PX-30 at § 1.01.)  It draws no
distinction between customers who indicate that they are not
renewing their contracts at the end of their term, like
cancelling a magazine subscription at the end of a subscription

term, and those customers who terminate their contracts before
the term of the contracts had otherwise expired.  In either
event, if a customer indicated its intent not to continue the
contract before the end of March, 2007, LivePerson would be
assured that the revenue would not be continuing, and the
language of the Merger Agreement covered both situations.  While
Mr. Freishtat contended that revenue was not to be eliminated
for "locked up" customers who did not have cancellation for
convenience provisions in their contracts, the Merger Agreement
itself drew no such distinction.  (Tr. 104-10, 121-22.)  Nor did
Mr. Freishtat ever communicate this understanding of the meaning
of the term "cancel" to LivePerson during the merger
negotiations.  (Tr. 122, 207-08.)

   36.  LivePerson and Proficient understood "cancel" to mean
the stopping of ongoing revenue from a customer contract.
Stephen Hufford, the former Executive Vice President of
Proficient, testified that a fair definition of "cancel" would
be "the taking of an affirmative step to stop a contract."  (Tr.
566.)  John Huntz, a former member of the Proficient Board of
Directors, testified that "cancelation is something that is a
proactive event on behalf of the customer, to take an action to
cancel an existing agreement."  (Tr. 524.)  Michael Kovach, the
Senior Vice President and Corporate Controller for LivePerson,
testified that he determined which customers had terminated

their contracts by way of a "cancellation notice," so dubbed
because "any stoppage of recurring services is a cancellation of
that ongoing revenue stream for us."  (Tr. 918-19.)

37.  In 2006, LivePerson had contracts that were
automatically renewable and that required that an affirmative
step be taken by the customer in order to stop LivePerson's
services.  (SF 33.)  These included contracts with Allstate, H&R
Block, and CorCell.  (DX-20 at § 5; PX-10 at § 9; PX-2 at 9.)

38.  LivePerson routinely used the term "cancel," "non-
renew" or other indications of cancellation interchangeably,
both internally and in communications with Proficient, to refer
to contracts that would not continue.  (Tr. 782; DX-108 at
PL000021; DX-125 at PL000065; DX-126 at PL000067.)  Mr. Dicso
testified that when he used the terms "cancel" and "not
renewed," there was no difference in his mind as to what those
terms meant.  (Tr. 782.)  Internal documentation indicates that
LivePerson used the terms "cancellation" and "termination"
interchangeably within the context of H&R Block's cancellation
notice.  (DX-193 at LP0003736.)

39.  Mr. Dicso testified that he had written "cancel" in
connection with the Allstate and H&R Block contracts in an earn-
out calculation prepared for March, 2007, because "[Allstate and
H&R Block] gave [LivePerson] notice that they were not intending

to continue using the service at the end of the term" and Mr. Dicso considered them "cancellations." (Tr. 797; DX-161.)

40. Mr. Kovach testified that upon receiving notices of cancellation, as in the case of Allstate, H&R Block, and CorCell, somebody from the Accounting Department, usually Ms. Clark, Mr. Kovach's accounting manager, would handwrite a "CL" on the notice. The document would then be placed in a sequential log of LivePerson's cancellations. Mr. Kovach stated that it was the policy and practice in effect at LivePerson from at least 2005 to keep a cancellation log and to log similar notices of termination. (Tr. 920-22.)

41. At no point did Mr. Freishtat and his colleagues at Proficient ever question or challenge LivePerson's use of the word "cancel" to signify a customer's decision to terminate the contractual relationship, or dispute LivePerson's running tally of the earn-out provided in the bi-weekly or monthly earn-out update spreadsheets, each of which excluded revenue from "cancelled" or "non-renew customers." (Tr. 574, 692, 747, 784-87.)

42. Thus, the credible evidence establishes that the Merger Agreement excluded revenue from former Proficient customers who indicated to LivePerson that they would not be continuing their contracts at the end of an automatic renewable term.

## 1.  Allstate

43.  Allstate indicated to LivePerson in writing prior to the end of March, 2007 that it intended to "cancel" its contract, as that term is used in the Merger Agreement. Therefore, it was appropriate to exclude Allstate's March, 2007 revenue from the earn-out calculation, as stated in the Earn-Out Notice.

44.  The July 14, 2005 Services Agreement between Proficient and Allstate provides that the "Agreement shall apply and remain in effect for a term that commences on [July 14, 2005], and extends for a period of 90 days following the Launch Date (the "Term"), unless earlier terminated pursuant to the terms hereof, or extended by both parties agreeing to such extension."  (PX-3 at § 1.)

45.  The terms of the Allstate contract were extended four times.  The final extension, Amendment #4, dated April 28, 2006, set forth an initial annual term ending April 30, 2007.  (DX-20 at § 1.)

46.  Amendment #4 to the Allstate contract set forth an automatic renewal provision as follows:

> After expiration of the Initial Annual Term, the Agreement will automatically renew for additional 12 month terms unless either party notifies the other party in writing of its intent to not to [sic] renew the Agreement at least 45 days prior to the expiration of the then current term.

(DX-20 at § 5.)

20

47. On January 17, 2007, Allstate indicated to LivePerson in writing that it intended to cancel its existing contract with Proficient. In this email, Allstate informed LivePerson that its written notice was intended to effect "the termination of [Proficient's] ProChat service(s), effective December 31, 2006, the date which we had discussed with your organization over the past few months." (PX-113.)

48. Because the Allstate contract could only be terminated at the end of its term, LivePerson continued to receive income from Allstate through the end of April, 2007. LivePerson recognized $10,500 in revenue from Allstate each month for the period of July, 2006 (after the acquisition of Proficient) through the end of April, 2007. (SF 27.)

49. Mr. Kovach testified credibly that Allstate's email requesting termination constituted a request for cancellation of its services with LivePerson, stating that there was no question in his mind that Allstate was processed as a cancellation when this notification was received. (Tr. 921.) Mr. Kovach testified that a copy of the January 17, 2007 email from Allstate, with a handwritten "CL," would have been placed in the sequential log of [LivePerson's] cancellations.

50. Thus, LivePerson appropriately excluded Allstate's March, 2007 revenue from the earn-out calculation because

Allstate had indicated to LivePerson in writing prior to the end of March, 2007 that it intended to cancel its contract.

## 2.  H&R Block

51.  H&R Block also indicated to LivePerson in writing prior to the end of March, 2007 that it intended to "cancel" its contract, as that term is used in the Merger Agreement. Therefore, it was appropriate to exclude H&R Block's March, 2007 revenue from the earn-out calculation, as stated in the Earn-Out Notice.

52.  The January 17, 2006 Subscription Agreement between Proficient and H&R Block states, in relevant part:  "This Agreement shall remain in effect unless terminated."  (PX-10 at § 9.)  By its terms, the agreement with H&R Block remained in effect for three months after the standard deployment date (the "Pilot Term") plus twelve months (the "Term"), and would automatically renew for additional annual terms unless it was cancelled, either due to a material breach or to the desire not to renew the contract for the next annual term.  (PX-10 at § 9, Ex. A.)

53.  Between December 1, 2006 and March 31, 2007, LivePerson recognized monthly revenues from H&R Block of $6,950. (SF 42.)  LivePerson did not include this revenue in the earn-out calculation.

54.  On March 29, 2007, H&R Block emailed LivePerson,
providing written notice that it would "as of today, . . . need
to terminate the use of live chat."  (DX-181 at LP0028046.)

55.  Mr. Kovach testified that this email was an email from
H&R Block "cancelling their services" as of March 29, 2007.
(Tr. 922.)  Mr. Kovach testified that this email was marked with
"CL" and a set of numbers and that this notation indicated that
the email requested cancellation or termination of H&R Block's
contract with LivePerson.  (Tr. 922; DX-181 at LP0028046.)

56.  In an internal communication, Mr. Dicso used the term
"cancellation" to describe H&R Block's written notice of its
intent not to renew its contract.  (DX-181 at LP0028045.)  Mr.
Dicso testified that he understood H&R Block's email request for
termination of services to be a "written notice of an intent to
cancel their contract."  (Tr. 834.)

57.  Thus, LivePerson appropriately excluded the March,
2007 revenue from H&R Block in the earn-out calculation because
H&R Block had indicated to LivePerson in writing prior to the
end of March, 2007 that it intended to cancel its contract.

**3. CorCell**

58.  Because CorCell indicated to LivePerson in writing
prior to the end of March, 2007 that it intended to "cancel" its
contract, as that term is used in the Merger Agreement, and
because Mr. Kovach promptly notified Mr. Freishtat after

23

learning of the cancellation following the Earn-Out Payment in
May, 2007, LivePerson is entitled to a refund of the value of
the 27,900 shares that were erroneously overpaid to the
Proficient shareholders as a result of including revenue
attributable to CorCell in the earn-out calculation.

59.   The Subscription Agreement between Proficient and
CorCell, dated June 30, 2005, states:  "This Agreement shall
remain in effect unless terminated.  Each Order shall remain in
effect for the number of months set forth on such Order.
Thereafter, each Order shall automatically renew for additional
one-month periods unless either party notifies the other party
of its intent not to renew at least 30 days prior to the end of
the then current period."  (PX-2 at § 9.)

60.   On November 15, 2005, the Agreement was amended to
include additional services.  (DX-15.)

61.   On March 22, 2007, before the earn-out date, Ms.
Lafferty, the Controller for CorCell Companies, Inc., emailed
Jonathan Gottfried of LivePerson's Small Business Group in
Israel to notify LivePerson in writing of CorCell's intent "to
end our contract for LivePerson on April 30, 2007." (DX-225 at
LP0014757.)

62.   LivePerson's Accounting Group in New York did not
receive this email until May 10, 2007, when Ms. Lafferty
forwarded her original March 22, 2007 email to Ms. Clark in

24

LivePerson's New York Accounting Department.  (Tr. 923-24; DX-225 at LP0014756.)

63.  Upon receipt, the Accounting Group in New York promptly recognized the notice as a written notice of intent to cancel and informed Proficient of the mistake.  (Tr. 924-25.)

64.  On May 17, 2007, Mr. Kovach emailed Mr. Freishtat stating that, due to an administrative error, LivePerson's Accounting Group only became aware that "CorCell had cancelled their contract with us" on May 10.  Because of the delay, LivePerson had improperly included CorCell's March revenue in the earn-out calculation.  Mr. Kovach's email further stated that, although LivePerson had released the shares, it would "officially request the Shareholders to refund LivePerson the cash value of [those] shares."  (DX-230 at PL0001326.)

65.  Mr. Freishtat responded to Mr. Kovach's email, stating that he would notify Proficient's counsel of the issue.  (DX-230 at PL0001326.)

66.  LivePerson recognized $2,500 in monthly revenue from CorCell in March, 2007 and included the amount in the earn-out calculations.  (Tr. 924; PX-203 at PL0000344.)

67.  After the intent to cancel was communicated by CorCell, but before the Accounting Group in New York became aware of it, LivePerson's stock transfer agent had already been instructed to release a certain number of shares to the

Proficient shareholders in order to ensure that the earn-out was timely delivered.  Those shares included shares based on the $2,500 of March, 2007 revenue from CorCell that was included in the earn-out calculation.  (Tr. 924-26; DX-230 at PL0001326.) The Earn-Out Notice indicated that $2,500 was included in the earn-out calculation for CorCell.  (Tr. 924; PX-203 at PL0000344.)

68.  Thus, as a result of the error regarding CorCell, LivePerson improperly overpaid the Proficient shareholders for $2,500 in revenue attributable to CorCell.  Applying the formula in the Merger Agreement, this resulted in an overpayment of 27,900 shares of LivePerson stock that LivePerson is entitled to recover.

**B.  Non-Recurring Revenue**

69.  The parties intended to exclude non-recurring revenues from the earn-out calculation, including one-time professional services fees as well as other unspecified categories of non-recurring revenues.

70.  The amount of "monthly recurring revenue" in the Merger Agreement's definition of Normalized Monthly Revenue "explicitly excludes" from the total two categories of non-recurring revenue:  exclusion (X) for "any one-time or non-recurring revenues such as testing or training fees"; and

exclusion (Z) for "any revenue recognized by [LivePerson] in connection with the provision of professional services (unless such professional services fees are ongoing rather than one-time in nature."  (PX-30 at § 1.01.)

71.  The mention of "testing or training fees" in exclusion (X) is not meant to provide an exhaustive list of excluded non-recurring revenues but only to provide two examples, as indicated by the phrase "such as."  (PX-30 at § 1.01.)  Mr. Kovach testified credibly, and consistently with the Merger Agreement, that exclusion (X) "wasn't limited to [testing or training fees].  It was any one time fee."  (Tr. 900.)

72.  The "professional services" listed in exclusion (Z) may be provided to a customer over a period of more than one month but are nevertheless one-time fees.  Mr. Kovach testified that "[t]he professional services fees take anywhere from upwards to about a month to configure their system and train the customer."  (Tr. 871.)

73.  Fees from professional services comprised a very small percentage of LivePerson's revenue.  (Tr. 663.)

74.  Thus, the Merger Agreement excluded professional services fees from the definition of "monthly recurring revenue," because such fees were non-recurring or "one-time" in nature.

**1. MD Nationwide**

75.   The professional services fees that LivePerson charged to MD Nationwide in connection with their December 1, 2006 agreement were "one-time in nature," as that phrase is used in the Merger Agreement.  Therefore, that revenue properly was not included in the recurring revenue for March, 2007. Moreover, the $4,875 installment of the professional services fees invoiced to MD Nationwide in March, 2007 was appropriately recognized as revenue in January, 2007, when those professional services were completed.  Accordingly, the earn-out calculation for MD Nationwide was correct as stated in the Earn-Out Notice.

76.   LivePerson entered into a Services Agreement with MD Nationwide effective December 1, 2006, that provided for a one-time "professional services" fee of 10,000 British Pounds, and a 3,000 British Pounds monthly "ASP Platform Fee," both of which were invoiced in United States dollars in four equal installments at then-current exchange rates.  (PX-89; Tr. 870, 957-58.)

77.   The "professional services" for MD Nationwide were completed on January 5, 2007, and were not performed again for MD Nationwide.  (DX-112 at LP0000365; Tr. 880.)

78.   In March, 2007, LivePerson invoiced MD Nationwide a total of $10,725 and booked that amount as revenue.  Of this amount, $5,850 represented the monthly fee for the use of

LivePerson's platform — which reflected the 3,000 British Pounds monthly charge at an exchange rate of 1.95 — and $4,875 represented the final installment of the fee for professional services that had been performed in full by January 5, 2007. (PX-133; DX-112 at LP0000365; Tr. 876-78.)

79. LivePerson included the full $5,850 of monthly recurring revenue in the earn-out calculation. (DX-159; PX-203 at PL0000344.) However, LivePerson did not include the $4,875 that represented the final installment of the professional services fee.

80. It was appropriate for LivePerson to have excluded the $4,875 professional services fee from the earn-out calculation, because that fee was "one-time in nature," as that term is used in the Merger Agreement. (PX-30 at § 1.01; Tr. 880.)

81. The fact that the professional services fee was invoiced to MD Nationwide in four installments does not make the professional services fee ongoing, because the services were completed in January, 2007, months before the final installment payment was invoiced. (Tr. 880.)

82. Moreover, it was proper to exclude the entirety of the $4,875 professional services fee from the earn-out calculation for the independent reason that, according to GAAP, the fee should have been accounted for in January, 2007, when the

services were performed and completed, with no portion recognized in March, 2007.

83.   Mr. Kovach testified that the proper treatment under GAAP of the revenue that was coming in from MD Nationwide was "to recognize all of the entire one-time fee upon completion and client acceptance, which was January." (Tr. 873.)  This conclusion was supported by the credible testimony of LivePerson's accounting expert, Professor Ray Stephens.  (Tr. 958-59.)  The fact that the fee was invoiced over a three-month period does not change the fact that the fee was properly accounted for under GAAP in January, 2007, and no portion should have been recognized in March, 2007, which was the relevant time for the earn-out calculation.

84.   Thus, LivePerson appropriately excluded the entirety of the $4,875 professional services fee from the earn-out calculation.

**2. Adobe Addendum #2**

85.   The parties dispute the proper treatment for the fees that LivePerson charged to Adobe for providing the third-party labor services of 24/7 Customer, Inc. ("24/7").

86.   Adobe and LivePerson entered into a Consulting Agreement with an effective date of August 24, 2005, and later executed several addenda to that agreement, some of which were

related to a separate paid trial.  (PX-5; PX-54; PX-112; PX-181.)

87.  Under Addendum #2 to the Consulting Agreement with Adobe ("Adobe Addendum #2"), effective as of January 9, 2007, but signed in March, 2007, LivePerson procured, on behalf of Adobe, the third-party labor services of 24/7 to staff the paid trial.  (PX-112.)  24/7 provided chat agents who worked in concert with the LivePerson application.  LivePerson paid 24/7 for the sales agents and invoiced Adobe for the services of those agents.  (PX-118; Tr. 643-44, 806, 901-06.)  LivePerson invoiced Adobe for $50,000, which consisted of a one-time $4,000 pass-through fee for system implementation, a one-time $4,000 pass-through fee for agent product training, and a $42,000 fee for the use of the 24/7 chat agents for the 60-day evaluation period.  (PX-112; Tr. 904-05.)  The plaintiff contends that $42,000 of this amount should have been included in the earn-out calculation.  LivePerson did not include any of the amount in the earn-out calculation because LivePerson concluded that it was all a one-time, non-recurring amount.  (Tr. 898-902.) LivePerson also contends that if any of this amount were included in the earn-out calculation, it should be limited to $3,500, which was the net amount LivePerson realized as a result of its contract with 24/7 and its provision of those 24/7 agents

to Adobe.  LivePerson only recognized $3,500 of revenue according to its revenue recognition policy.  (Tr. 902-05.)

88.  The duration of the services provided in Adobe Addendum #2 was limited to 60 days, but Adobe had the right to extend the trial period.

89.  The contract between LivePerson and 24/7 provided that:

> [u]pon conclusion of the Initial Term, Adobe shall be permitted to contract directly with 24/7 for the provision of services.  Alternatively, if requested by Adobe, LivePerson and 24/7 may extend the Agreement for up to an additional sixty (60) days . . . by mutual written agreement prior to the expiration of the Initial Term.  If no such notice is provided, this agreement shall expire at the end of the Initial Term.

(PX-118 at LP0001326.)

90.  Beginning at least by early March, 2007, Adobe and LivePerson were discussing an extension of LivePerson's services under Addendum #2, as well as Addendum #1.  (PX-141, PX-142, PX-157, PX-162, PX-175.)  The parties had not yet entered into an agreement for the extension but the services were continuing.  Adobe and LivePerson entered into a third Addendum (Addendum #3), which continued Addendum #2, as well as Addendum #1.  This was executed by the parties in late May and early June, 2007, and it retroactively covered the period March 3, 2007 through June 1, 2007.  (PX-181.)

91.  From about June or July, 2007, Adobe contracted directly with 24/7 because, as Mr. Davidson, a senior manager at

Adobe, testified, Adobe "preferred to manage the ongoing relationship of driving sales directly with those agents who had that responsibility, to talk directly to the end customers . . . . " (Tr. 627.)

92.  LivePerson excluded any revenue from Addendum #2 because it concluded that the revenue was a one-time, non-recurring amount.  (Tr. 898-902.)  That was true for the $4,000 pass-through fee for agent product training and the $4,000 fee for system implementation, and the plaintiff does not allege that those amounts should have been included in the earn-out calculation.  However, because the charges for the chat agents provided by 24/7 were in fact continued after March, 2007, and were eventually covered by Addendum #3, those charges were not "one-time" or "non-recurring" revenues within the meaning of the Merger Agreement.

93.  However, the revenue properly included in the earn-out calculation is only the $3,500 in revenue that was actually recognized by LivePerson in accordance with its revenue recognition policy, and not the $42,000 sought by the plaintiff. (Tr. 902-05.)  Professor Stephens testified credibly that, given all of the circumstances of LivePerson's contracts with Adobe and 24/7, GAAP required that the revenue be recognized on a net basis after taking into account the amount LivePerson owed to 24/7 rather than simply on a gross basis counting only the

income received from Adobe.  (Tr. 964-77.)  That is consistent
with the principles provided by the Emerging Issues Task Force
(EITF) 99-19, which was introduced and adopted as part of an
effort to serve as a check on companies unfairly exaggerating
revenue figures, particularly when those revenues were merely
passing through the company on the way to a third party.  (Tr.
340-45, 454, 964.)  To have recognized $42,000 in revenue would
have grossly exaggerated LivePerson's revenue from Addendum #2
when all but $3,500 was paid out to 24/7 for the agents that
were being provided by 24/7.  While Mr. Love concluded that the
entire $42,000 should have been recognized as revenue, that
testimony was not credible.  (Tr. 340-73.)  It was contrary to
LivePerson's revenue recognition policy and relied in part on
the services that LivePerson was providing to Adobe under
Addendum #1.  (Tr. 457-67.)

94.  Accordingly, LivePerson should have included $3,500 in
revenue from Addendum #2 in the earn-out calculation.  Applying
the formula in the Merger Agreement, this exclusion resulted in
an underpayment of shares of LivePerson stock in the amount of
39,060 shares.[1]

---

[1] LivePerson has not argued that only 50% of the revenue from
Addendum #2 should be credited on the basis that it was a 90-day
paid trial contract.

**C. 90-Day Paid Trial Contract**

95.   The term "90-day paid trial contract," as it is used in the Merger Agreement, is a term of art used to distinguish short-term evaluations from long-term committed subscriptions. LivePerson properly included only 50% of the revenue from its "proof of concept" contracts with Adobe and Mark Travel in the earn-out calculation because they were still engaged in short-term evaluations in March, 2007.

96.   Under the definition of Normalized Monthly Revenue, one half of the monthly recurring revenue which LivePerson books as revenue in that month, according to GAAP, generated by certain customers that are on a "90-day paid trial contract," was to be included in the earn-out calculation.  (PX-30 at § 1.01.)  Without this provision, there could have been a dispute as to whether any income from customers on a 90-day paid trial contract should be included because, given the explicit limited contract term, the revenue might not be considered to be "recurring."

97.   The terms trial, pilot, system evaluation, proof of value (POV), and proof of concept (POC) are used interchangeably in the industry.  Mr. Freishtat, Mr. Huntz, Mr. Hufford, Mr. Bixby, Mr. Dicso, and Mr. Kovach each agreed that these terms are interchangeable.  (Tr. 114, 510, 574-75, 742, 801, 891.)

98.  LivePerson used the term 90-day paid trial contract internally to refer generally to paid trials.  (Tr. 695.)  The term "90-day paid trial" is used colloquially because that is the most common period of time for LivePerson proof of concepts.  (Tr. 742-43.)  It was also a fairly typical period of time for Proficient trial contracts.  (Tr. 575.)

99.  Mr. Freishtat testified that it is not the number of days but instead the "state of mind," specifically the absence of commitment from the customer, that makes a proof of concept different from an ongoing, long-term contractual commitment, and that a "pilot is different than a one-year contract independent of the length of the pilot."  (Tr. 211-12, 267-68.)  Mr. Freishtat also testified that "the fact that there is a pilot means that the sale's not finished."  (Tr. 220.)

100. In forwarding the final deal sheet to his Board and others, Mr. Freishtat explained that "the pay out is based upon the GAAP revenues recognized by [LivePerson] in the month of March 2007," minus, among another categories, "50% for any revenues of deals still in pilot."  Mr. Freishtat made no reference to a 90-day limitation for such pilots.  (PX-23 at PL0000765; Tr. 210.)

101. The term "90-day paid trial contract" is inherently ambiguous because it is unclear when the trial period would start — whether on the date the contract was signed, or the date

that the system would go live.  (Tr. 743.)  Moreover, any trial period could be extended, for some period of time, while the potential customer was still testing the concept to see if the customer wanted to enter into a long-term contract.  (Tr. 575-78, 802-05.)  It would make no sense to exclude 60-day paid trial contracts from the 50% exclusion provision because such contracts would have even less recurring revenue than a 90-day paid trial contract.  As used in the Merger Agreement, the term "90-day paid trial contract" is most reasonably understood by the parties to mean a short-term evaluation period as opposed to a long-term commitment.

102. Thus, under the Merger Agreement, only one half of the revenue from paid trial contracts lasting longer than 90 days should be included in the Earn-Out Payment if the customer had not signed a long-term agreement with LivePerson by March 31, 2007.

**1. Adobe Addendum #1**

103. Adobe Addendum #1, the contract between LivePerson and Adobe for a 60-day system evaluation, was a "90-day paid trial contract" as that phrase is understood in the Merger Agreement, and thus LivePerson properly included only 50% of the revenue from Adobe Addendum #1 in the earn-out calculation.

104. Addendum #1 to the Master Consulting Agreement between LivePerson and Adobe, dated as of September 28, 2006 ("Adobe

37

Addendum #1"), specifies the technology and services to be provided by LivePerson for a paid trial.  The trial was explicitly labeled in Exhibit B to Addendum #1 as a "Proof of Value" (POV) and as a "system evaluation."  (PX-54 at LP0001104.)

105. Adobe Addendum #1 ran for sixty days following the live date of January 26, 2007, until March 26, 2007.  (SF 54-55.)

106. As of March 26, 2007, Adobe Addendum #1 expired by its own terms.  No further addenda extending LivePerson services were executed before the end of March, 2007.  Addendum #3 to the LivePerson-Adobe Master Consulting Agreement ("Adobe Addendum #3") was not executed until May 25, 2007 by LivePerson and June 4, 2007 by Adobe.  (PX-181.)  Adobe was not ready to commit to a long-term contract at the end of March.  (Tr. 804-05.)  Addendum #3 retroactively covered the period March 3, 2007 through June 1, 2007, and specified that it was a "continuation of the proof of concept services . . . ."  (PX-181.)

107. The existence of a contract signed after March, 2007 is irrelevant for purposes of determining whether Adobe was on a trial contract in March, 2007.  As Mr. Freishtat testified, from Proficient's perspective, it would be Proficient's "tough luck" under the deal structure if LivePerson signed any deals on April

1 or later.  Mr. Freishtat acknowledged that "we were not going to get that revenue." (Tr. 93-94.)

108. It is equally irrelevant whether Adobe and LivePerson were in negotiations in March, 2007 to execute what would become Adobe Addendum #3.  As Vince Love, the plaintiff's accounting expert, acknowledged, under LivePerson's revenue recognition policy, a signed contract is needed to recognize revenue.  (Tr. 338.)

109. In the absence of any executed long-term renewal of the trial contract, LivePerson appropriately recognized only 50% of the March, 2007 Adobe revenue as Normalized Monthly Revenue under the terms of the Merger Agreement because Adobe was still in a 60-day proof of concept period.  (Tr. 804-05.)

110. This is true despite Section (C) of the definition of Normalized Monthly Revenue in the Merger Agreement, which provides that the total under the definition will include the "monthly recurring revenue" from one of four companies listed in Annex II that has generated "the least amount of revenue" for LivePerson.

111. Annex II is a list of four Pipeline Prospects, which included Adobe.  Of the four (Gateway, Sallie Mae, Vodafone UK Business, and Adobe), Adobe was the only customer that was under contract with LivePerson in March, 2007, and thus the only customer generating revenue.

112. However, revenue from Adobe was included in the earn-out calculation, and Section (C) does not state that it trumps Section (B) by requiring that all monthly revenue, rather than 50% of that revenue, be counted for the relevant company. (PX-30 at § 1.01; PX-203 at PL0000344.)

113. Thus, it was appropriate to recognize only 50% of the revenue from Adobe Addendum #1 in the Earn-Out Payment.

114. However, the $7,500 in normalized monthly revenue that LivePerson attributed to Adobe in the earn-out calculation was not entirely precise.  (PX-203 at PL0000344.)

115. The total fee that LivePerson charged Adobe for the two-month trial was $30,000.  (PX-54 at LP0001104; Tr. 962.)  In conducting the earn-out calculation, LivePerson booked the trial period as a two-month arrangement, recognizing half, or $15,000, of revenue in both February and March, 2007, and none in January, 2007.  (PX-203 at PL0000344; Tr. 893, 963.)

116. The accounting expert for the plaintiff testified that, rather than attributing $15,000 to March, 2007, a per diem allocation would have been more appropriate, and LivePerson's expert agreed that such an approach was acceptable.  (Tr. 317-18, 962.)  A per diem approach takes the total number of days of service and the total fee for the contract and allocates the revenue on a daily basis.

117. Applying the more precise per diem approach to Adobe Addendum #1, 26 of the 60 days should have been recognized as revenue in March. Thus, $13,000 should have been recognized in March. (This was the figure calculated by Professor Stephens and was more credible than the slightly different figure used by Mr. Love.) (Tr. 962.) Taking 50% of this figure because Adobe Addendum #1 was a "90-day paid trial contract" as that term is used in the Merger Agreement, only $6,500 should have been reported in the earn-out calculation rather than the $7,500 actually reported. (Tr. 317-18, 961-63.) The monthly allocation therefore led to a $1,000 overstatement of the earn-out calculation and, applying the formula in the Merger Agreement, an overpayment of 11,160 shares. (Tr. 317-18, 961-63.)

**2. Mark Travel**

118. Addendum #2 between LivePerson and Mark Travel, extending the 60-day proof of concept contract through March 31, 2007, was a "90-day paid trial contract" as that phrase is used in the Merger Agreement, and Addendum #2 was a modification of Addendum #1. Therefore, LivePerson reasonably included only $5,000 — or 50% — of the $10,000 in March, 2007 revenue from Addendum #2 in the earn-out calculation. However, under a more precise per diem approach, $5,061 – rather than $5,000 – should

have been assigned to March, 2007, resulting in an underpayment of $61, or 681 shares to the Proficient shareholders.

119. The Mark Travel Corporation and LivePerson entered into a Services Agreement ("Mark Travel Agreement") that was executed on October 5, 2006, which provided for an initial paid Proof of Value ("POV") trial for LivePerson's proactive chat services.  (PX-49 at PAGE 04/09, PAGE 09/09.)

120. The paid trial went live on December 8, 2006.  (SF 46.)

121. Two addenda to the Mark Travel Agreement provided short-term extensions of the "POC Term" through March 31, 2007. Addendum #1 to the Mark Travel Agreement ("Mark Travel Addendum #1") states that "LivePerson is exercising its right to extend the POC Term."  The term of the extension was from February 11, 2007 through March 10, 2007.  (PX-124.)  Addendum #2 to the Mark Travel Agreement ("Mark Travel Addendum #2") states that "LivePerson is exercising its right to extend the POC Term." The term of the extension was from February 11, 2007 through March 31, 2007.  (PX-144; Tr. 909-10.)

122. At the end of March, 2007, no further addenda had been executed, nor had Mark Travel agreed to an annual or other long-term contract.

123. Addendum #3 to the Mark Travel Agreement was not executed until April 20, 2007 by Mark Travel and April 23, 2007 by LivePerson.  (PX-179.)

124. In the absence of any definitive long-term renewal of the POC, LivePerson appropriately recognized only 50% of the March, 2007 Mark Travel revenue as Normalized Monthly Revenue under the terms of the Merger Agreement.

125. The Earn-out Binder Summary for Mark Travel shows Mr. Kovach's treatment of the revenue from the agreement.  The summary lists the 60-day system evaluation fee of $20,000 and "Total Monthly RMR for POC Period" as $10,000.  It then states "POC rate per Agreement" is 50%, which results in $5,000 "RMR included in earn-out."  (DX-162.)  Mr. Kovach testified that, in the absence of a long-term commitment from Mark Travel, it was appropriate to include 50% from the extended POC.  (Tr. 910-12.)

126. LivePerson invoiced $16,000 of revenue in March, 2007 from Mark Travel for the paid trial period from February 11, 2007 through March 31, 2007.  (PX-144; PX-160.)

127. Of the $16,000 received by LivePerson, $10,000 was assigned to March, 2007 and the remaining $6,000 was a prorated fee for a portion of February.  (Tr. 911.)  Mark Travel Addendum #1 was executed on February 19, 2007 by Mark Travel and on February 21, 2007 by LivePerson.  (PX-124.)  Mark Travel Addendum #2, executed in March, was a modification of Addendum

#1 because it extended the term from March 10 to March 31 and changed the fee from $8,000 to $16,000.  (PX-144.)  Professor Stephens testified that, accordingly, LivePerson should recognize the revenue over the term of the POC rather than recognizing revenue from both addenda in March.  (Tr. 978-79.)

128.  Because the Merger Agreement requires recognition of only 50% of revenue realized under paid trials in March, 2007, LivePerson appropriately included only $5,000 of Mark Travel's March, 2007 revenue in the earn-out calculation.  (DX-162; PX-203 at PL0000344.)  However, the parties agree that a per diem approach is more precise.  Using a per diem approach, $5,061, rather than $5,000, would be assigned to March.  (Tr. 980-81.)  The monthly recurring revenue for March, 2007 was accordingly understated by $61, which yields an underpayment of 681 shares to the Proficient shareholders.  (Tr. 980-81; PX-30 at §§ 1.01, 2.04(b)(1).)

## D. Generally Accepted Accounting Principles ("GAAP")

129.  The Merger Agreement requires the inclusion in the earn-out calculation of the "monthly recurring revenue which [LivePerson] books as revenue" in March, 2007 "according to GAAP."  (PX-30 at § 1.01.)

130. The parties included a reference to GAAP in the Merger Agreement as a recognition that LivePerson is a publicly-traded

company that routinely adheres to GAAP.  The reference to GAAP was not intended by either party to signal that LivePerson's good-faith and reasonable accounting determinations as to the revenues that LivePerson recognized and reported to the public were subject to subsequent second-guessing.

### 1. LivePerson's Preparation of the Earn-Out Calculation

131. Mr. Kovach is a certified public accountant, well-versed in generally accepted accounting principles.  (Tr. 863-64.)

132. Mr. Kovach used appropriate accounting methods when calculating the recurring monthly revenue for purposes of the Earn-Out Notice.  LivePerson's outside auditors reviewed the earn-out calculations and had no comment.  (Tr. 868-69.)

133. As a publicly-traded company, LivePerson subjects its numbers and financial reports to auditors on a periodic basis and is required to comply with GAAP.  LivePerson is also subject to various deadlines and reporting requirements imposed by the U.S. Securities and Exchange Commission ("SEC").  (Tr. 865.)

134. Mr. Bixby testified that LivePerson's financial statements are prepared in accordance with GAAP and are regularly audited by outside public auditors to ensure compliance with GAAP.  (Tr. 760.)  There is no evidence that LivePerson manipulated its accounting treatment of any of the relevant entries in order to affect the earn-out calculation.

## 2. GEICO

135. One half (50%) of the $12,500 "risk premium fee" that LivePerson charged to GEICO in March, 2007 under Addendum #2 to the GEICO contract — or $6,250 — was appropriately excluded from the earn-out calculation because this portion of the risk premium fee was a contingent prepayment that could not properly be recognized until September, 2007 at the earliest. Accordingly, the earn-out calculation for GEICO was correct as stated in the Earn-Out Notice.

136. Proficient and GEICO executed a Subscription Agreement on December 30, 2003.  (DX-1 at LP0000283.)

137. Addendum #2 to the 2003 Subscription Agreement, dated February 28, 2007 ("GEICO Addendum #2"), extended the term of the agreement until September 1, 2007.  The Extended Term Fees include a "Base Fee" of $50,000 per month for "Existing Functionality on the Proficient Platform" and other services, and a "Risk Premium" fee of $12,500 per month for "Extended Hosting on Proficient Servers."  The risk premium fee was added to offset the cost of continuing to host GEICO on Proficient servers, even though other customers had been moved over to LivePerson's platform.  (PX-129 at LP0000293; Tr. 403.)

138. Mr. Kovach testified that when Addendum #2 was executed, "GEICO was still on Proficient's platform, their technology, so LivePerson was incurring incremental costs to

keep those servers up and running.  So we had wanted GEICO to migrate off of that platform and move on to a LivePerson network and GEICO was hesitant so we were incurring incremental fees and we wanted to charge them for those fees.  We were passing those on to them."  (Tr. 883.)

139. Section (B)(2) of GEICO Addendum #2 provides that 50% of the "risk premium fees" of $12,500 per month charged to GEICO will be "credited forward" to GEICO in the event that GEICO elects to renew the Subscription Agreement for an additional one-year commitment no later than 60 days before the end of the extended term. (PX-129 at LP0000291.)

140. LivePerson booked $56,250 of the $62,500 invoiced to GEICO in March, 2007, and accordingly included that amount in the earn-out calculation.  $50,000 of that amount was the "Base Fee," provided for in GEICO Addendum #2, and the remaining $6,250 represented 50% of the $12,500 monthly "risk premium" provided for under the GEICO agreement — the portion that was not subject to the "credit forward" provision.  (PX-129 at LP0000293; PX-203 at PL0000344; DX-166; Tr. 411-12, 961.) However, the remaining $6,250 of the monthly "risk premium" fee that was subject to the "credit forward" provision was not included in the earn-out calculation.  The parties dispute whether this amount was appropriately excluded.

141. Mr. Kovach testified that "of the $12,500 total risk premium, [LivePerson] had earned and recognized half of that, $6,250, and for each month from March up through September while we continued to bill it we had pushed it to deferred revenue on the balance sheet and did not recognize one half of that fee, the other $6,250." (Tr. 884.)

142. In order to recognize revenue by a service entity, the seller's price must be fixed or determinable.  Professor Stephens testified that GAAP requires that four criteria be satisfied in order to recognize revenue:

> You have to have persuasive evidence of an arrangement is the first.  And that each individual company gets to choose what they say is persuasive evidence of arrangement.  You have to have provided the services or delivered the product depending upon whether it's a product or service arrangement.  You have to have a fixed or determinable amount for the revenue to be recognized and you have to have a high probability of cash receipt.

(Tr. 956-57.)

143. Mr. Love testified that "[t]he GEICO accounting issue was whether or not you had in this specific instance a fixed or determinable fee.  I think everyone agreed that all of the other three major criteria had been met. The question was was this a fixed or determinable fee."  (Tr. 402.)

144. Mr. Kovach testified that "the second $6,250, the amount that was deferred, did not meet all of the revenue recognition criteria, in this case primarily was our fee fixed or determinable."  (Tr. 885.)

48

145. As of March 31, 2007, GEICO had not decided either to renew or not to renew the Subscription Agreement.

146. Mr. Kovach testified that GEICO Addendum #2 "left GEICO with several options and as of March 2007 . . . we didn't know what option they would elect come September 2007, so accounting treatment couldn't be determined until they elected one of the options." (Tr. 886).  Mr. Kovach testified that "[b]ecause of the wording of the agreement that second $6,250 is deemed a contingency according to GAAP and [LivePerson] had no right to recognize the revenue because of the contingency." (Tr. 884).

147.  Mr. Kovach explained persuasively that:

> GAAP doesn't want you to ever be in a situation where you will have to credit forward effectively reversing something that was previously recognized.  Because what we can say to exaggerate the point is pay me $1 million today and in a year I will credit forward and give you free services.  The effect of that fake transaction would be to accelerate $1 million of revenue into a current period which is what a software company would love to have higher earnings.  You just can't recognize revenue if you may at a later time have to give it back, and in this case the revenue recognition criteria that that triggers is the fixed or determinable fee.  We didn't know if we were going to earn the full $62,000 or if we are going to earn only the $56,000 at that particular time.

(Tr. 887.)

148. Professor Stephens testified that the amount that LivePerson earned from GEICO:

> was not fixed or determinable because it was not clear, and [Mr. Kovach] said contingent to be precise, and that is what we would call it.  It was not clear when that was

49

> earned.  It would either be earned if they did not sign a
> 12-month contract by September 1 or when they were notified
> that they were not going to sign that contract, or
> otherwise it would be treated as a prepayment of fees that
> would be earned actually in the period September through
> November.

(Tr. 960.)

149. Professor Stephens testified that the "credit forward
provision" should be characterized "as effectively a prepayment
rather than as revenue which is earned in the current period but
it's contingent because they only get that if they go forward
with the 12 month extension and if they don't go forward, then
all the revenue comes in at the time in which they make the
determination not to go forward."  (Tr. 1027.)

150. Professor Stephens testified that the proper amount to
recognize in the earn-out as recurring monthly revenue for
March, 2007 was "[t]he $50,000 of the monthly fee plus the one
half of what is variously called in one place risk premium,
which is the amount that is not subject to any contingency."
(Tr. 961.)

151.  GEICO eventually cancelled its contract with
LivePerson but not until September, 2007.  (Tr. 888.)

152. In September, 2007, when LivePerson learned that GEICO
had cancelled its contract, LivePerson properly booked the
$6,250 in revenue.

153.  Mr. Kovach testified that "on September 2nd all of
the criteria for revenue recognition ha[d] effectively been met

because the campaign has no further obligations to GEICO because of the cancellation so at that point in time in the month of September [LivePerson] recognized all previously deferred fees." (Tr. 889.)

154. Accordingly, $6,250 was appropriately excluded from the earn-out calculation because it was contingent revenue, and not recognizable as revenue in March, 2007, and in fact was not booked as revenue in March, 2007 by LivePerson, according to GAAP. (Tr. 886).

### 3. HBOS

155. For purposes of the HBOS earn-out calculation, LivePerson erred by failing to include a portion of the $2,176 foreign currency adjustment that Liveperson recognized in March, 2007. While the parties dispute the amount of the adjustment that should have been included in the earn-out calculation, Proficient's calculation of $703 is more reasonable than Liveperson's calculation of $182. Therefore, Liveperson underpaid the Proficient shareholders by $703, which, applying the formula in the Merger Agreement, yields an underpayment of 7,845 shares.

156. HBOS and LivePerson entered into a Services Agreement, effective August 15, 2006. Under Addendum #3 to that agreement, LivePerson issued an invoice to HBOS in December, 2006 for its annual fee, covering the one-year period between December 4,

2006, and December 3, 2007. This invoice billed $137,880 for this one-year service period.  (DX-55 at LP0000832, LP0000848; PX-92.)

157.  The December, 2006 annual fee invoice used an exchange rate of 1.9 to convert British pounds to United States dollars. The December invoice lists an exchange rate of 1.8, but the parties agree that $137,880 actually reflects an exchange rate of 1.9. (PX-92; Tr. 429, 982.)  When LivePerson received payment in March, 2007, it received $2,176 more than the $137,880 previously recorded due to a change in the foreign exchange rate.  The additional $2,176 was recorded on a placeholder invoice.  (Tr. 914-15, 983.)

158.  Mr. Kovach testified that "the amount of U.S. dollars that actually cleared the bank [in March, 2007] was greater than the receivable that we had created through the December invoice. So we made a bookkeeping entry, if you will, to create a second invoice just so that there was a place to put the full amount of U.S. dollars that was actually received . . . ."  (Tr. 914.)

159.  Professor Stephens testified that LivePerson generated a second invoice in March because when LivePerson received the British pounds and converted them to United States dollars, it had $2,176.32 more than it had previously recorded.  (PX-154; Tr. 983.)

160. LivePerson booked $13,666 of total revenue for HBOS in March, 2007, including $11,490 for the recurring Base Monthly Fee, and $2,176 for the foreign currency exchange rate adjustment, which was a one-time revenue adjustment that applied to the entirety of the twelve-month contract. (SF 25; DX-55 at LP0000849; Tr. 917.)

161. Mr. Kovach testified that LivePerson recognized all of the foreign currency exchange rate adjustment in March because it was immaterial for financial statement purposes to correct retroactively prior months' revenue, or to defer portions of the revenue over the remainder of the contract. (Tr. 917.)

162. LivePerson included the base monthly fee of $11,490 in the earn-out calculation but failed to include any of the $2,176 foreign currency exchange rate adjustment in the earn-out. (DX-165; PX-203 at PL0000344; Tr. 915.)

163. The issue is how to account for the additional $2,176 for purposes of the earn-out calculation. LivePerson concedes that it was error not to include a portion of the $2,176 in the revenue recognized in March, but it would include only one-twelfth of the total, or about $182, because it contends that the original underestimate was based on a mistake in the exchange rate, and that this was an error that should be corrected by spreading the correction over all of the months of the contract. (Tr. 983-87). This calculation is very

hypothetical because the alleged error was not material, and
LivePerson's accountants who were preparing their accounts
according to GAAP, a factor on which LivePerson relies in other
contexts, did not make such an adjustment. (Tr. 988-89). The
plaintiff argues, supported by its accounting expert, Mr. Love,
that there was a change in the estimated foreign exchange rate
that was made in March, 2007, and that the correct accounting
treatment was to recognize the three months that had already
occurred and then to continue to make the adjustment in the
following months.  This would, therefore, recognize three months
of adjustments, and result in recognizing $703 in March, 2007.
(Tr. 431-37).  Given that the parties agree LivePerson erred in
not including a portion of the exchange rate adjustment in the
revenue for March, 2007, and given that it would have been
unreasonable to restate revenues for the previous two months,
and LivePerson did not do so, the plaintiff's allocation of $703
is wholly reasonable.  Using the formula from the Merger
Agreement, the failure to include this amount resulted in an
underpayment of 7,845 shares to the Proficient shareholders.

## VII.  Damages

### A.  Underpayment

164. As detailed above, there were several instances where
LivePerson breached the Merger Agreement by failing to provide

LivePerson shares to the former Proficient shareholders that they were owed pursuant to the earn-out.

165.   LivePerson has counterclaimed for breach of the Merger Agreement based on alleged overpayments to the Proficient shareholders.   (Answer, Affirmative Defenses and Counterclaim of Defendant LivePerson, Inc., <u>Freishtat v. LivePerson, Inc.</u>, No. 07 Civ. 6838, at 9 (S.D.N.Y. Aug. 17, 2007), ECF No. 2.) LivePerson did provide shares to the plaintiff that were not owed under the Merger Agreement and LivePerson is entitled to credit for those shares.

166.   Totaling both the underpayment and overpayment of LivePerson shares to the Proficient shareholders described above yields a net underpayment of 8,526 shares.   Specifically: (1) LivePerson erroneously included $2,500 in the Earn-Out Notice for CorCell; (2) LivePerson failed to include $3,500 in revenue from Adobe Addendum #2; (3) a per diem calculation indicated that the Adobe Addendum #1 revenue in the earn-out calculation was overstated by $1,000; (4) a per diem calculation indicated that the Mark Travel revenue in the earn-out calculation was understated by $61; and (5) the HBOS revenue in the earn-out calculation should have included an additional $703.   Thus, in total, the March, 2007 revenue in the earn-out calculation was understated by $764 ($2,500 - $3,500 + $1,000 - $61 - $703 =

-$764), resulting in a total underpayment of 8,526 LivePerson shares to the Proficient shareholders, using the formula in the Merger Agreement.

167. When, as here, the breach of contract is the failure to deliver the correct number of shares of stock, the proper measure of damages is to determine the loss sustained or gain prevented at the time and place of breach.  Waxman v. Envipco Pickup & Processing Servs., No. 02 Civ. 10132, 2006 WL 1788964, at *2-3 (S.D.N.Y. June 28, 2006) (citing Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971)).

168. Here, the relevant date is May 11, 2007, which is the date when LivePerson delivered shares to the Proficient shareholders as reflected in the Earn-Out Notice.  (SF 17.) The closing price for LivePerson stock on May 11, 2007 was $6.52.  (SF 17; PX-240 at ¶ 47.)  Accordingly, the underpayment due the plaintiff is 8,526 shares multiplied by $6.52/share, which totals $55,590.

169. The LivePerson shares provided to Proficient were subject to trading restrictions and some discount should be assessed against the value of the shares.  The most reasonable discount presented to the Court is a discount of 5%.  (Tr. 282-84.)  Therefore, the discount is $2,780, and the total damages owed to the plaintiff is $52,810.

### B. Plaintiff Not Entitled to Bonus Shares

170.   The plaintiff is not entitled to an additional 50,000 shares under the terms of the Merger Agreement because it is plain that the Net Annualized Revenue did not equal or exceed $4,500,000, which would have been required for the Proficient shareholders to obtain the bonus.   (PX-30 at § 2.04(b)(i)(II).)

### CONCLUSIONS OF LAW

1.   To the extent that any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law.

2.   This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse.  See 28 U.S.C. § 1332.

3.   The Merger Agreement provides that it is governed by New York law.  (PX-30 at § 11.05.)  Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002).  Where a contract is unambiguous, it must be enforced according to its terms without resort to extrinsic evidence. See Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc., 674 F. Supp. 2d 458, 463 (S.D.N.Y. 2009).  However, where a contract is ambiguous, the court may look to extrinsic evidence to determine

the parties' intent.  See <u>Alexander & Alexander Servs., Inc. v.</u>
<u>Certain Underwriters at Lloyd's, London</u>, 136 F.3d 82, 86 (2d
Cir. 1998).

     4.    LivePerson breached its obligation to account properly
for Net Annualized Revenue as defined in the Merger Agreement
and to provide the amount of LivePerson shares that were
required to be provided under the Merger Agreement.

     5.    LivePerson did not breach its obligation to provide
the Shareholders' Representative with Supporting Documentation.

     6.    LivePerson is entitled to credit for the shares that
it provided in the earn-out that exceeded the amount of shares
it was required to provide under the Merger Agreement.

     7.    The plaintiff is entitled to recover $52,810 from
LivePerson, which is the amount of damages suffered from the
failure by LivePerson to provide the required LivePerson shares
under the Merger Agreement.  See <u>Waxman</u>, 2006 WL 1788964, at *2-
3 (citing <u>Simon</u>, 269 N.E.2d at 26).

## CONCLUSION

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.  The plaintiff should submit a proposed judgment in five (5) days.  The defendant may submit a counter-judgment two (2) days thereafter.

SO ORDERED.

Dated: New York, New York
  June 27, 2012

           John G. Koeltl
        United States District Judge